**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **KELVIN J. COCHRAN**, | |
| Plaintiff, | Case No. |
| v. | |
| **CITY OF ATLANTA, GEORGIA; and MAYOR KASIM REED, IN HIS INDIVIDUAL CAPACITY,** | **VERIFIED COMPLAINT** |
| Defendants. | **JURY DEMAND REQUESTED** |

Plaintiff, by and through counsel, and for his Complaint against the Defendants, hereby states as follows:

## INTRODUCTION

1.    Kelvin J. Cochran ("Cochran") is one of the most decorated fire fighters of our day.

2.    He achieved his childhood dream of becoming a firefighter, and rose to the highest fire service position in the United States when in 2009 President Barack Obama nominated, and the United States Senate confirmed, him to the post of U.S. Fire Administrator for the U.S. Fire Administration.

3.    Cochran left his position as Fire Chief of the Atlanta Fire and Rescue Department ("AFRD") when he became U.S. Fire Administrator.

4.      But the City of Atlanta and Mayor Reed soon realized how badly they needed Cochran's leadership at AFRD, so Mayor Reed "begged" Cochran to return to his post.

5.      Cochran agreed to leave the U.S. Fire Administration and returned to his position as Fire Chief of AFRD in 2010.

6.      Cochran faithfully led the AFRD for the next five years, attaining personal and departmental accolades along the way, including Fire Chief of the Year in 2012 and a Class 1 Public Protection Classification (PPC) rating for the first time in Atlanta's history on November 1, 2014.

7.      But just a few weeks later, the City and Mayor Reed suspended Cochran without pay and ultimately fired him on January 6, 2015.

8.      Why did Defendants decide to dismiss one of the most decorated firefighters of our day and deprive themselves and Atlanta's residents of his excellent service and leadership?  Because Cochran wrote and self-published a non-work-related, 162-page, religious book that expresses his religious beliefs about God's purpose for our lives.  A few passages concern sexual morality; namely, that God created sexual acts for procreation and marital pleasure in holy matrimony between a man and a woman and that the pursuit of sex outside of marriage—including fornication, homosexual acts, and all other types of non-marital sex—is contrary to God's will.

9.      During his seven years as Atlanta's Fire Chief, Cochran never discriminated against, and was never accused of discriminating against, anyone based on race, gender, sexual orientation, or any other protected characteristic.

10.      Nonetheless, Defendants fired Cochran.

11.     Defendants fired Cochran solely because he holds religious beliefs concerning same-sex marriage and homosexual conduct that are contrary to the Mayor's and the City's views on these subjects, and because he expressed those beliefs in the non-work-related, religious book he self-published.

12.     Defendants' actions put every City employee at risk of punishment, up to and including termination, simply for expressing religious beliefs on sexual morality that are similar to Cochran's.

13.     For these reasons, Cochran brings this case to protect his and others' constitutional rights to free speech, free exercise, freedom of association, equal protection, freedom from religious hostility, and due process under 42 U.S.C. § 1983.

## JURISDICTION AND VENUE

14.     This action arises under the United States Constitution, particularly the First and Fourteenth Amendments; and under federal law, particularly 28 U.S.C. §§ 2201, 2202; 42 U.S.C. §§ 1983 and 1988.

15.     This Court has original jurisdiction over Plaintiff's federal claims by operation of 28 U.S.C. §§ 1331 and 1343.

16.     This Court has authority to issue the requested declaratory relief under 28 U.S.C. § 2201.

17.     This Court has authority to issue the requested injunctive relief under FED. R. CIV. P. 65 and 28 U.S.C. § 1343(3).

18.     This Court is authorized to award the requested damages under 28 U.S.C. § 1343(3).

19.     This Court is authorized to award attorneys' fees under 42 U.S.C. § 1988.

20.     Venue is proper under 28 U.S.C. § 1391 in the Northern District of Georgia because this claim arose there and because, upon information and belief, all Defendants reside within the District.

<h2 style="text-align:center">IDENTIFICATION OF PLAINTIFF</h2>

21.     Kelvin J. Cochran ("Cochran") is a citizen of the United States and a resident of the City of Atlanta.

22.     Cochran is a devout Christian.

23.     Cochran is a member of Elizabeth Baptist Church in Atlanta, Georgia, and is a Deacon there.

<h2 style="text-align:center">IDENTIFICATION OF DEFENDANTS</h2>

24.     The City of Atlanta is a body politic which is able to sue and be sued in its corporate name.  *See City of Atlanta v. Brinderson Corp.*, 799 F.2d 1541, 1543 (11th Cir. 1986).

25.     The City has adopted the policies and procedures described herein and is responsible for their enforcement against Cochran.

26.     Kasim Reed is, and was at all times relevant to this Complaint, Mayor of the City of Atlanta.

27.     Mayor Reed is responsible for the City's administration and policy-making, including the policies and procedures described herein and for their enforcement against Cochran.

28.     Mayor Reed is sued in his individual capacity.

29.   The City acquiesces in, sanctions, and supports Mayor Reed's enforcement of the City's policies and procedures described herein against Cochran.

## STATEMENT OF FACTS

**Cochran's Background**

30.   Cochran was born and raised in Shreveport, Louisiana.

31.   Cochran's family was very poor and lived in low income, public housing in Shreveport.

32.   When he was very young, Cochran's father left his mother.

33.   Once Cochran's father left, Cochran, his mother, and his four brothers and two sisters could no longer afford to live in low income, public housing so they moved to a shotgun house in an alley.

34.   A shotgun house is a small home with a front, middle, and back room.  The front door and back door are lined up so when you open both you can see through the house and fire a shotgun from one door through the other, which is where the phrase "shotgun house" comes from.

35.   When he was five, Cochran's neighbor's house caught fire and the fire department came.

36.   Cochran and his family watched the firefighters put out the fire, and on that day Cochran's life-long dream to become a firefighter was born.

37.   Cochran's childhood experiences gave him two driving goals in life: to become a firefighter and to not be poor.

38.   The adults and mentors in his life at the time told him that he would achieve his dreams if he lived by a few simple, religious-based rules:

(1) believe in and have faith in God; (2) go to school; (3) respect your elders; and (4) treat others as you want to be treated.

39.     Cochran took these values to heart and has followed them throughout his life.

40.     In 1981, Cochran attained his dream when he was hired as a firefighter by the Shreveport Fire Department.

41.     Cochran was one of the first African-Americans hired by the department.

42.     Cochran faced numerous obstacles and difficulties at work because of his race.

43.     But Cochran believed that if he practiced the same religious values he had been taught as a child, and demonstrated passion and dedication for the department and his colleagues, that he could overcome any racial barriers.

44.     Cochran was right and he was promoted to a training officer in 1985.

45.     As a training officer, Cochran initially trained new firefighter recruits on operating trucks, hoses, etc.

46.     Eventually, Cochran started providing leadership training to other officers, which ignited a life-long passion for training officers and other leaders.

47.     In 1990, Cochran was promoted to Assistant Chief Training Officer.

48.     In this position, Cochran managed and conducted training programs for fire department officers.

49.     In 1999, he was appointed Fire Chief of the Shreveport Fire Department.

50.     He had an exemplary record as Shreveport's Fire Chief.

51.     In January 2008, he was appointed Fire Chief of the Atlanta Fire Rescue Department by then mayor Shirley Franklin.

52.     In 2009, President Obama nominated, and the Senate confirmed, Cochran to the post of U.S. Fire Administrator for the U.S. Fire Administration in the Washington, D.C. area.

53.     The U.S. Fire Administration is a component of the U.S. Department of Homeland Security's Federal Emergency Management Agency ("FEMA").

54.     Its mission is to provide national leadership to foster a solid foundation for fire and emergency services stakeholders in prevention, preparedness, and response.

55.     The U.S. Fire Administrator is the highest ranking fire official in the nation.

56.     As U.S. Fire Administrator, Cochran oversaw, coordinated and directed national efforts to prevent fires and improve fire response and led fire prevention and safety education programs and professional development opportunities for emergency responders.

