## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

_____

**KELVIN J. COCHRAN,**

    **Plaintiff,**

       **v.**                  **Case No. 1:15-cv-00477-LMM**

**CITY OF ATLANTA, and**
**MAYOR KASIM REED,**

    **Defendants.**

_____

_____

### PROPOSED *AMICUS CURIAE* LAMBDA LEGAL DEFENSE & EDUCATION FUND, INC.'S MOTION FOR LEAVE TO FILE BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS AND TENDERED *AMICUS* BRIEF

_____

### MOTION FOR LEAVE TO FILE *AMICUS* BRIEF

Proposed *Amicus Curiae* Lambda Legal Defense and Education Fund, Inc.

("Lambda Legal" or "*Amicus*") is the nation's oldest and largest legal organization

1

working for full recognition of the civil rights of lesbian, gay, bisexual and transgender ("LGBT") people and people living with HIV through impact litigation, education and policy advocacy.  Lambda Legal often is counsel of record or *amicus curiae* in cases posing issues regarding the asserted religious needs of a party.  *See*, *e.g.*, *Burwell v. Hobby Lobby Stores, Inc.,* 134 S. Ct. 2751 (2014) (*amicus*); *EEOC v. Abercrombie & Fitch Stores*, Case No. 14-86, 2014 U.S. Briefs 86, 2014 U.S. S. Ct. Briefs LEXIS 4355 (U.S. Dec. 10, 2014) (*amicus*); *North Coast Women's Care Med. Grp., Inc. v. San Diego Cnty. Superior Court (Benitez)*, 189 P.3d 959 (Cal. 2008) (counsel).  Lambda Legal has argued that religious exercise does not justify demeaning others or denying services to them, and it also has supported the religious freedom claims of workers where such exercise would not have these deleterious effects.  Compare *EEOC v. Abercrombie & Fitch*, *supra* (supporting Muslim woman whose exercise of faith would result in wearing a hijab, or headscarf, at work) with *North Coast Women's Care*, *supra* (holding that medical provider may not deny services to lesbian, rejecting claim that nondiscrimination statute infringed physician's speech and religious exercise rights).  Lambda Legal also has been *amicus curiae* in cases involving individuals' assertions of First Amendment violations in their present and future workplaces.

2

*See Keeton v. Anderson-Wiley*, 664 F.3d 865 (11th Cir. 2011) (holding that counseling student's speech and religious exercise rights did not warrant exemption from university's requirement that she counsel lesbian and gay clients pursuant to professional standards); *National Gay Task Force v. Bd. of Educ.*, 729 F.2d 1270 (10th Cir. 1984) (holding that statute violated First Amendment in proscribing teacher public advocacy on behalf of the LGBT community).

Lambda Legal seeks to file this brief to expand on the broad principles laid out in the defendants' motion and provide the Court with specific guidance as to how courts have handled assertions by public employees of rights of free speech, free exercise and equal protection when the conduct in question undermines the public policy of their employer and is demeaning to segments of the community, including women and the LGBT community.

WHEREFORE, proposed *amicus curiae* Lambda Legal respectfully requests that this Court grant leave to file the proposed *amicus* brief accompanying this motion.

# TABLE OF AUTHORITIES

## Cases

*Altman v. Minn. Dept. of Corr.*, 251 F.3d 1199 (8th Cir. 2001) ................. 12, 13, 15

*Anderson v. Burke Cnty., Ga.*, 239 F.3d 1216 (11th Cir. 2001) ..............................2

*Bodett v. CoxCom, Inc.*, 366 F.3d 736 (9th Cir. 2004) ...................................... 1, 12

*City of Atlanta v. McKinney*, 454 S.E.2d 517 (Ga. 1995).......................................11

*City of Atlanta v. Morgan*, 492 S.E.2d 193 (Ga. 1997) ..........................................11

*Daniels v. City of Arlington*, 246 F.3d 500 (5th Cir. 2001) ....................................14

*Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027 (9th Cir. 2005) .............12

*Dushane v. Leeds Hose Co. #1*, 6 F. Supp. 3d 204 (N.D.N.Y. 2014) ....................13