57.     Only ten months after Cochran was appointed U.S. Fire Administrator, Mayor Reed "got on a plane and …went and …begged Chief Cochran to leave a presidential appointment confirmed by the Senate to come back to the City of Atlanta."   Mayor Kasim Reed 2014 State of the City Address, http://www.atlantaga.gov/index.aspx?page=1114.

58.    Cochran agreed and resumed his duties as Fire Chief of the Atlanta Fire Rescue Department in 2010.

59.    He held that position until he was fired on January 6, 2015.

60.    In 2012, Cochran was awarded Fire Chief of the Year by *Fire Chief* magazine at the International Association of Fire Chief's Fire-Rescue International Conference.

61.    Mayor Reed issued a press release congratulating Cochran on the award and highlighting his exceptional leadership of Atlanta's Fire Rescue Department.

62.    The Mayor's press release included the following summary of Cochran's achievements:

> Under Chief Cochran's leadership, the department has seen dramatic improvements in response times and staffing. In July, the department reached full staffing of four firefighters per engine and zero vacant firefighter positions for the first time in the history of the department. The department also reached a new level of responsiveness on fire emergencies, meeting the National Fire Protection Association Codes and Standards for response coverage 81% of the time, up from 65% in 2010.

Press Release, Kelvin J. Cochran Awarded Fire Chief of the Year, http://www.atlantaga.gov/index.aspx?recordid=1228&page=672.

63.    Mayor Reed thanked Cochran for his "pioneering efforts to improve performance and service within the Atlanta Fire Rescue Department," applauded "Chief Cochran and all of Atlanta's brave firefighters for the commitment to excellence shown throughout the department," and recognized that Cochran's "national recognition" as Fire Chief of the Year was "much-deserved." *Id.*

64.     Under Chief Cochran's leadership, the Insurance Services Office gave the city a Class 1 Public Protection Classification (PPC) rating for the first time in Atlanta's history.    News Release, Atlanta Fire Rescue Department Announces Upgrade in City's ISO Rating to Class 1, http://www.atlantaga.gov/index.aspx?recordid=3015&page=672.

65.     The Class 1 rating went into effect on November 1, 2014.

66.     The rating "indicates an exemplary ability to respond to fires," resulted in insurance premiums being lowered throughout the City, and is a rating shared by only 60 cities nationwide.  *Id.*

**Cochran's Religious Beliefs and Self-Published Book**

67.     Cochran is an evangelical Christian who holds to historic Christian beliefs.

68.     Cochran is a member of, attends, and is a Deacon at Elizabeth Baptist Church.

69.     Cochran frequently teaches Sunday school, teaches or facilitates men's Bible studies, and has preached from the pulpit at his and other churches.

70.     Cochran's sincerely held religious beliefs include a historical Christian view of vocation and work.

71.     Cochran's historical Christian view of vocation and work compels him to honor God in all aspects of his work by doing everything with excellence throughout his job.

72.     Cochran believes that performing his public, secular job with excellence results in the private, religious benefit of bringing God glory.

73.    Cochran's religious beliefs also compel him to treat all fire department staff under his command, and all members of the community he serves, with dignity, justice, equity, and respect, regardless of their personal traits, characteristics, and beliefs.

74.    Cochran's religious beliefs thus require him to run an inclusive fire department that respects the diverse traits, characteristics, and beliefs of all his employees.

75.    In fact, Cochran's leadership and management philosophy is centered on ensuring that every member of a fire department he leads is treated with dignity, justice, equity, and respect, regardless of any personal characteristic that sets them apart.

76.    In 2008, when Cochran first became Atlanta's Fire Chief, he set out to achieve this goal by instructing his subordinates to assemble a group of firefighters that fully represented the diverse backgrounds, characteristics, and beliefs within AFRD.

77.    Cochran knew that at least two LGBT employees were members of this group.

78.    Cochran then worked with this group to develop a vision, mission, and governing philosophy for AFRD.

79.    This process resulted in a document called the Atlanta Fire Rescue Doctrine.

80.    Cochran followed this procedure for developing the fire department's policies and procedures because he believes it is the best way for him to discharge his duty to God that he treat every employee within a

fire department with dignity, justice, equity, and respect—thereby cultivating an inclusive culture and high-level of performance that glorifies God.

81.    Cochran personally experienced being treated differently based on his race during his early years within the fire service.

82.    He has worked diligently throughout his career to ensure that no one under his command is mistreated because of their membership in a particular group.

83.    In 2012, Cochran was facilitating a men's Bible study at his Church.

84.    One unit in the study focused on God's purpose for men.

85.    This unit included teaching on God's question to Adam in Genesis, "Who told you that you were naked?" *See* Gen. 3:11.

86.    Cochran thought about this question often after facilitating the study and eventually felt led by God to study every reference in the Bible to the word "naked."

87.    Cochran then did a second study searching for every reference in the Bible to the word "clothed."

88.    After completing these word studies, Cochran felt led by God to write a Bible study that reflected his findings and observations.

89.    Shortly after starting to write the Bible study, Cochran discovered that he had enough information to write a book.

90.    Over the next year, Cochran worked on the book at home early in the mornings and on weekends as well.

91.    Cochran finished the book in the Fall of 2013 and it was self-published in late 2013.

92.     The book is titled *Who Told You That You Were Naked?:
Overcoming the Stronghold of Condemnation.*

93.     The book is written primarily for men, and is intended to help
them fulfill God's purpose for their life.

94.     The book's primary goal is to guide men on how to overcome the
stronghold of condemnation, to walk in the fullness of salvation, and to live a
faith-filled, virtuous life.

95.     The book is not about sexual morality.

96.     The book does, however, address sexual morality on a few of its
162 pages.

97.     Sex is one of several areas in which many men struggle.

98.     The book teaches that God created sexual acts for procreation
and marital pleasure in holy matrimony between a man and a woman.

99.     This teaching is consistent with the Bible and historic Christian
teaching.

100.    The book teaches that pursing sex outside the confines of
marriage between a man and woman—including fornication, homosexual
acts, and all other types of non-marital sex—is contrary to God's will.

101.    This is also consistent with the Bible and historic Christian
teaching.

102.    The book is 162 pages long.

103.    It addresses Biblical standards of sexual morality on
approximately 6 pages.

104.    The rest of the book deals with Christian teaching concerning
original sin and the ability of Christians to overcome the influence of sin in

their lives through fully embracing and understanding the sacrifice of Jesus Christ.

105.   At around the same time he set out to write the book, Cochran contacted Nina Hickson, the City of Atlanta Ethics Officer.

106.   He asked Ms. Hickson whether a currently serving city official could write a non-work-related, faith-based book.

107.   Cochran explained the religious theme of the book to Ms. Hickson.

108.   Ms. Hickson responded that so long as the subject matter of the book is not the city government or fire department he could write the book.

109.   Ms. Hickson also asked Cochran for a copy of the book once it was completed.

110.   When Cochran was close to completing the book, he called Ms. Hickson again and inquired whether it would be permissible for him to state that he was Atlanta's Fire Chief in the "About the Author" section.

111.   Ms. Hickson responded in the affirmative.

112.   Therefore, Cochran added a phrase to the About the Author section that states that he "is currently serving as Fire Chief of the City of Atlanta Fire Rescue Department (GA)."

113.   This statement is merely autobiographical, as is the rest of the About the Author section.

114.   Cochran did not write or publish the book in his capacity as AFRD Fire Chief.

115.   The book expresses his personal religious beliefs.

116.   The book resulted from private religious study undertaken for his church.

117.   In January 2014, Cochran provided a copy of the book to Mayor Reed's executive assistant, Lilly Cunningham, at a reception at the Mayor's office.