*Fairley v. Fermaint*, 482 F.3d 897 (7th Cir. 2006)................................................12

*Greer v. Amesqua*, 212 F.3d 358 (7th Cir. 2000) ...................................................11

*Lumpkin v. Brown*, 109 F.3d 1498 (9th Cir. 1997)....................................... 9, 10, 11

*Lumpkin v. Jordan*, No. C-93-4338 FMS,
   1994 U.S. Dist. LEXIS 17280 (N.D. Cal. Nov. 28, 1994)........................... 10, 15

*Matthews v. Wal-Mart Stores, Inc.*, 417 Fed. Appx. 552 (7th Cir. 2011) ................1

*Moysey v. Rearick*, Civ. No. 3:00cv2026 (AHN),
   2004 U.S. Dist. LEXIS 12531 (D. Conn. Mar. 25, 2004)...................................13

*Peterson v. Hewlett-Packard, Inc.*, 358 F.3d 599 (9th Cir. 2004)...........................1

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)..........................4

## Statutes

Atl. Code. 94-131.....................................................................................................11

Atl. Code. Chapter 94 ..............................................................................................10

## Other Authorities

Anita Bernstein, *What's Wrong With Stereotyping?*,
   55 Ariz. L. Rev. 655, 666 (2013) ........................................................................6

Christine Alice Corcos, *Portia Goes to Parliament: Women and Their Admission
   to Membership in the English Legal Profession*,
   75 Denv. U.L. Rev. 307 (1998)............................................................................7

i

Dyana Bagby and Patrick Saunders, "Atlanta Mayor Kasim Reed ousts anti-gay
    fire chief," The Georgia Voice, January 6, 2015, available online at
    http://thegavoice.com/anti-gay-atlanta-fire-chief-terminated-mayor/ ...................9

G.B. Crook, *The Law Society: Admission of Women as Solicitors*,
    146 LAW TIMES J. & REC. 409 (1919)....................................................................7

Jane Caputi, *Re-creating Patriarchy: Connecting Religion and Pornography*,
    1 WAKE FOREST J. L. & POL'Y 293 (2011) ...........................................................6

KELVIN J. COCHRAN, WHO TOLD YOU THAT YOU WERE NAKED?
    (3G Publishing, 2013) ........................................................................... 4, 5, 6, 8

Kimberly Charles, *Defining Feminism: Sexism is a "Family Value"*,
    9 CARDOZO WOMEN'S L.J. 255 (2003)....................................................................6

Mary E. Becker *"The Politics of Women's Wrongs and the Bill of "Rights":*
    *A Bicentennial Perspective*," 59 U. CHI. L. REV. 453 (1992)................................7

Paula Abrams, *The Tradition of Reproduction*,
    37 ARIZ. L. REV. 453 (1995)..............................................................................6, 7

## SUMMARY OF ARGUMENT

*Amicus* takes no position on many of the defendants' arguments, including those regarding due process or the alleged failure of plaintiff Kelvin J. Cochran ("Cochran") to comply with City of Atlanta (the "City" or "COA") procedures regarding the securing of permission to publish his book.[1]  Instead, *amicus* focuses in this brief on how courts have dealt with public employees' constitutional claims that have been raised when action was taken against such employees for statements demeaning to women or the LGBT community.  The law could not be clearer:  the

_____

[1] *Amicus* also does not focus in this brief on the Title VII claim that Cochran foreshadows bringing once he receives a right-to-sue letter from the EEOC.  See Complaint [1] at ¶ 205.  *Amicus* does note, however, that there is a whole other body of case law dooming such a claim unless Cochran can show that his comments insulting to women and the LGBT community were singled out for action by showing that the City ignored similar statements by others who did not advance a religious foundation for such statements.  *See Matthews v. Wal-Mart Stores, Inc.*, 417 Fed. Appx. 552, 554 (7th Cir. 2011) ("Wal-Mart fired her because she violated company policy when she harassed a coworker, not because of her beliefs, and employers need not relieve workers from complying with neutral workplace rules as a religious accommodation if it would create an undue hardship. . . . [S]uch an accommodation could place Wal-Mart on the 'razor's edge' of liability by exposing it to claims of permitting workplace harassment."); *Bodett v. CoxCom, Inc.*, 366 F.3d 736, 743 (9th Cir. 2004) ("In the context of a disparate treatment claim based on religious discrimination," a plaintiff must plead, among the things, that "similarly situated individuals outside [her] protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination."); *accord Peterson v. Hewlett-Packard, Inc.*, 358 F.3d 599, 603 (9th Cir. 2004).