118.    Cochran asked her to make sure the Mayor received it.

119.   A few weeks later, Cochran attended the Mayor's 2014 State of the City address.

120.   At this event, Cochran asked Mayor Reed if he had received a copy of his book.

121.   Mayor Reed confirmed that he had received a copy of Cochran's book.

122.   Mayor Reed told Cochran that he planned to read it on an upcoming flight.

123.   In late January 2014, Cochran provided copies of his book to three members of the Atlanta City Council:  President Caesar Mitchell and Councilmembers Ivory Young and C.T. Martin.

124.   All three of these individuals are still on the City Council.

125.   Cochran gave the book to these Councilmembers when they visited a joint command center the City had set up to deal with a winter storm disaster that hit Atlanta in late January 2014.

126.   Between January and March 2014, Cochran also handed out a few copies of his book to AFRD employees as a free gift.

127.  In January 2014, Cochran gave the book to 10 AFRD employees who he knew were Christians, who knew he was writing the book, and who had requested to receive copies of it upon completion.

128.  Cochran also gave the book to approximately 3-5 additional employees who approached him and requested a copy of the book after learning of it from the initial employees who had received copies.

129.  Cochran also provided copies of the book as a free gift to three command level AFRD employees—Chief Christopher Wessels; Chief William Collier; and Battalion Chief Stephen Hill.

130.  Wessels, Collier, and Hill had previously shared their Christian faith with him.

131.  Cochran gave a copy of the book to Chief Collier (who was a former AFRD Chaplain) in January 2014.

132.  Cochran gave a copy of the book to Chief Wessels in late June or early July 2014.

133.  Cochran gave a copy of the book to Battalion Chief Hill in October 2014.

134.  This was the final time Cochran gave a free copy of the book to an AFRD employee.

135.  Cochran did not convey to any AFRD employees who received his book that reading or following the teachings of his book was in any way relevant to their status or advancement within AFRD.

**The City Suspends Chief Cochran Without Pay**

136.  Between January 2014 when Cochran began giving out a few free copies of his book to AFRD employees and his suspension in November 2014,

15

no AFRD employees raised any complaints whatsoever to Cochran about his book.

137. During this time frame, Cochran's book caused no disruption with any city practices or procedures or in the workplace at all.

138. However, on the evening of Thursday, November 20, 2014, Cochran received a phone call from the Commissioner of the Office of Constituent Services, Andrea Boone, and approximately 10 minutes later, a phone call from Chief of Police, George Turner.

139. Ms. Boone and Chief Turner informed Cochran that someone from AFRD had shown a few passages of his book to City Councilmember Alex Wan.

140. Mr. Wan is openly gay.

141. Specifically, the AFRD member apparently showed Councilmember Wan the few passages of the book concerning sexual morality and told Councilmember Wan that these passages were opposed to his beliefs on the subject.

142. Boone and Turner also informed Cochran that Councilmember Wan brought these sections of the book to the attention of the City's Human Resources Commissioner, Yvonne Yancey.

143. In addition, Boone and Turner informed Cochran that a meeting had been held involving Chief Operating Officer Mike Geisler, City Attorney Cathy Hampton, Yvonne Yancey, Mayor Reed's Deputy Chief of Staff Katrina Taylor-Parks, and Mayor Reed's Senior Advisor Melissa Mullinax.

16

144.   The consensus of this meeting was that a meeting with Mayor Reed was necessary and that a recommendation would be made for Cochran's termination.

145.   A few days later, on November 24, 2014, the City suspended Cochran for 30 days without pay.

146.   The City suspended Cochran because of the religious views expressed in his book.

147.   The City issued the suspension prior to any City official even speaking to Cochran to confirm the facts related to the situation.

148.   The City provided Cochran a letter advising him of his suspension on November 24, 2014.

149.   The letter did not provide any details regarding why he was suspended.

150.   The letter merely said that it was "being issued to you for your performance of an action that constitutes a 'cause of action' as outlined in Section 114-528 of the Code of Ordinances City of Atlanta."

151.   Sec. 114-528(b) provides 21 separate ways in which a City employee can be found to have committed a "cause of action."

152.   The City's letter did not advise Cochran which of these 21 provisions he had violated.

153.   The letter did not advise Cochran of what conduct he had engaged in that caused the violation.

154.   In a statement issued November 24, 2014 concerning Cochran's unpaid suspension, Mayor Reed stated that he "was surprised and disappointed to learn of this book on Friday."

155. Mayor Reed, in fact, had received a copy of the book 10 months earlier, in January 2014.

156. In his statement, Mayor Reed confirmed that the City suspended Cochran without pay because of the religious beliefs expressed in his book and because those beliefs differed from the Mayor's and City's beliefs.

157. Specifically, Mayor Reed stated: "I profoundly disagree with and am deeply disturbed by the sentiments expressed in the paperback regarding the LGBT community."

158. Mayor Reed also stated, "I want to be clear that the material in Chief Cochran's book is not representative of my personal beliefs, and is inconsistent with the Administration's work to make Atlanta a more welcoming city for all of her citizens – regardless of their sexual orientation, gender, race and religious beliefs."

159. Mayor Reed also stated on his Facebook page that "[t]he contents of the book do not reflect the views of Mayor Reed or the Administration."

160. The City permits Mayor Reed, City Councilmember Wan, and other City employees, including employees within the AFRD, to freely express views favorable of same-sex marriage and homosexual conduct inside and outside of work without fear of adverse action by the City.

161. However, Cochran, and other City employees who agree with Cochran's religious views regarding same-sex marriage and homosexual conduct, are under a constant state of threat of the City taking adverse action against them—up to and including termination—if they express those views inside and outside of work.

162.   Mayor Reed also announced that Cochran would "be required to complete sensitivity training."

163.   The sensitivity training was solely targeted at reforming Cochran's religious beliefs.

164.   The City had no evidence whatsoever that Cochran had engaged in discriminatory conduct as AFRD Fire Chief.

165.   The only thing he had done was self-publish a book that expressed his religious beliefs.

166.   Councilmember Wan further confirmed that the City suspended Cochran without pay because his religious beliefs were contrary to the City's beliefs.

167.   Wan made the following statement to the Atlanta Journal Constitution:  "I respect each individual's right to have their own thoughts, beliefs and opinions, but when you're a city employee, and those thoughts, beliefs and opinions are different from the city's, you have to check them at the door."

168.   During his seven years as Atlanta's Fire Chief, Cochran never discriminated against, and was never accused of discriminating against, anyone based on race, gender, sexual orientation, or any other protected characteristic.

**The City Fires Cochran**

169.   Despite Cochran never having discriminated against LGBT or any other AFRD employees based on any protected characteristic, the City fired Cochran on the day his unpaid suspension ended, which was January 6, 2015.

19

170.   In writing and publishing his non-work-related, religious book, Cochran complied with all Atlanta Ordinances and policies.

171.   Specifically, Atlanta Code of Ordinances Sec. 2-820(d) states the following:

> Commissioners, deputy commissioners, department heads, chief operating officer, deputy chief operating officers, chief of staff, deputy chiefs of staff, bureau directors, and employees of the office of the mayor who report directly to the mayor shall not engage in any private employment or render any services for private interests for remuneration, regardless of whether such employment or service is compatible with or adverse to the proper discharge of the official duties of such employee. However, the employees named in this paragraph may engage in private employment or render services for private interests only upon obtaining prior written approval from the board of ethics in accordance with this paragraph. The board of ethics shall review each request individually and provide written approval or disapproval of the notification within 30 days. All requests for approval of outside employment shall state the type and place of employment, the hours of work, and the employer's name and address. City employment shall remain the first priority of the employee, and if at any time the outside employment interferes with city job requirements or performance, the official or employee shall be required to modify the conditions of the outside employment or terminate either the outside employment or the city employment. This paragraph shall not apply to single speaking engagements or to participation in conferences or on professional panels; provided, however, that any expense reimbursements received for such engagements must be reported in accordance with section 2-815.