government has the right to relieve of his or her duties any employee who publicly

demeans the role of women and/or excoriates the intimate relationships of the

LGBT community, where, as here, there is no allegation that such positions would

be tolerated in a non-religious individual.  *Amicus* is a friend of the Court and not

fully siding with the assertions of any litigant, and therefore volunteers that this

case would stand on different footing if Cochran could point to an instance in

which the defendants continued to employ a department head who had no religious

beliefs but made demeaning statements similar to those that Cochran published and

disseminated to his subordinates.  But there are no such allegations.  Therefore,

there can be no viable claim that the defendants violated any federal law in

informing Cochran that they no longer require his services.

Defendants make the point that Cochran's termination is justified if the

defendants' governmental interests outweigh Cochran's interest in publicizing his

religious views.  City Defendants' Motion to Dismiss and Incorporated Brief in

Support ("COA MTD") [11] at 9.  Defendants cite the needs of a "paramilitary

organization, such as a fire department . . . to secure discipline, mutual respect,

trust and particular efficiency among the ranks . . ."  *Id*. quoting *Anderson v. Burke

Cnty., Ga.*, 239 F.3d 1216, 1222 (11th Cir. 2001).  *Amicus* writes to point out that

2

courts have recognized that a city can terminate employees to serve other needs as well, including a city's need to employ officials who do not publicly undermine the city's public policy and who do not demean groups of its residents.

Defendants make the argument that various of Cochran's claims fail due to his inability to define a "similarly situated comparator who was treated differently —*i.e.* the head of a paramilitary department of the City of Atlanta who failed to obtain written approval."  COA MTD [11] at 18.  The same holds true for Cochran's claim of religious and viewpoint discrimination and denial of equal protection – these claims fail because there is no comparator who publicly spoke similar demeaning comments but was retained because he did not rely on a religious justification for his positions.

## COCHRAN'S PROBLEMATIC ACTIONS

In his book, which he published for sale and disseminated to subordinates, Cochran made multiple statements demeaning to the relationships of lesbians and gay men and demeaning to women generally, castigating their worthiness in making independent decisions.

Cochran's complaint tries to soft-pedal his demeaning words about same-sex relations; it merely describes them using terms such as "contrary to God's will"

3

(Complaint [1] at ¶¶ 8, 100), and fails to mention the book's labeling of such relations as "vile," "vulgar," "defile" and "perversion."  KELVIN J. COCHRAN, WHO TOLD YOU THAT YOU WERE NAKED? 82, 85  (3G Publishing, 2013) ("WHO TOLD YOU?").[2]   In the book, Cochran excoriates men who "pursue sexual fulfillment through multiple partners, with the opposite sex, the same sex and sex outside of marriage and many other vile, vulgar and inappropriate ways which defile their body-temple and dishonor God."  *Id.* at 85.   The book also defines "Uncleanness" as "whatever is opposite of purity; including sodomy, homosexuality, lesbianism, pederasty, bestiality, all other forms of sexual perversion."  *Id*. at 82.

Moreover, while Cochran is unapologetic about his pronouncements about "sexual morality," including inveighing against "homosexual acts," "homosexual conduct," and "same-sex marriage" (Complaint [1], ¶¶ 8, 11, 100, 160-61, 251-53, 295-96, 317-19, 322, 329-30), the Complaint notably ignores the book's comments

---

[2] In addition to the avenue of judicial notice requested by the City of Atlanta, *amicus* notes that it is well-settled that a Court, in considering a motion to dismiss, can consider an entire document that the complaint selectively references.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)  ("courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice. See 5B Wright & Miller § 1357 (3d ed. 2004 and Supp. 2007).").