172.   On its face, Sec. 2-820(d) does not apply to a covered employees' self-publication of a non-work-related, religious book.

173.   Nonetheless, out of the abundance of caution, as alleged above in ¶¶ 105-09, Cochran did ask the City's Ethics Officer whether a currently

serving city official could write a non-work-related, faith-based book and she said that he could.

174.   Further, Sec. 2-820(d) contains no criteria or standards to guide the City's Ethics Officer in determining whether a covered employee's request should be submitted to the Board of Ethics.

175.   Nor does it contain criteria or standards to guide the Board of Ethics in determining whether to approve or deny a covered employee's request to engage in "private employment or render services for private interests."

176.   The City could not constitutionally require Cochran to obtain City permission before writing his non-work related, religious book.

177.   Neither Sec. 2-820(d) nor any other City policy or regulation requires any City employee to get the Mayor's permission before they can write and publish a non-work related book.

178.   Any such requirement would, like Sec. 2-820(d), be an impermissible prior restraint on the non-work-related speech of government employees.

179.   During his thirty day suspension, Cochran was approached by several media outlets for comment.

180.   He did not do interviews or make public statements.

181.   Instead, he told members of the media that he could not speak to them about the situation until after his thirty-day suspension.

**The City Fails to Follow Proper Procedure**

182.   Under Atlanta Code of Ordinances Sec. 114-528, City employees, including the AFRD Fire Chief, cannot be fired or otherwise adversely affected as to compensation or employment except for cause.

183.   Atlanta Code Sec. 114-526 states that "[t]he city supports a process in which disciplinary action is applied in several steps of increasing severity.  The usual sequence of progressive discipline is oral admonishment, written reprimand, suspension and dismissal. The progressive disciplinary process affords the employee the opportunity to correct behavior or inadequate job performance with the minimum level of discipline applied at each step."

184.   The City did not follow this progressive discipline approach with Cochran.

185.   The City immediately fired him after a short suspension without cause.

186.   According to Atlanta Code Sec. 114-529(c), the disciplinary actions taken against Cochran—suspension without pay and dismissal—are both "adverse actions."

187.   Atlanta Code Sec. 114-529(c) states the City may impose adverse actions only in compliance with the procedural requirements set out in Sec. 114-530.

188.   Sec. 114-530(a) states that an employee against whom an adverse action is to be taken "shall be given a written notice of proposed adverse action, signed by the appointing authority or designee, at least ten working days prior to the effective date of the proposed adverse action."

189.   Sec. 114-530(b) states that the written notice must contain: (1) the proposed action to be taken; (2) the effective date of the proposed action, which must be at least 10 days after the notice is received by the employee; (3) specific and detailed charges and the reasons for the adverse action; (4) a statement that the employee has a right to respond in writing to the charges or to appear before the person who has authority to affirm or modify the proposed adverse action, with a representative if desired; and (5) a statement that the employee's failure to respond within the specified time frame is a waiver of all future rights of appeal.

190.   The City did not provide Cochran the required written notice 10 days both prior to suspending him without pay on November 24, 2014, and prior to dismissing him on January 6, 2015.

191.   The City provided Cochran a letter at the time of his suspension on November 24, 2014, the subject line of which read:  "Notice of Thirty (30) Day Suspension Without Pay."

192.   The written suspension letter failed to comply with each of the five (5) requirements for a notice of adverse action set out above.

193.   The City did not provide any written communication notifying Cochran of his dismissal on January 6, 2015.

194.   The City failed to comply with the five (5) requirements for a notice of adverse action in relation to his firing as well.

195.   Instead of providing the required written notice, city officials, including Chief Operating Officer Mike Geisler, Human Resources Commissioner Yvonne Yancey, and City Attorney Robert Godfrey, met with

Cochran on January 6, 2015 and informed him that he could resign or be terminated.

196.   At the meeting, Cochran explained his perspective on the situation and, believing that there was sufficient evidence available to exonerate him of all charges of wrongdoing, asked Mr. Geisler if he could meet with Mayor Reed to plead his cause.

197.   Mr. Geisler responded that a meeting with the Mayor was not an option.

198.   Cochran believed that he did nothing wrong and that if he had been provided an opportunity to respond he would have been exonerated.

199.   Cochran did not resign.

200.   Defendants terminated Cochran's employment on January 6, 2015.

201.   The City did not provide Cochran any meaningful opportunity to respond to both adverse actions taken against him (suspension without pay and dismissal).

202.   Atlanta Code Sec. 114-530(c) states that an "employee shall be given the opportunity to respond to charges before the appointing authority or designee who has authority to affirm or modify the proposed adverse action."

**Cochran Files EEOC Complaint**

203.   Cochran filed a complaint with the Equal Employment Opportunity Commission on January 19, 2015.

204.   Cochran alleged that the City violated Title VII by firing him on the basis of his Christian religion.

205.   Cochran will amend this Complaint to add a Title VII claim once the EEOC issues him a right to sue letter.

**Cochran Loses Job Opportunity in Louisiana**

206.   In late October or early November 2014, Cochran was contacted by the Mayor of another city.

207.   The Mayor wanted Cochran to serve in that city as Assistant Chief Administrative officer.

208.   Cochran indicated his interest and was in negotiations with the Mayor to secure the position.

209.   However, shortly after the City suspended Cochran from his position on November 24, 2014, the other Mayor rescinded the offer and told him it was because of the circumstances surrounding his suspension.

## ALLEGATIONS OF LAW

210.   The government cannot discriminate against or punish employees because of their religious beliefs or speech.

211.   Defendants terminated Cochran for holding historical Christian beliefs about marriage and sexuality and making those views known in a self-published, non-work-related, religious book.

212.   Public employees do not renounce their citizenship when they accept government employment.

213.   Public employers may not condition government employment on the relinquishment of constitutional rights.

214.   Speech by citizens on matters of public concern lies at the heart of the First Amendment.

215.   Government employers cannot extend their reach to censor employees' religious expression that is unrelated to their work.

216.   Cochran has the constitutional right to believe as he will and to act and associate according to his religious beliefs.

217.   Government employees have a First Amendment right to distribute religious materials at work in a non-coercive manner.

218.   Defendants terminated Cochran for exercising those rights.

219.   All of the acts of the Defendants, their officers, agents, employees, and servants, were executed and are continuing to be executed by Defendants under the color and pretense of the policies, statutes, ordinances, regulations, customs, and usages of the State of Georgia.

220.   Cochran is suffering economic injury and irreparable harm from the conduct of the Defendants.

221.   Unless the Defendants' policies and practices challenged herein are enjoined, Cochran will continue to suffer economic and irreparable injury.

## FIRST CAUSE OF ACTION
### First Amendment Right to Freedom of Speech: Retaliation
### (42 U.S.C. § 1983)

222.   Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1-221 of this Verified Complaint.

223.   The Free Speech Clause of the First Amendment, incorporated and made applicable to the states by the Fourteenth Amendment, protects the right of government employees to speak as citizens on matters of public concern.

224. The Free Speech Clause of the First Amendment, incorporated and made applicable to the states by the Fourteenth Amendment, also protects the right of government employees to speak as citizens on matters unrelated to their work.

225. Cochran wrote and published his book, which discusses historical Christian beliefs about marriage and sexuality among a wide variety of other religious subjects, outside of work in his personal time and with his personal funds.

226. Religious speech, including speech reflecting historical Christian beliefs about marriage and sexuality, is of concern to the public at large.

227. Cochran's book reflected religious study that he conducted in order to teach spiritual lessons at his church.

228. Cochran intended his book to help members of his church and other members of the public resolve common spiritual struggles with sin.

229. Religious speech enjoys a form of First Amendment protection and is central to the meaning and purpose of the First Amendment, as evidenced by the Free Speech and Establishment Clauses.

230. Cochran's book, as religious expression, was completely unrelated to his government employment.

231. Cochran's religious expression did not threaten the City's ability to administer public services and was not likely to do so.