about the adverse consequences Cochran asserts ensue when women make their own decisions and do not defer to their husbands, as happened in the story of Adam and Eve.  This silence is all the more deafening given that, as the Complaint itself acknowledges, (1) the title and focus of the book is "concerning original sin" and how Christians can overcome it.  (See Complaint [1], ¶¶ 85, 92, 104); and (2) Mayor Reed specifically said in firing Cochran that "I want to be clear that the material in Chief Cochran's book is not representative of my personal beliefs, and is inconsistent with the Administration's work to make Atlanta a more welcoming city for all of her citizens – regardless of their sexual orientation, *gender*, race and religious beliefs."  Complaint, ¶ 158 (emphasis added).  Cochran laid forth his view of the profound negative consequences that result from women making decisions themselves:

> "Ever wondered what would have happened if Eve would have said 'You need to talk to my husband.' What if she would have said, 'Do I know you? Who are you? Why would I listen to you? I don't know you? I do know God. He created this garden, these trees, animals, and all these creeping things; he created my husband and formed me from my husband's rib. He even created you! Why would I listen to you? You need to talk to my husband.'"

Who Told You? at 47.

5

The book also states that Samson's "weakness for whining, nagging women would ultimately cost his destiny."  *Id.* at 116.

Many scholars over the years have decried the tale of Eve and the Serpent as misogynist in unfairly blaming women for mankind's fall from grace.[3]  Similarly, many have noted the story's role as the impetus for the subjugation of women

---

[3] Kimberly Charles, *Defining Feminism: Sexism is a "Family Value"*, 9 CARDOZO WOMEN'S L.J. 255, 263 (2003) ("Original Sin refers to the biblical story of where Eve disobeyed God and coerced Adam into doing likewise. 'Due to this transgression, namely man's association with woman [who is seen as evil], especially [Eve's] vice, the world is now in a state of chaos.'"); Jane Caputi, *Re-creating Patriarchy: Connecting Religion and Pornography*, 1 WAKE FOREST J. L. & POL'Y 293, 304-05 (2011) (citing a "diatribe from St. Tertullian, a third century Christian, who is typical in his pious condemnation of the female sex: 'Do you know that you are each an Eve? . . . You are the devil's gateway . . . You destroyed so easily God's image, man.' St. Tertullian identifies the female sex as the conduit of the devil, denies that women are made in the image of God, and directs us to the source of the problem, Eve."); Anita Bernstein, *What's Wrong With Stereotyping?,* 55 Ariz. L. Rev. 655, 666 (2013) (decrying the "stereotype assigns blame or responsibility for a voluntary act to a member of the stereotyped group even though this person did not commit it. Reminiscent of exegeses on a Bible story that held Eve responsible for the action of her adult partner Adam even though Adam outranked her"); Paula Abrams, *The Tradition of Reproduction*, 37 ARIZ. L. REV. 453, 464 (1995) ("The Bible is replete with ambivalence toward women. Women are exalted when fulfilling their true callings as wives and mothers, but also are repeatedly depicted as temptresses, leading men into sin.").

through the ages.[4]  Any interpretation of the importance of the story, or its gender-based implications, as incidental in Cochran's mind is disproven by both its prominence in his book and his explicit blaming of original sin on Eve's failure to leave decision-making to her husband.   The very title of Cochran's book begins "Who told you that you were naked?," the very words Genesis attributes to God after Adam and Eve ate the apple.  *See* Genesis 3:9-11; *see also* Complaint at

---

[4] Abrams, *supra*, at 466-67 ("Women were not allowed to be independent thinkers: 'Let a woman learn in silence with all submissiveness. I permit no woman to teach or to have authority over men; she is to keep silent. . . . Women could not teach because 'the woman [Eve] taught once, and ruined all.' For the same reasons, women's authority is 'nil,' and she must in all things be subject to the rule of man. These religious teachings became the source of canon-law, and later common-law, disabilities of women as legal persons."); Mary E. Becker "*The Politics of Women's Wrongs and the Bill of "Rights": A Bicentennial Perspective*," 59 U. CHI. L. REV. 453, 461 (1992) ("Eve tempts Adam and her reproductive power becomes a punishment for sin in the story of the fall. Because of her sin, God declares Adam her master."); Christine Alice Corcos, *Portia Goes to Parliament: Women and Their Admission to Membership in the English Legal Profession*, 75 Denv. U.L. Rev. 307, 389 (1998), quoting G.B. Crook in *The Law Society: Admission of Women as Solicitors*, 146 LAW TIMES J. & REC. 409, 411 (1919) ("When Queen Mary was on the throne she could not keep her axe off the neck of Lady Jane Grey, nor could Queen Elizabeth keep the axe off the neck of Mary Queen of Scots, any more than Eve could keep her hand off the apple. The judicial factor was not a part of woman; the Almighty never intended to instil [sic] it in her.").