232. Cochran's religious expression did not interfere with the fire department's internal operations or with internal order and discipline and was not likely to do so.

233.  Cochran's interest in engaging in religious teaching and other religious expression as a citizen outweighs any legitimate interest Defendants may have in promoting the efficiency of public services.

234.  Defendants unlawfully terminated Cochran because his protected religious expression contained a belief about marriage and sexuality with which they disagreed.

235.  Cochran at all times performed his duties at work in a satisfactory manner.

236.  Cochran's protected religious expression about marriage and sexuality was the sole reason Defendants terminated his employment.

237.  Defendants would not have terminated Cochran's employment in the absence of his protected religious expression about marriage and sexuality.

238.  Defendants' termination of Cochran, who is a registered Democrat like the Mayor, was not based on his party affiliation or political beliefs.

239.  Because Cochran's protected religious expression concerned spiritual topics unrelated to his job, Defendants must overcome strict scrutiny to justify censoring his speech.

240.  As Cochran's protected religious expression concerned spiritual topics unrelated to his job, Defendants cannot rely upon their disagreement with, or the unpopularity of Cochran's message, to justify discharging him for his speech.

241. Nor can Defendants rely upon some community members' dislike of Cochran's message to justify censorship of his expression, as that would constitute an impermissible heckler's veto of protected religious speech.

242. But pursuant to their policies and practices, Defendants discharged Cochran because he expressed his religious beliefs and viewpoints in a book that he wrote and published in his private capacity as a citizen on spiritual matters of public concern.

243. In so doing, Defendants have, by policy and practice, retaliated against Cochran because of his religious expression and deprived him of his First Amendment right to freely express his beliefs about issues of public concern that are unrelated to his job.

244. Defendants have no rational interest, let alone a compelling interest, in terminating Cochran based on his expression of personal religious beliefs about marriage and sexuality.

245. Defendants' policies and practice are not narrowly tailored to advance any legitimate interest the City may possess because Cochran's speech does not implicate any legitimate interests Defendants might assert.

246. Defendants' termination of Cochran's employment based on his expression of religious views about marriage and sexuality that were written and published outside of work, unrelated to work, and discussed issues of public concern, violates the Free Speech Clause of the First Amendment, as incorporated against the States by the Fourteenth Amendment, both facially and as-applied to Cochran.

247. By their policy and practice, Defendants, acting under color of state law, have explicitly and implicitly retaliated against Plaintiff for

29

exercising his First Amendment right to freedom of speech as incorporated against the States by the Fourteenth Amendment.

WHEREFORE, Plaintiff respectfully prays the court grant the equitable and legal relief set forth hereinafter in the prayer for relief.

## SECOND CAUSE OF ACTION
### First Amendment Right to Freedom of Speech: Viewpoint Discrimination, Overbreadth, Prior Restraint and Unbridled Discretion, and Unconstitutional Conditions
### (42 U.S.C. § 1983)

248.   Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1-221 of this Verified Complaint.

249.   The Free Speech Clause of the First Amendment, incorporated and made applicable to the states by the Fourteenth Amendment, prohibits the government from engaging in viewpoint discrimination.

250.   Viewpoint based restrictions on speech are presumptively unconstitutional and are subject to strict scrutiny even where citizens do not possess a constitutional right to speak in the first place.

251.   Pursuant to their policies and practices, Defendants have allowed numerous City employees similarly situated to Cochran, including Defendant Reed, to express their beliefs and viewpoints in favor of and approving of same-sex marriage and homosexual conduct.

252.   But Defendants terminated Cochran because of his expression of a religious belief and religious viewpoint contrary to same-sex marriage and the morality of homosexual conduct.

253.  By terminating Cochran based on his expression of a religious belief against same-sex marriage and the morality of homosexual conduct and allowing other, similarly-situated City employees to express viewpoints supportive of same-sex marriage and homosexual conduct, Defendants have, by policy and practice, treated Cochran's viewpoint on marriage and sexuality differently and engaged in viewpoint discrimination.

254.  Defendants have no rational, let alone compelling, reason for prohibiting Cochran's expression of his religious viewpoint on marriage and sexuality, which is shared by millions of other Georgians.

255.  The Free Speech Clause of the First Amendment, incorporated and made applicable to the states by the Fourteenth Amendment, also forbids the government from imposing overbroad restrictions on protected speech.

256.  To the extent, Defendants' policies—including Sec. 2-820(d) and an unwritten policy requiring Defendant Reed's pre-clearance before employees publish a book—and practice forbid employees from engaging in speech on matters of public concern unrelated to their jobs that do not and will not likely disrupt the City's provision of public services or internal operations, they are substantially overbroad and burden a vast array of expression protected by the First Amendment.

257.  The substantial overbreadth of Defendants' policy and practice chills, deters, and restricts Cochran's speech and that of other City employees not before the Court who wish to engage in expression about matters of public concern that are unrelated to their jobs

258.  Indeed, after Cochran's termination, City employees who share Cochran's Christian views are likely to avoid expressing their religious beliefs

about marriage and sexuality for fear of losing their livelihood, as are other City employees who hold viewpoints on subjects unrelated to their jobs with which Defendants disagree.

259.   The Free Speech Clause of the First Amendment, incorporated and made applicable to the states by the Fourteenth Amendment, also forbids the government from imposing prior restraints on speech.

260.   Any prior restraint on speech bears a heavy presumption against its validity and must satisfy strict scrutiny.

261.   Defendants' policies—including Sec. 2-820(d) and any alleged unwritten policy requiring Defendant Reed's pre-clearance before employees publish a work—and practice constitute prior restraints on speech because they prohibit or censure speech before it can take place.

262.   A large portion of the speech to which Defendants' prior restraint policies—including Sec. 2-820(d) and any alleged unwritten policy requiring Defendant Reed's pre-clearance before employees publish a work—and practice apply do not involve the subject matter of government employment and take place outside of the workplace.

263.   Cochran's religious book, in particular, did not relate to his government employment but was written and published outside of work as a result of study undertaken for his church during his personal time and using his private funds.

264.   The gagging of publication is permitted only in exceptional circumstances that are not present here.

265.   Moreover, prior restraints on speech must not grant unbridled discretion to government officials.

266. Defendants' policies—including Sec. 2-820(d) and any alleged unwritten policy requiring Defendant Reed's pre-clearance before employees publish a work—and practice provide unbridled discretion to Defendants and other City officials.

267. For example, Defendants' policies—including Sec. 2-820(d) and any alleged unwritten policy requiring Defendant Reed's pre-clearance before employees publish a work—contain no objective guidelines or standards to limit officials' discretion in making prior approval decisions, thus leaving officials free to discriminate against Cochran's and other city employee's protected viewpoints and expression.

268. The decision whether Cochran and other employees may engage in protected speech is left entirely to the whim of Defendants and other City officials.

269. Defendants' policies—including Sec. 2-820(d) and any alleged unwritten policy requiring Defendant Reed's pre-clearance before employees publish a work—thus constitute invalid prior restraints, both facially and as applied to Cochran, that violate the Free Speech Clause of the First Amendment, as incorporated against the States by the Fourteenth Amendment.

270. The unconstitutional conditions doctrine also prohibits the government from conditioning a benefit, such as government employment, on the relinquishment of First Amendment rights.

271. Cochran and other City employees retain the First Amendment right to believe as they will on religious matters and to act in accordance with those beliefs, including by expressing them publicly in written works

33

unrelated to their employment that are researched, written, and published during personal time in their private capacity as citizens.

272. By policy—including Sec. 2-820(d) and an unwritten policy requiring Defendant Reed's pre-clearance before employees publish a book— and practice Defendants have unconstitutionally conditioned the receipt of a state benefit—specifically, government employment—on Cochran's and other City employees' surrendering of their First Amendment right to engage in religious expression.