¶ 85.[5]  Cochran specifically maintains that, if only Eve had deferred to Adam, he would have killed the serpent instead of succumbing to temptation.

Beyond the problems associated with its mere publication, Cochran's dissemination of the book in the workplace, coupled with his admitted perception of his job function, understandably caused the City concern.  In his book, Cochran describes his job description as fire chief as including the responsibility "[t]o cultivate its culture for the glory of God."  WHO TOLD YOU? at 76.  Cochran's own allegations show that he gave copies of his book to 16-18 City of Atlanta employees who were his subordinates within the Atlanta Fire Rescue Department ("AFRD"). (Complaint [1], ¶¶ 117, 123, 126-134); *see also* COA MTD [11] at 4. According to Cochran's own allegations, the book's "primary goal is to guide men on how to overcome the stronghold of condemnation, to walk in the fullness of salvation, and to live a faith-filled, virtuous life."  Complaint [1], ¶ 94.  "The book is written primarily for men, and is intended to help them fulfill God's purpose for their life." *Id*. ¶ 93.  According to Cochran, one of the obstacles to a proper life is

---

[5] Genesis 3:9-11 reads, "But the Lord God called to the man, 'Where are you?' He answered, 'I heard you in the garden, and I was afraid because I was naked; so I hid.'  And God said, 'Who told you that you were naked? Have you eaten from the tree that I commanded you not to eat from?'"

sexual relations that he believes to be morally wrong.  See *Id*. ¶ 97 ("Sex is one of several areas in which many men struggle.").

Given this backdrop, it is hardly surprising that an AFRD employee was so upset that he complained to a city council member, which subsequently led to Cochran's firing.  *Id*. at ¶ 141.  Atlanta Professional Firefighters Local 134 issued a statement saying about the firing that it "would like to commend Mayor Reed and his administration for their decision to terminate Fire Chief Kelvin Cochran.  Local 134 supports LGBT rights and equality among all employees."  Dyana Bagby and Patrick Saunders, "Atlanta Mayor Kasim Reed ousts anti-gay fire chief,"  The Georgia Voice, January 6, 2015, available online at http://thegavoice.com/anti-gay-atlanta-fire-chief-terminated-mayor/

## ARGUMENT

### A CITY IS ENTITLED TO DISCHARGE EMPLOYEES WHO PUBLICLY DEMEAN SEGMENTS OF THE COMMUNITY AND WHO PUBLICLY UNDERMINE THE CITY'S PUBLIC POLICIES FAVORING DIVERSITY AND NON-DISCRIMINATION.

The most on-point case to the instant lawsuit is *Lumpkin v. Brown*, 109 F.3d 1498 (9th Cir. 1997),  in which San Francisco's mayor removed Rev. Eugene Lumpkin from his duties on the San Francisco Human Rights Commission after

9

Rev. Lumpkin publicly said that homosexuality is an abomination, citing the Bible. Rev. Lumpkin sued, asserting that his termination violated the First Amendment. The court rejected the claims, noting that "when the government acts as an employer, it has certain latitude to protect its operations and policies from being subverted by its own personnel." *Id*. at 1500. *See also id*. at 1501 (city had the right to require public servants to "refrain from speaking publicly in a way that mocks the City's antidiscrimination policy."); *Lumpkin v. Jordan*, No. C-93-4338 FMS, 1994 U.S. Dist. LEXIS 17280, at *18 (N.D. Cal. Nov. 28, 1994) ("[Reverend Lumpkin] is, and at all times was, free to hold and to profess his religious beliefs; however, when the expression of those beliefs clashed with the goals of the Jordan Administration and undermined the public confidence in the ability of the Commission to effect its goals, the Mayor was justified in removing him. The Court finds that plaintiff's removal did not violate the Free Exercise Clause.)," *aff'd sub. nom. Lumpkin v. Brown*, 109 F.3d 1498 (9th Cir. 1997).