273. Defendants' imposition of this unconstitutional condition on public employment by policy—including Sec. 2-820(d) and any alleged unwritten policy requiring Defendant Reed's pre-clearance before employees publish a book—and practice, and enforcement thereof, chills, deters, and restricts Cochran and other City employees from freely expressing their religious beliefs by jeopardizing their livelihoods.

274. Defendants have no rational, let alone compelling, reason for placing Cochran on leave without pay, censoring his religious speech, and terminating his employment.

275. Defendants' policies and practice are not narrowly tailored to advance the City's legitimate interests because Cochran's speech does not implicate any legitimate interests Defendants might assert.

276. Defendants by policy and practice, acting under color of state law, have prohibited Cochran and other City employees from exercising their clearly established rights to freely speak on matters of public concern, to be free from viewpoint discrimination, to be free from prior restraints that grant officials unbridled discretion to censure speech, and to be free of

unconstitutional conditions placed on government employment, all of which are secured by the First Amendment to the United States Constitution.

WHEREFORE, Plaintiff respectfully prays the court grant the equitable and legal relief set forth in the prayer for relief.

**THIRD CAUSE OF ACTION**
**First Amendment Right to the Free Exercise of Religion and No Religious Tests Clause of Art. VI, ¶ 3 of the Constitution**
**(42 U.S.C. § 1983)**

277.   Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1-221 of this Verified Complaint.

278.   The Free Exercise Clause of the First Amendment, incorporated and made applicable to the states by the Fourteenth Amendment, protects citizens' freedom to believe as they will and to make those beliefs publicly known.

279.   Indeed, a fundamental purpose of the Free Exercise Clause is to render man's relation to his God no concern of the state such that citizens may believe and profess whatever religious doctrines they desire.

280.   Under the Free Exercise Clause, no person can be punished by the government for entertaining or professing religious beliefs.

281.   Government action based upon disagreement with religious tenets or practices violates the Free Exercise Clause.

282.   But Defendants, pursuant to their policy—including Sec. 2-820(d) and an unwritten policy requiring Defendant Reed's pre-clearance before employees publish a work—and practice explicitly and implicitly terminated

Cochran based on disagreement with his religious views on marriage and human sexuality.

283.   Cochran's religious faith requires that he believe, profess, and teach others about historical Christian teachings regarding the one-man-one-woman nature of marriage and the sinfulness of sexual conduct outside of that union.

284.   Defendants by their policy—including Sec. 2-820(d) and any alleged unwritten policy requiring Defendant Reed's pre-clearance before employees publish a work— and practice temporarily suspended Cochran and then terminated his employment because he expressed his sincerely held religious beliefs regarding marriage and sexuality.

285.   Defendants thus punished Cochran for entertaining and professing religious beliefs with which they disagreed.

286.   Indeed, Defendant Reed publicly noted his disagreement with Cochran's religious tenets.

287.   But the Free Exercise Clause forbids government from penalizing or discriminating against individuals or groups because they hold religious views abhorrent to the authorities.

288.   Moreover, the Free Exercise Clause forbids government from forcing citizens to choose between their religion and forfeiting benefits, such as government employment, and abandoning the precepts of their religion in order to maintain their jobs.

289.   Indeed, imposing such a choice is equivalent to forcing a citizen to pay a fine for engaging in Sunday worship.

290.   But Defendants by their policy—including Sec. 2-820(d) and any alleged unwritten policy requiring Defendant Reed's pre-clearance before employees publish a work—and practice forced Cochran to choose between fulfilling his religious obligations and forfeiting his government employment or abandoning the teachings of his Christian faith in order to maintain his position as fire chief.

291. Defendants have, in effect, instituted by policy and practice, under color of state law, the equivalent of a religious test for public employment that excludes those who hold and profess in a public manner historical Christian beliefs about marriage and sexuality that are of public concern.

292.   This religious test for City employment violates the No Religious Tests Clause of Article VI, ¶ 3 of the Constitution and the Free Exercise Clause of the First Amendment.

293.   In addition, the Free Exercise Clause forbids the government from imposing special disabilities based upon a citizen's religious views.

294.   Defendants did just that by their policy—including Sec. 2-820(d) and any alleged unwritten policy requiring Defendant Reed's pre-clearance before employees publish a work—and practice, which disqualifies those who hold and express historical Christian beliefs about marriage and sexuality from City employment.

295.   Defendants' policy and practice are not neutral because they expressly target historical Christian beliefs that are counter to same-sex marriage and homosexual conduct and allow officials to arbitrarily decide what religious speech is permitted and what religious speech is proscribed.

296. Defendants' policy and practice are likewise not generally applicable because they do not ban public employees from engaging in private speech unrelated to their employment that is favorable to same-sex marriage and homosexual conduct and because they grant officials unbridled discretion to censor Cochran's religious expression while permitting other employees to express their personal views on marriage and sexuality.

297. Defendants have no rational, let alone compelling, reason for placing Cochran on administrative leave without pay, censoring his expression of religious belief, and terminating his employment.

298. Defendants' policies and practice are not narrowly tailored to advance any legitimate interests the City may possess because Cochran's speech does not implicate any legitimate interests Defendants might assert.

299. Defendants' policy—including Sec. 2-820(d) and any alleged unwritten policy requiring Defendant Reed's pre-clearance before employees publish a work—and practice, both facially and as applied to Cochran, violate the Free Exercise Clause of the First Amendment, as incorporated against the States by the Fourteenth Amendment, by invading his right of conscience and belief, effectively imposing a religious test for public employment that excludes those who hold and express historical Christian beliefs about marriage and sexuality, and restricting the free exercise of his religion in a manner that is not neutral or generally applicable.

WHEREFORE, Plaintiff respectfully prays the court grant the equitable and legal relief set forth in the prayer for relief.

## FOURTH CAUSE OF ACTION
## First Amendment Right to Freedom of Association
## (42 U.S.C. § 1983)

300.  Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1-221 of this Verified Complaint.

301.  The First Amendment, incorporated and made applicable to the states by the Fourteen Amendment, protects the right of citizens to join together to promote a message on matters unrelated to their jobs that are of public concern.

302.  Cochran's church is an expressive association that adheres to certain Christian beliefs and regularly expresses those beliefs both at religious church meetings and in the community at large.

303.  By expressing his religious beliefs in his book, which he wrote and self-published as a citizen after conducting scriptural study to teach lessons at church, Cochran acted as an extension of his church and participated in the church's efforts to proclaim a religious message about marriage and sexuality, among other spiritual subjects.

304.  By joining his church, serving as a Deacon, teaching religious lessons, and participating in the church's efforts, and his own, to express the church's religious beliefs—including its beliefs about marriage and sexuality—at church and in the community, Cochran engages in an expressive association on matters unrelated to work that are of public concern.

305.  Cochran's religious expression did not concern or relate to his employment at the fire department, did not affect the fire department's provision of services to the community, did not cause internal disruption at

the fire department, nor was it likely to affect the fire department's internal or external operations in the future.

306. Because Cochran's expressive association concerned a topic unrelated to his work, Defendants must overcome strict scrutiny to justify infringing on his expression.

307. Defendants cannot rely upon their disagreement with, or the unpopularity of Cochran's message, to justify discharging him for his speech.

308. But pursuant to their policies and practice—including Sec. 2-820(d) and any alleged unwritten policy requiring Defendant Reed's pre-clearance before employees publish a work—Defendants terminated Cochran because he expressed his religious beliefs about marriage and sexuality, matters of public concern, in association with his church in his capacity as a citizen.

309. In so doing, Defendants have, by policy and practice, deprived Cochran of his right to freely associate with others to speak about issues of public concern on matters unrelated to his job.

310. Defendants have no rational, let alone compelling, reason for placing Cochran on leave without pay, censoring his religious speech, and terminating his employment.

311. Defendants' policies and practice are not narrowly tailored to advance any legitimate interest the City may possess because Cochran's speech does not implicate any legitimate interests Defendants might assert.