The City of Atlanta's commitment to nondiscrimination against women, lesbians and gay men, and its support of same-sex couples, is manifest.  The City has a nondiscrimination ordinance covering sex, sexual orientation, gender identity, and domestic relationship status.  Atl. Code. Chapter 94.  The city also has

10

a domestic partner registry, which it successfully defended before the Georgia Supreme Court.  Atl. Code. 94-131; *City of Atlanta v. McKinney*, 454 S.E.2d 517 (Ga. 1995).  The City also passed a domestic partner benefits ordinance for dependents of city employees registered as domestic partners, which it also successfully defended before the Georgia Supreme Court.  See *City of Atlanta v. Morgan*, 492 S.E.2d 193 (Ga. 1997).

Nearly identical policies supporting lesbians and gay men and their relationships were cited by the *Lumpkin v. Brown* court as providing ample support for the termination of employees publicly undermining them:  "Applying the *Pickering* balancing test, we hold that the City's interest in having commissioners who work to promote City policies far outweighs any commissioner's First Amendment interest in publicly expressing views that subvert those policies." *Lumpkin v. Brown*, 109 F.3d at 1501.  The mayor's removal of Lumpkin was held to "serve[] a compelling governmental interest – the preservation of the integrity of [the city's] antidiscrimination policies.  It was also the only effective way to remedy the damage his statements" had done.  *Id*.; see also *Greer v. Amesqua*, 212 F.3d 358, 372 (7th Cir. 2000) (upholding termination of fireman who "had publicly excoriated [the fire chief] as a lesbian" leading to an unwanted "front-page

11

newspaper story").  Indeed, the government's interest in its diversity policies allow

it to do more than just insist that employees don't publicly undermine them; the

government is allowed to mandate cooperation with trainings to promote diversity

and tolerance, irrespective of their personal religious beliefs.  *See Altman v. Minn.*

*Dept. of Corr.*, 251 F.3d 1199 (8th Cir. 2001) (public employer's insistence that

employees attend lesbian/gay diversity training and not read Bibles during the

presentation did not violate the employee's free exercise rights).

Cochran's protestations that he has not engaged in misconduct towards his

subordinates and the community he served is contrary to law.  *See Fairley v.*

*Fermaint*, 482 F.3d 897, 903 (7th Cir. 2006) (noting that a government workplace

where "the men demean the women . . . may be actionable under the

Constitution."); *Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1035 (9th

Cir. 2005)  ("genuine factual disputes exist as to both the severity and

pervasiveness of Stacey's conduct," citing his "demeaning comments about

women in the workplace, including stating that 'women should only be in

subservient positions' . . ."); *Bodett v. CoxCom, Inc.*, 366 F.3d 736, 745 (9th Cir.

2004) (telling subordinate "that 'the Bible says that homosexuality is a sin,' that

'the relationship [with a woman] that she was in, was probably the cause of the

12

turmoil and unhappiness in her life,' and that if she was dating another woman 'I would be disappointed.' . . . certainly constitute harassment . . . "); *Moysey v. Rearick*, Civ. No. 3:00cv2026 (AHN), 2004 U.S. Dist. LEXIS 12531, at *3, *10 (D. Conn. Mar. 25, 2004) (even if his complaints about other officers did constitute speech of public concern, officer properly was disciplined for making statements "that were demeaning toward women").