312. Defendants' unconstitutional actions and policies chilled Cochran's expressive association with his church when they resulted in his termination despite his satisfactory job performance.

313. Defendants' policy—including Sec. 2-820(d) and any alleged unwritten policy requiring Defendant Reed's pre-clearance before employees publish a work—and practice of prohibiting religious expression regarding marriage and sexuality that is unrelated to one's job, which Cochran engaged in as part of an expressive association with his church, violates Cochran's freedom of association, which is secured by the First Amendment and incorporated against the States by the Fourteenth Amendment.

314. Defendants' acting pursuant to their policy—including Sec. 2-820(d) and any alleged unwritten policy requiring Defendant Reed's pre-clearance before employees publish a work—and practice, under color of state law, explicitly and implicitly retaliated against Cochran for exercising his clearly established right to freedom of association as secured by the First Amendment and incorporated against the States by the Fourteenth Amendment.

WHEREFORE, Plaintiff respectfully prays the court grant the equitable and legal relief set forth in the prayer for relief.

## FIFTH CAUSE OF ACTION
## First Amendment Right to Avoid Religious Hostility:  Establishment
## (42 U.S.C. § 1983)

315. Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1-221 of this Verified Compliant.

316. The Establishment Clause of the First Amendment, incorporated and made applicable to the states by the Fourteenth Amendment, prohibits the government from disapproving of or showing hostility toward a particular religion or religion in general.

317. Pursuant to their policies—including Sec. 2-820(d) and any alleged unwritten policy requiring Defendant Reed's pre-clearance before employees publish a work—and practice Defendants have allowed employees similarly situated to Cochran, including Defendant Reed, to express secular and religious beliefs and viewpoints in favor of same-sex marriage and homosexual conduct.

318. But Defendants terminated Cochran because of his religious beliefs and viewpoints that are contrary to same-sex marriage and homosexual conduct.

319. By terminating Cochran, pursuant to their policies and practice, because of his religious beliefs and expression opposed to same-sex marriage and homosexual conduct and allowing other employees to express secular and religious viewpoints supportive of same-sex marriage and homosexual conduct, Defendants have evinced a discriminatory suppression of private speech that is hostile toward religion.

320. Cochran's termination pursuant to defendants' policies and practices sends the message that religious believers that share his views are second-class citizens, outsiders, and not full members of the community.

321. It also sends the message that Christians that share Cochran's beliefs are not eligible for City employment simply as a result of their religious faith.

322. By firing Cochran pursuant to their policies—including Sec. 2-820(d) and any alleged unwritten policy requiring Defendant Reed's pre-clearance before employees publish a work—and practice, established under

color of state law, Defendants have targeted for suppression protected expression critical of same-sex marriage and homosexual conduct.

323. Defendants' singling out of Cochran for unpaid leave, censure, and firing on the basis of his religious viewpoint on marriage and sexuality, pursuant to their policies and practice deprived Cochran of the right to be free from religious hostility secured by the First Amendment.

324. Defendants' policies—including Sec. 2-820(d) and any alleged unwritten policy requiring Defendant Reed's pre-clearance before employees publish a work—and practice, both facially and as applied to Cochran, thus violate the Establishment Clause of the First Amendment.

WHEREFORE, Plaintiff respectfully prays the court grant the equitable and legal relief set forth in the prayer for relief.

## SIXTH CAUSE OF ACTION
### Fourteenth Amendment Right to Equal Protection of the Laws
### (42 U.S.C. § 1983)

325. Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1-221 of this Verified Complaint.

326. The Equal Protection Clause of the Fourteenth Amendment requires that the government treat similarly-situated persons alike.

327. Religion is an inherently suspect classification under the Equal Protection Clause.

328. Cochran as a Christian and member of a Christian church belongs to a protected class.

329. Pursuant to their policies—including Sec. 2-820(d) and any alleged unwritten policy requiring Defendant Reed's pre-clearance before

employees publish a work—and practice, Defendants allowed numerous City employees similarly situated to Cochran—including Defendant Reed—to express a secular belief and viewpoint favorable to same-sex marriage and homosexual conduct.

330. But pursuant to their policies—including Sec. 2-820(d) and any alleged unwritten policy requiring Defendant Reed's pre-clearance before employees publish a work—and practice, Defendants terminated Cochran because of his religious belief and viewpoint against same-sex marriage and the morality of homosexual conduct.

331. Defendants thus intentionally discriminated against Cochran's religious belief and viewpoint by treating it differently from the speech of other similarly situated City employees, including that of Defendant Reed.

332. When governmental policies—like Sec. 2-820(d) and any alleged unwritten policy requiring Defendant Reed's pre-clearance before employees publish a work—and practice infringe upon fundamental rights, discriminatory intent is presumed.

333. Defendants' policies—including Sec. 2-820(d) and any alleged unwritten policy requiring Defendant Reed's pre-clearance before employees publish a work—and practice infringe upon Cochran's fundamental rights to freedom of speech, freedom of association, and freedom of religion, among other fundamental rights.

334. Defendants have no rational, let alone compelling, reason for targeting Cochran's religious speech for disparate treatment.

335. Defendant's policies and practice are not narrowly tailored to advance any legitimate interest the City may possess because Cochran's speech does not implicate any legitimate interests Defendants might assert.

336. Defendants' policies—including Sec. 2-820(d) and any alleged unwritten policy requiring Defendant Reed's pre-clearance before employees publish a work—and practice violate the Equal Protection Clause of the Fourteenth Amendment both facially and as applied to Cochran.

337. Defendants' enactment and enforcement of their policies—including Sec. 2-820(d) and any alleged unwritten policy requiring Defendant Reed's pre-clearance before employees publish a work—and practice, under color of state law, which explicitly and implicitly discriminate against Cochran on the basis of his religious beliefs and viewpoint deprived him of his clearly established right to equal protection of the laws secured by the Fourteenth Amendment.

WHEREFORE, Plaintiff respectfully prays the Court grant the equitable and legal relief set forth in the prayer for relief.

## SEVENTH CAUSE OF ACTION
### Fourteenth Amendment Right to Due Process:  Vagueness
### (42 U.S.C. § 1983)

338. Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1-221 of this Verified Complaint.

339. The Due Process Clause of the Fourteenth Amendment prohibits the government from censoring speech pursuant to vague standards that grant government officials unbridled discretion.

45

340. Defendants' arbitrary determination of what protected religious expression violates their policies—including Sec. 2-820(d) and any alleged unwritten policy requiring Defendant Reed's pre-clearance before employees publish a work—and practice and what protected religious expression does not violates this norm.

341. Employees of common intelligence must guess and will differ in their views as to what expression will meet with Defendants' approval and be permitted under their  policies—including Sec. 2-820(d) and any alleged unwritten policy requiring Defendant Reed's pre-clearance before employees publish a work—and practice and what expression will not and be banned.

342. Defendants' policies—including Sec. 2-820(d) and any alleged unwritten policy requiring Defendant Reed's pre-clearance before employees publish a work—and practice also provide no warning or notice as to what expression will meet with their approval and be permitted and what speech will not and be banned.

343. Instead, Defendants' policies and practice provide them and other City officials with unbridled discretion to determine when employees may engage in protected religious expression thus subjecting the exercise of Cochran's and other City employee's fundamental rights to the whim of government bureaucrats.

344. Defendants' policies—including Sec. 2-820(d) and any alleged unwritten policy requiring Defendant Reed's pre-clearance before employees publish a work—and practice thus violate the Due Process Clause of the Fourteenth Amendment, both facially and as-applied to Cochran, because

they provide no binding guidelines prescribing what protected expression City officials may permit or deny.

WHEREFORE, Plaintiff respectfully prays the Court grant the equitable and legal relief set forth in the prayer for relief.

## EIGHTH CAUSE OF ACTION
### Fourteenth Amendment Right to Due Process:  Liberty Interest
### (42 U.S.C. § 1983)

345.   Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1-221 of this Verified Complaint.