Even more to the point, Cochran's protestations of not having violated any discrimination law is "legally irrelevant" to the propriety of his termination. *Dushane v. Leeds Hose Co. #1*, 6 F. Supp. 3d 204, 214 n.6 (N.D.N.Y. 2014).  A decisionmaker "does not need to demonstrate that the comment was actionable under Title VII. . . . [E]mployers are free to terminate employees for any lawful reason, they are certainly free to terminate employees for making deeply offensive and misogynistic comments. . . ."  *Id.  See also Altman*, 251 F.3d at 1201, 1204 (directing dismissal of free exercise and freedom of conscience claims despite the fact that plaintiffs' reading Bibles during diversity training "did not disrupt the trainers' presentation" and "none complained about [their] behavior."); *id*. at 1203 ("An employee who refuses to be trained has, from the employer's reasonable perspective, impeded his or her ability to do the job.").  Here, being disruptive or

13

exposing defendants to liability is not required.  The damage to the City's public

policy is palpable.  Cochran excoriated same-sex relationships and specifically

editorialized that the fault of the fall of the human race into sin was due to a

woman not deferring to her husband.  As a matter of law, defendants acted

reasonably in invoking its interest in "maintaining the public trust and efficient

provision of fire department services," see COA MTD [11] at 15, given Cochran's

publicly-pronounced disdain for same-sex relationships and distrust of women as

independent decision-makers.

  As referenced above, if another city employee got away with similar public

disdain, using either historical accounts or fictional fables not from the Bible,

Cochran could have a claim, but there are no such allegations in the complaint. [6]

*See Daniels v. City of Arlington*, 246 F.3d 500, 507 (5th Cir. 2001) (First

Amendment claim failed where police officer did "not prove[] any disparate

---

[6] That Cochran misunderstands the basis of the City's action is suggested by
paragraphs 73-75 of the Complaint in which he alleges that his religious beliefs
compel him to treat every individual with dignity and respect.  Notably, and unlike
many other paragraphs of the complaint, there is no citation to any passage in his
published book in paragraphs 73-75.  Whether in fact Cochran was less scornful of
women, lesbians, and gay men personally than he publicly portrayed is irrelevant;
indeed, if he did not believe a word is his book, that would not matter either.
Cochran was not dismissed for the beliefs in his heart, as he asserts with no factual
support, but rather for his public pronouncements.

14

treatment or show[] that any non-Christian pin request was approved or otherwise handled differently from his."); *Altman*, 251 F.3d at 1202-03 and n.3 (employees with strong religious objections to diversity training would have a cognizable First Amendment claim if they could prove that "similarly situated persons – employees who have been inattentive for other reasons during [] training sessions" employees "went unpunished" despite being "equally insubordinate," thus possibly demonstrating "'the presence of an unlawful intent to discriminate against the plaintiff for an invalid reason,' such as their religion."). Comments excoriating segments of the community, whether religiously-based or not, are understandably unacceptable. See *Lumpkin v. Jordan*, *supra*, 1994 U.S. Dist. LEXIS 17280 at *13-14, 20-21 (if employee had been discharged for "proclaiming that he believed the world had been created in seven days, this would be a very different case; such a statement presumably would not have thwarted the  policies of the Commission and of the Mayor. . . . he was not removed because he believed in the inerrancy of the Bible; rather, he was removed because his religious beliefs were at odds with the goals of the Commission and disrupted Mayor Jordan's administration.").

15

## CONCLUSION

Amicus concurs with the City of Atlanta that the complaint in this action should be dismissed in its entirety.

Respectfully submitted,

LAMBDA LEGAL DEFENSE &
EDUCATION FUND, INC.

By: /s/ Gregory R. Nevins
Gregory R. Nevins
GA State Bar No. 539529
730 Peachtree St. NE, Suite 1070
Atlanta, GA 30308
Telephone: (404) 897-1880
Facsimile:  (404) 897-1884
ATTORNEYS FOR AMICUS CURIAE
Lambda Legal Defense & Educ. Fund, Inc.

16

## CERTIFICATION UNDER L.R. 7.1D

Pursuant to Northern District of Georgia Local Rule 7.1D, the undersigned counsel for Plaintiff certifies that the foregoing document is a computer document prepared in Times New Roman (14 point) font in accordance with Local Rule 5.1B.

So certified this 3rd day of April, 2015.

LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.

/s/ Gregory R. Nevins_____
Gregory R. Nevins

## CERTIFICATION OF SERVICE

I hereby certify that on April 3, 2015, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will automatically send notification of such filing to all counsel of record.

So certified this 3rd day of April, 2015.

LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.

/s/ Gregory R. Nevins_____
Gregory R. Nevins

17