346.   The Due Process Clause of the Fourteenth Amendment protects rights that are fundamental or implicit in the concept of ordered liberty, including the right to earn a livelihood in a common calling free from unreasonable government interference.

347.   Cochran has a protected liberty interest in working and earning a living and establishing a home and position in his community.

348.   But pursuant to their polices—including Sec. 2-820(d) and any alleged unwritten policy requiring Defendant Reed's pre-clearance before employees publish a work—and practice, Defendants irrationally terminated Cochran for "discrimination" against homosexuals despite the fact that he has never discriminated against, nor been accused of discriminating against, anyone on the basis of a protected characteristic, including sexual orientation.

349.   Defendants' groundless suspension and termination of Cochran in a highly publicized manner that engendered nationwide media attention stigmatized him and irretrievably damaged his reputation in the community.

350.   Defendants' groundless suspension and termination of Cochran in a highly publicized manner that engendered nationwide media attention also rendered it impossible for him to pursue his common calling by finding and maintaining work in any fire department.

351.   The Due Process Clause of the Fourteenth Amendment secures Cochran against such arbitrary government actions.

352.   Defendants have no rational interest, let alone a compelling interest, in terminating Cochran in an infamous manner based on his expression of personal religious beliefs about marriage and sexuality.

353.   Defendants' policies—including Sec. 2-820(d) and any alleged unwritten policy requiring Defendant Reed's pre-clearance before employees publish a work—and practice thus violate the Due Process Clause of the Fourteenth Amendment because they grossly stigmatized Cochran's reputation in the community and deprived Cochran of his right to earn a living as a firefighter and fire chief.

WHEREFORE, Plaintiff respectfully prays the Court grant the equitable and legal relief set forth in the prayer for relief.

### NINTH CAUSE OF ACTION
### Fourteenth Amendment Right to Due Process:  Procedure
### (42 U.S.C. § 1983)

354.   Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1-221 of this Verified Complaint.

355.  Atlanta Code of Ordinances Sec. 114-528 provides City employees, including Cochran as the AFRD Fire Chief, with a protected property interest in their jobs by providing that they cannot be fired or

otherwise adversely affected as to compensation or employment except for cause.

356.  The Due Process Clause of the Fourteenth Amendment requires that states provide fair procedures and an impartial decisionmaker before infringing on a citizen's interest in life, liberty, or property.

357.  The Due Process Clause of the Fourteenth Amendment also requires that states give employees with protected property interests in their jobs notice of the charges against them, an explanation of the employer's evidence, and a meaningful opportunity to present their side of the story before they are terminated.

358.  In suspending Cochran without pay and terminating him without cause, and further without the increasing steps of severity outlined in the Atlanta Code, Defendants failed to follow their own policies that required Cochran receive notice of a proposed adverse employment action at least ten working days prior to the effective date, *see* Sec. 114-530(a).

359.  Nor did Defendants provide Cochran with the specific and detailed charges and the reasons for the adverse actions proposed as required by the Atlanta Code, *see* Sec. 114-530(b).

360.  Defendants also failed to give Cochran any meaningful opportunity to respond to his proposed suspension without pay and proposed dismissal as required by the Atlanta Code, *see* Sec. 114-530(c).

361.  No adequate means of remedying these procedural violations exists under municipal or state law.

362.  By depriving Cochran of his protected property interest in his employment without due process of law Defendants violated the Due Process Clause of the Fourteenth Amendment.

WHEREFORE, Plaintiff respectfully prays the Court grant the equitable and legal relief set forth in the prayer for relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendants and provide Plaintiff with the following relief:

(A)   A permanent injunction requiring Defendants, their agents, employees, and all persons in active concert or participation with them to

　　1. reinstate Cochran to his former position as Fire Chief of the Atlanta Fire and Rescue Department; and

　　2. stop enforcing their policies—including Sec. 2-820(d) and any alleged unwritten policy requiring Defendant Reed's pre-clearance before employees publish a work—and practice of allowing adverse employment actions against Cochran and other City employees for expressing protected religious messages about marriage and sexuality when those messages are about matters of public concern, do not concern their job duties, and do not interfere with the City's external or internal operations and are not likely to do so;

(B)   A declaration stating that Defendants violated Cochran's rights to free speech, free association, free exercise, freedom from religious hostility, equal protection, and due process by allowing

City employees to express viewpoints supportive of same-sex marriage and homosexual conduct and by terminating Cochran because of his religious beliefs concerning sexual morality;

(C)     A declaration stating that Defendants' policies—including Sec. 2-820(d) and any alleged unwritten policy requiring Defendant Reed's pre-clearance before employees publish a work—on their face and as applied to Cochran violate the First and Fourteenth Amendments;

(D)     Compensatory damages, including, but not limited to: lost wages, costs associated with Cochran finding new employment, and humiliation, emotional distress, inconvenience, and loss of reputation caused by Defendants' actions and statements;

(E)     Nominal damages for violating Cochran's constitutional rights;

(F)     Other equitable relief including back pay and front pay for violating Cochran's constitutional rights and the expungement of Cochran's disciplinary record for all matters related to the personal expression of his religious beliefs;

(G)     Reasonable attorneys' fees, costs, expenses, and other disbursement in this action pursuant to 42 U.S.C. §§ 1988 and 2000e-5(k);

(H)     The above-requested injunctive relief without condition of bond or other security being required of Cochran;

(I)     Prejudgment interest on any pecuniary awards provided;

(J)     All other relief this Court deems just and equitable.

Respectfully submitted this 18th day of February, 2015,

By: /s/David A Cortman

JONATHAN D. CRUMLY, SR.
Georgia Bar No. 199466
**MANER CRUMLY CHAMBLISS LLP**
2900 Paces Ferry Road
Suite B-101
Atlanta, GA 30339
(770) 434-0310
(404) 549-4666 (facsimile)
Jcrumly@Manercc.com

Garland R. Hunt
Georgia Bar No. 378510
**HUNT & ASSOCIATES**
12110 Helleri Hollow
Alpharetta, GE 30005
(770) 294-0751
(770) 777-5847 (facsimile)
garlandhunt1@gmail.com

DAVID A. CORTMAN
Georgia Bar No. 188810
J. MATTHEW SHARP
Georgia Bar No. 607842
RORY T. GRAY
Georgia Bar No. 880715
**ALLIANCE DEFENDING FREEDOM**
1000 Hurricane Shoals Road, NE
Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
(770) 339-6744 (facsimile)
dcortman@alliancedefendingfreedom.org
msharp@alliancedefendingfreedom.org
rgray@alliancedefendingfreedom.org

KEVIN H. THERIOT
Georgia Bar No. 373095
JEREMY D. TEDESCO*
Arizona Bar No. 023497
JONATHAN A. SCRUGGS*
Arizona Bar No. 030505
**ALLIANCE DEFENDING FREEDOM**
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
(480) 444-0028 Fax
ktheriot@alliancedefendingfreedom.org

*_pro hac vice_ application
pending

jtedesco@alliancedefendingfreedom.org
jscruggs@alliancedefendingfreedom.org

ATTORNEYS FOR PLAINTIFF

## DECLARATION UNDER PENALTY OF PERJURY

I, KELVIN J. COCHRAN, a citizen of the United States and a resident of the State of Georgia, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed this _____ day of February, 2015, at Atlanta, Georgia.

KELVIN J. COCHRAN

## CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of February, 2015, a copy of the foregoing Verified Complaint was filed with the Clerk of the Court using the ECF system.   I also certify that the foregoing will be served, along with a copy of the Summons and Complaint, via a private process server upon the following defendants:

MAYOR KASIM REED
City of Atlanta
55 Trinity Avenue
Atlanta, GA 30303

CITY OF ATLANTA
c/o Mayor Kasim Reed
55 Trinity Avenue
Atlanta, GA 30303

/s/David A Cortman
David A. Cortman
*Attorney for Plaintiff*