# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

**KELVIN J. COCHRAN**,

                       Plaintiff,

    v.

**CITY OF ATLANTA, GEORGIA; and MAYOR KASIM REED, IN HIS INDIVIDUAL CAPACITY,**

                  Defendants.

Case No. 1:15-cv-00477-LMM

**BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

KEVIN H. THERIOT
Georgia Bar No. 373095
KENNETH J. CONNELLY*
Arizona Bar No. 025420
JEANA HALLOCK*
Arizona Bar No. 032678
**ALLIANCE DEFENDING FREEDOM**
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
ktheriot@adflegal.org
kconnelly@adflegal.org
jhallock@adflegal.org

DAVID A. CORTMAN
Georgia Bar No. 188810
**ALLIANCE DEFENDING FREEDOM**
1000 Hurricane Shoals Road, NE
Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
dcortman@adflegal.org

Garland R. Hunt
Georgia Bar No. 378510
**HUNT & ASSOCIATES**
12110 Helleri Hollow
Alpharetta, GA 30005
(770) 294-0751
(770) 777-5847 (facsimile)
garlandhunt1@gmail.com

JONATHAN D. CRUMLY, SR.
Georgia Bar No. 199466
**MANER CRUMLY CHAMBLISS LLP**
2900 Paces Ferry Road
Suite B-101
Atlanta, GA 30339
(770) 434-0310
Jcrumly@Manercc.com

*pro hac vice* admission

# TABLE OF CONTENTS

INTRODUCTION ................................................................................. 1

STATEMENT OF FACTS ................................................................... 3

ARGUMENT ....................................................................................... 3

I.   Chief Cochran is Entitled to Summary Judgment on His First
     Amendment Retaliation Claim. .......................................................... 3

     A.   Chief Cochran Spoke as a Citizen on a Matter of Public
          Concern. ..................................................................................... 7

     B.   Chief Cochran's Free Speech Interest Outweighs Defendant's
          Interests. .................................................................................... 8

          1.   Chief Cochran's Speech Did Not Impede Defendant's
               Ability to Efficiently Perform Its—or His—Duties. ............ 8

          2.   The Manner, Time, and Place of the Speech Demonstrate
               That Chief Cochran's Speech Interest Outweighs
               Defendant's Interest. ....................................................... 12

          3.   The Context of Chief Cochran's Speech Demonstrates
               That His Interest Outweighs the Interest of Defendant.  14

     C.   Chief Cochran's Speech Played a Substantial Part in
          Defendant's Decision to Suspend and Terminate Him. .......... 15

     D.   Defendant Cannot Show That It Would Have Suspended and
          Terminated Chief Cochran Absent His Speech. ..................... 16

II.  Defendant Engaged in a Policy and Practice of Prohibiting the
     Constitutionally Protected Free Speech Rights of Chief Cochran. . 20

     A.   Defendant Engaged in Content and Viewpoint Discrimination
          By Suspending and Terminating Chief Cochran as a Result of
          His Writing and Publishing His Book. ................................... 20

    B.  Defendant's Written and Unwritten Policies Requiring Pre-Clearance To Publish Written Works Unrelated to the Subject Matter of Government Employment Violate the First Amendment. ............................................................... 22

        1.  Defendant's Policies Constitute Impermissible Prior Restraints When Applied to Such Written Works. .......... 22

        2.  Defendant's Application of Its Policies Impermissibly Grant It Unbridled Discretion. ......................................... 27

III. Chief Cochran is Entitled to Summary Judgment on His Procedural Due Process Claim under Section 114-528 of the City of Atlanta Code of Ordinances and under Section 2-820 of the City of Atlanta Code of Ethics. .................................................................. 29

CONCLUSION ................................................................... 35

CERTIFICATE OF COMPLIANCE ................................................. 37

# TABLE OF AUTHORITIES

**Cases**

*Alexander v. United States,*
    509 U.S. 544 (1993) ................................................................. 22

*Alves v. Board of Regents of the University System of Georgia,*
    804 F.3d 1149 (11th Cir. 2015) ................................................ 6

*Bantam Books, Inc. v. Sullivan,*
    372 U.S. 58 (1963) ................................................................... 22

*Battle v. Mulholland,*
    439 F.2d 321 (5th Cir. 1971) ................................................... 10

*Board of Regents of State Colleges v. Roth,*
    408 U.S. 564 (1972) ................................................................. 30

*Berger v. Battaglia,*
    779 F.2d 992 (4th Cir. 1985) ................................................... 11

*Bloedorn v. Grube,*
    631 F.3d 1218 (11th Cir. 2011) ............................................... 29

*Brown v. Georgia Department of Revenue,*
    881 F.2d 1018 (11th Cir. 1989) .......................................... 32, 33

*Bryson v. City of Waycross,*
    888 F.2d 1562 (11th Cir. 1989) ............................................ 8, 16

*City of San Diego, California v. Roe,*
    543 U.S 77 (2004) ..................................................................... 7

*Cleveland Board of Education v. Loudermill,*
    470 U.S. 532 (1985) ................................................................. 31

*Cochran v. City of Atlanta,*
    150 F. Supp. 3d 1305 (N.D. Ga. 2015) ...................... 6, 7, 8, 14, 30-31

*Connick v. Myers*,
    461 U.S. 138 (1983) ................................................................. 6, 7, 8

*Cook v. Gwinnett County School District*,
    414 F.3d 1313 (11th Cir. 2005) ....................................................7

*Cooper v. Dillon*,
    403 F.3d 1208 (11th Cir. 2005) ................................................. 22

*Crue v. Aiken*,
    370 F.3d 668 (7th Cir. 2004) ................................................. 25-26

*Dixon v. Metropolitan Atlanta Rapid Transit Authority*,
    242 Ga. App. 262 (2000) ........................................... 30, 32, 33

*Doss v. City of Savannah*,
    290 Ga. App. 670 (Ga. Ct. App. 2008) ............................... 32-33

*Feiner v. New York*,
    340 U.S. 315 (1951) ................................................................. 11

*Flanagan v. Munger*,
    890 F.2d 1557 (10th Cir. 1989) ............................................... 11

*Forsyth County, Georgia v. Nationalist Movement*,
    505 U.S. 123 (1992) ........................................................... 22, 27

*Harman v. City of New York*,
    140 F.3d 111 (2d. Cir. 1998) ............................................. 26, 29

*Haves v. City of Miami*,
    52 F.3d 918 (11th Cir. 1995) .....................................................3

*Lamb's Chapel v. Center Moriches Union Free School District*,
    508 U.S. 384 (1993) ................................................................. 20

*Liverman v. City of Petersburg*,
    844 F.3d 400 (4th Cir. 2016) ................................................... 25

*Nebraska Press Association v. Stuart*,
    427 U.S. 539 (1976) ................................................................. 22

*Palmore v. Sidoti,*
    466 U.S. 429 (1984) ................................................................. 10

*Perry v. Sindermann,*
    408 U.S. 593 (1972) ................................................................. 30

*Pickering v. Board of Education of Township High School District,*
    391 U.S. 563 (1968) ................................................................... 6

*Price Waterhouse v. Hopkins,*
    490 U.S. 228 (1989) ................................................................. 16

*Rankin v. McPherson,*
    483 U.S. 378 (1987) ............................................................. 8, 14

*Reed v. Town of Gilbert, Arizona,*
    135 S. Ct. 2218 (2015) ............................................................ 20

*Rosenberger v. Rector & Visitors of University of Virginia,*
    515 U.S. 819 (1995) ................................................................. 20

*Sanjour v. E.P.A.,*
    56 F.3d 85 (D.C. Cir. 1995) ................................................ 26, 29

*Saxe v. State College Area School District,*
    240 F.3d 200 (3d Cir. 2001) ............................................... 11-12

*Southeastern Promotions, Ltd. v. Conrad,*
    420 U.S. 546 (1975) ................................................................. 22

*Stanley v. City of Dalton, Georgia,*
    219 F.3d 1280 (11th Cir. 2000) ............................................... 15

*Swartzwelder v. McNeilly,*
    297 F.3d 228 (3d Cir. 2002) .................................................... 26

*Tinker v. Des Moines Independent Community School District,*
    393 U.S. 505 (1969) ................................................................. 10

*Tucker v. State of California Department of Education,*
    97 F.3d 1204 (9th Cir. 1996) .................................................... 26

*United States v. National Treasury Employees Union,*
   513 U.S. 454 (1995) ........................................................ 6, 23-26

*Warren v. Crawford,*
   927 F.2d 559 (11th Cir. 1991) ................................................ 30

*Waters v. Chaffin,*
   684 F.2d 833 (11th Cir. 1982) ................................................ 13


**Constitutional Provisions**

U.S. Constitution, Amendment XIV ............................................... 30


**Statutes and Rules**

Federal Rules of Civil Procedure, Rule 56 ........................................ 3

City of Atlanta Code of Ethics, Section 2-806 ............................... 33-34

City of Atlanta Code of Ethics, Section 2-820(d) ................... 23, 25, 27

City of Atlanta Code of Ordinances, Section 114-528 ..................... 31

City of Atlanta Code of Ordinances, Section 114-530 ..................... 31

# INTRODUCTION

Defendant City of Atlanta punished, and ultimately fired, Plaintiff Kelvin Cochran because it disagreed with the religious beliefs he expressed in a book he wrote for a men's Bible study.[1]  The book, which Chief Cochran wrote on personal time while chief of the Atlanta Fire and Rescue Department ("AFRD"), was entitled *Who Told You That You Were Naked?: Overcoming the Stronghold of Condemnation*, and was aimed at helping Christian men fulfill God's purpose for their life. Chief Cochran self-published the book in November 2013 and later gave a few free copies to AFRD members who either requested them or with whom he had established a previous relationship as a fellow Christian. Chief Cochran also gave a copy of his book to Mayor Reed's assistant, Lilly Cunningham, about a week before the mayor's State of the City address, in February 2014, and asked her to give it to the mayor. Chief Cochran later spoke to the mayor after his address, and the mayor confirmed that he had received a copy of the book.[2]  For an entire year, until

---

[1] Based upon this Court's ruling on Defendants' Motion to Dismiss, Plaintiff's claims sounding in First Amendment retaliation and free speech pertain to Defendant City of Atlanta alone, while his Fourteenth Amendment procedural due process claim pertains to Defendants City of Atlanta and Mayor Reed, in his individual capacity.

[2] Mayor Reed could not recall for certain the facts regarding this matter. *See* Reed Dep. at 90-91. However, when Director of Communications Anne Torres later discussed the matter with an inquiring reporter, she indicated that the mayor had in fact received the book but had not read it. *See* Torres Dep. at 52-56; Pl's Ex. 72

November 2014, when one AFRD member read the 162-page book and raised a concern founded in personal disagreement with some of its contents, the book, the city, and the AFRD peacefully coexisted.

Yet once that single instance of personal disagreement surfaced, Defendant immediately took both private and public issue with the book's contents and launched a much publicized investigation into Chief Cochran's leadership of AFRD. That investigation ultimately revealed that the religious beliefs expressed by Chief Cochran in his book did not affect the way he discharged his duties as fire chief. Defendant summarily terminated Chief Cochran anyway.

The record reveals that the content of the book drove Defendant's disciplinary process from start to finish, and ultimately accounted for its decision to suspend and terminate Chief Cochran. It was only after Defendant had acted pursuant to its substantive disagreement with Chief Cochran's book that it then added to its sole focus on content, attempting to justify its discipline on policies that either do not exist, or cannot be constitutionally applied here.

Each of the decisions made by Defendant—both to suspend and to terminate Chief Cochran—independently violated his constitutional right to free speech. Moreover, by depriving him of the procedural protections that were his due under

---

("He did not read the book when he handed it to him."). Regardless of whether the Mayor read the book, he was clearly aware of it and had the opportunity to read it.

the City's Code of Ethics, Defendants—both the City of Atlanta and Mayor Reed in his individual capacity—violated Chief Cochran's right to procedural due process. Accordingly, because the undisputed evidence demonstrates that Defendant punished Chief Cochran based on the content of his book, and did so while ignoring the procedural rights the City normally affords to all other employees in like situations, Chief Cochran is entitled to summary judgment on his First Amendment retaliation, viewpoint discrimination, prior restraint, unbridled discretion, and procedural due process claims.

## STATEMENT OF FACTS

The facts are as stated in Plaintiff's Statement of Material Facts Not in Dispute, which Plaintiff incorporates as if fully set forth here.

## ARGUMENT

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995).

**I.     Chief Cochran is Entitled to Summary Judgment on His First Amendment Retaliation Claim.**

Because Chief Cochran's book comprises constitutionally protected speech for which Defendant improperly disciplined him, he is entitled to summary judgment

3

on his retaliation claim. Indeed, the record demonstrates that Defendant suspended and ultimately terminated Chief Cochran based upon its substantive disagreement with the content of his book.

As to suspension, the entire process was precipitated by a solitary instance of personal disagreement with a small portion of the book's content. *See* Borders Dep. at 54 l. 14; 55 l. 17 (discussing the fact that Chief Wessels pointed out to union president Stephen Borders what he deemed to be "disturbing" passages focused on "some very explicit conservative Christian ideals"). That content was soon seized upon by Defendant to manufacture a crisis where none actually existed. *See* Wan Dep. at 46-47, 53 (detailing that Borders took the book to Councilman Alex Wan, who, because he disagreed with the contents of the book, then took it to Commissioner of Human Resources Yvonne Yancy). Indeed, City officials, upon being made aware of personal disagreement with the book, almost immediately— both privately and publicly—repudiated the beliefs expressed in the book. *See* Yancy Dep. at 26 l. 22; 69 l. 8-9 (Yancy stated that "the content [of the book] was problematic," and concluded that Chief Cochran had "espoused beliefs that were offensive to many groups"); Pl's Ex. 10 (Mayor Reed stated on his Facebook page that he was "deeply disturbed by the sentiments expressed in the book," which was "not representative of [his] beliefs"); Wan Dep. at 84-85; Pl's Ex. 108 (Councilman Wan told the Atlanta Journal Constitution that when a city employee's "opinions

4

are different from the City's you have to check them at the door"). And they launched an investigation because of the book's content. Yancy Dep. at 62-64; Geisler Dep. at 57 l. 24-58 l. 1 (stating that one of the purposes of the investigation "was to address any concerns, different community groups, the LGBT would have had about the chief's stand on things"). Finally, the ostensibly offensive content of the book featured prominently at Chief Cochran's suspension meeting, Yancy Dep. at 93; Cochran Dep. at 200-202, at which he was informed that he would be required to attend sensitivity training because of what he wrote in his book. Yancy Dep. at 68-69, 76; Pl's Ex. 10.

As with suspension, content also drove Defendant's decision to terminate. Although the City Law Department concluded that Chief Cochran's religious beliefs had not affected his leadership of the AFRD, whether as to discrimination or discipline, Pl's Ex. 13 at 3-4, and although no City leader or employee could recall any instance in which Chief Cochran had discriminated against anyone, Reed Dep. at 156 l. 10-13; Geisler Dep. at 47 l. 2-13; Yancy Dep. at 102 l. 11-14; Mullinax Dep. at 19 l. 19-20 l. 4, Defendant terminated him. Defendant then continued to publicly repudiate the contents of Chief Cochran's book. Mayor Reed specifically noted in his January 6, 2015 press conference announcing Chief Cochran's termination that "the book . . . contains material that is clearly inflammatory." Pl's Ex. 14 at 2. And Anne Torres, the Mayor's Director of Communications, even after Chief Cochran

had been terminated for an entire week, even after the investigation had

exonerated him of discrimination, on the very day the City released its

Investigative Report, sent out proposed Tweets for distribution to Defendant's

"supporters," suggesting that the content of Chief Cochran's book constituted

discrimination against AFRD members. Pl's Ex. 77; Torres Dep. at 76-77.

Given this undisputed evidence, it is clear that Defendant's actions cannot

pass constitutional muster. "A government employer may not [discipline] a public

employee in retaliation for speech protected by the First Amendment," *Alves v.*

*Board of Regents of the University System of Georgia*, 804 F.3d 1149, 1159 (11th

Cir. 2015), which protects the right of citizens to speak freely on matters of "public

concern." *United States v. Nat'l Treasury Emps Union*, 513 U.S. 454 (1995)

("*NTEU*"); *Pickering v. Bd. of Educ. of Twp. High Sch. Dist.*, 391 U.S. 563, 573

(1968). Put simply, the fact that he was employed by the city does not mean that

Chief Cochran was required to "relinquish [his] First Amendment right[] to

comment on matters of public interest" *Connick v. Myers*, 461 U.S. 138, 140 (1983).

As this Court has previously recognized, to determine whether a plaintiff

prevails on his free speech retaliation claim, the Eleventh Circuit has adopted "a

four-part test[] based on *Pickering* and its progeny." *Cochran v. City of Atlanta*,

150 F. Supp. 3d 1305, 1312 (N.D. Ga. 2015). That test requires the employee to

show that:

> (1) the speech involved a matter of public concern; (2) the employee's free speech interests outweighed the employer's interest in effective and efficient fulfillment of its responsibilities; and (3) the speech played a substantial part in the adverse employment action.

*Cook v. Gwinnett Cty. Sch. Dist.*, 414 F.3d 1313, 1318 (11th Cir. 2005). Once an employee satisfies these requirements, "the burden then shifts to the employer to show by a preponderance of the evidence that it would have made the same decision even in the absence of the protected speech." *Id.*

## A. Chief Cochran Spoke as a Citizen on a Matter of Public Concern.

This Court previously found that Chief Cochran had sufficiently pled a claim that he spoke as a private citizen on a matter of public concern. *Cochran*, 150 F. Supp. 3d at 1313-14. As no material facts have been adduced through discovery to cast any doubt upon this Court's earlier conclusion, no further analysis is necessary to establish this factor as a matter of law. *See Cook*, 414 F.3d at 1318 (public concern inquiry is a "question of law"). Chief Cochran's book clearly constituted speech by a private citizen on a matter of public concern. *See City of San Diego, Cal. v. Roe*, 543 U.S 77, 83-84 (2004) (stating that "public concern is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication"); *Connick*, 461 U.S. at 146 (establishing that speech "relating to any matter of political, social, or other concern to the community" is protected).

**B. Chief Cochran's Free Speech Interest Outweighs Defendant's Interests.**

Once an employee establishes that his speech implicates a matter of public concern, "[t]he State bears a burden of justifying the discharge on legitimate grounds." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987). The Supreme Court has cautioned that where an "employee's speech more substantially involve[s] matters of public concern," "a stronger showing may be necessary" by the employer. *Connick*, 461 U.S. at 152. Here, Chief Cochran's speech substantially involved matters of public concern. *See Cochran*, 150 F. Supp. 3d at 1313 (wherein this Court found that Plaintiff addressed issues "frequently the subject of political and social commentary"). Defendant's burden to justify its disciplinary action is therefore high.

The balancing inquiry used to decide this factor looks at "(1) whether the speech at issue impedes the government's ability to perform its duties efficiently, (2) the manner, time and place of the speech, and (3) the context within which the speech was made." *Bryson v. City of Waycross*, 888 F.2d 1562, 1567 (11th Cir. 1989) (citations and quotations omitted). Analysis of these questions reveals that Chief Cochran's interest should comfortably prevail over Defendant's.

**1. Chief Cochran's Speech Did Not Impede Defendant's Ability to Efficiently Perform Its—or His—Duties.**

Defendant has adduced no evidence to show that Chief Cochran's book impeded its ability to efficiently administer City government or interfered with the AFRD's internal operations. In fact, the record demonstrates quite the opposite conclusion. Defendant's investigation actually revealed that the beliefs reflected in Chief Cochran's book did not affect how he ran the department. *See* Yancy Dep. at 102 l. 11-13 ("The investigation showed that he had . . . not treated people differently, which I was . . . ecstatic to see and hear"); Geisler Dep. at 66-67; Pl's Ex. 13 at 3-4. The City Law Department unequivocally concluded in its Investigative Report that "[n]o interviewed witness could point to a specific instance in which any member of the organization has been treated unfairly by Chief Cochran on the basis of his religious beliefs." Pl's Ex. 13 at 4. It further found "no indication that Chief Cochran allowed his religious beliefs to compromise his disciplinary decisions." *Id*. at 3.

These findings were notably consistent with the experience of Mayor Reed, Commissioner of Human Resources Yvonne Yancy, Chief Operations Officer Michael Geisler, Special Advisor to the Mayor Melissa Mullinax, and AFRD Public Communications Officer Janet Ward with respect to Chief Cochran's leadership of the AFRD. *See* Reed Dep. at 156 1. 10-13; Yancy Dep. at 102 l. 11-14 (noting that the investigative results exonerating Chief Cochran of any discrimination were "consistent with [Yancy's] knowledge of [Chief] Cochran"); Geisler Dep. at 66 l. 18-

21; Mullinax Dep. at 19 l. 19-20 l. 4 (stating that Chief Cochran had "always been very supportive" of "gay pride events"); Pl's Ex. 17. None of these City personnel—managers, peers, and subordinates alike—could offer any indication that Chief Cochran ever exhibited discrimination towards, or unfair treatment of, any AFRD employee. This unalloyed evidence of fairness and equity on the part of Chief Cochran in running the day-to-day operations of the AFRD defeats any contention that the book impeded or threatened to impede the operation of City government or the AFRD.

Of course, Defendant may attempt to argue that the personal offense taken by some AFRD employees and City leaders to the content of the book is tantamount to disruption or inefficiency. They have testified, for instance, that City leaders and managers were offended by the beliefs expressed in the book. *See* Yancy Dep. at 27 l. 2-10; Reed Dep. at 125 l. 5-13, 135 l. 2-8; Pl's Ex. 10; Shahar Dep. at 40 l. 12-41 l. 19. But "the law cannot, directly or indirectly, give . . . effect" to "private biases." *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984). Personal disagreement—or even less, the mere possibility of its future communication—is not equivalent to disruption or inefficiency. *See Battle v. Mulholland*, 439 F.2d 321, 324 (5th Cir. 1971) (*quoting Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 505, 508 (1969) (stating that "[u]ndifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression"). In other words, "disruption by disagreement"

simply will not do. Permitting such thin gruel to do so here would be to reward Defendant for advancing what amounts to little more than a City-sponsored heckler's veto, and it is axiomatic that such a predicate for stifling speech is constitutionally infirm. *See Flanagan v. Munger*, 890 F.2d 1557, 1566-67 (10th Cir. 1989) (where speech was unrelated to any internal functioning of the police department, where record was "devoid of evidence of actual or potential internal disruption caused by plaintiffs' speech," and where "evidence pointed only to potential problems which might be caused by the public's reaction to plaintiffs' speech," reversing summary judgment against police officers, holding that defendant could not "justify disciplinary action . . . simply because some members of the public find plaintiffs' speech offensive"); *Berger v. Battaglia*, 779 F.2d 992, 996, 1001 (4th Cir. 1985) (where there was no "disruption of the [Police] Department's internal harmony and operations resulting from any of [plaintiff police officer's public] performances in blackface," holding that "threatened disruption by others reacting to [that] speech simply may not be allowed to serve as justification for [department's] disciplinary action"); *see also Feiner v. N.Y.*, 340 U.S. 315, 320 (1951) (holding that "the ordinary murmurings and objections of a hostile audience cannot be allowed to silence a speaker"); *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 215 (3d Cir. 2001) (Alito, J.) (stating that "[t]he Supreme

11

Court has held time and again . . . that the mere fact that someone might take offense at the content of speech is not sufficient justification for prohibiting it").

>   **2. The Manner, Time, and Place of the Speech Demonstrate That Chief Cochran's Speech Interest Outweighs Defendant's Interest.**

Chief Cochran wrote and published his book on his own personal time. *See* Cochran Dep. at 136 l. 19-137 l. 13; First Amended Verified Complaint ¶90 ("Am. Comp.")  From approximately January-March 2014, he gave a few free copies of his book to those he knew to be Christian and had established a prior relationship with and to those who had requested a copy from him when the book was completed. *See* Am. Comp. ¶¶126-27, 129; Cochran Dep. at 217 l. 2-5. Chief Cochran's book was published and for sale for almost a year before any objection was raised to it whatsoever—and even then the offense taken was on a personal level, as to the content of the book—by one AFRD member who had had the book in hand for almost 4 months or more, and who read the entire book on his own time before he took offense and complained. *See* Pl's Ex. 116 at No. 23; Borders Dep. at 54-55; Am. Comp. ¶91. Chief Cochran never conveyed to anyone in the AFRD that reading the book or following its teachings was in any way relevant to that employee's status or potential for advancement in the AFRD, and no record evidence permits any conclusion to the contrary. *See* Am. Comp. ¶135. And again, Defendant's own

investigation revealed that the beliefs expressed in the book did not result in discrimination toward, or discipline of, any AFRD member. Pl's Ex. 13 at 3-4.

Taken together, these facts definitively establish that the circumstances surrounding the writing and publishing of the book do not support a claim of municipal disruption or inefficiency. The timeline of long and undisturbed peaceful coexistence between the book and the workplace—prior to one person being offended and Defendant itself conspicuously taking issue with the contents of the book—shows that any allegation of negative workplace impact rests not upon objective evidence but rather on rank speculation and prognostication of possible future disruption or inefficiency. In other words, Defendant's asseveration of disruption is far "more apparent than real." *Waters v. Chaffin*, 684 F.2d 833, 839–40 (11th Cir. 1982) (holding that where 9 months had elapsed between the time a police officer uttered an insubordinate remark and the time discipline was meted out, no "reasonable likelihood of harm to [the department's] efficiency, discipline, or harmony" existed, precisely because any such allegation of adverse effect was "belie[d]" by the "long delay between the incident and the notice of discharge"). Because Defendant has not shown even a reasonable likelihood of harm, much less actual harm, Chief Cochran's paramount interest in his right to free speech must take precedence.

Finally, although it can be expected that Defendant will make much of the fact that Chief Cochran gave a copy of his book to some AFRD members, there is no evidence to suggest that those gifts came with any strings attached whatsoever. *See* Am. Comp. ¶135. In fact, they are part and parcel of the many private communications that mark life in the modern workplace, communications for which speech restriction and punitive discipline are particularly inappropriate. *See Rankin*, 483 U.S. at 393 (Powell, J., concurring) (noting that where "a statement is on a matter of public concern, it will be an unusual case where the employer's legitimate interests will be so great as to justify punishing an employee for . . . private speech that routinely takes place at all levels in the workplace").

### 3. The Context of Chief Cochran's Speech Demonstrates That His Interest Outweighs the Interest of Defendant.

As with the discussion relating to the manner, time, and place of Chief Cochran's speech, the context of that speech also demonstrates that Defendant's operations were never endangered. Chief Cochran's book is a religious commentary on matters of public concern that did not implicate or affect the administration of City government or AFRD affairs. *See Cochran*, 150 F. Supp. 3d at 1313-14 (finding that Chief Cochran had sufficiently pled a claim that he spoke as a private citizen on a matter of public concern); Am. Comp. ¶¶92-93; 96; 98; 100; 103-104; 115-16; 142-44. Furthermore, as has already been established, no AFRD member was required to read the book or to agree with its contents in order to receive fair

14

treatment or to advance in the organization. *See* Am. Comp. ¶135. Defendant's own investigation revealed no evidence to suggest otherwise. Pl's Ex. 13 at 3-4.

Thus, because Defendant can proffer only a hypothetical possibility of a future disruption posed by Chief Cochran's book—a mere conclusory allegation masquerading as proof—Chief Cochran's speech interests outweigh any interests Defendant had in stifling and disciplining him for that speech. *See Stanley v. City of Dalton, Ga.*, 219 F.3d 1280, 1289–91 (11th Cir. 2000) (holding that a police officer's right to voice a "theft accusation" against a superior officer, even where that allegation ultimately proved false, outweighed the interest the department had in maintaining "mutual respect, discipline, and trust in the quasi-military setting of the police department," because there was "no evidence of disruption of the . . . department's operations").

### C. **Chief Cochran's Speech Played a Substantial Part in Defendant's Decision to Suspend and Terminate Him.**

From the time Defendant admits it became aware of the book in November 2014, straight through to its termination of Chief Cochran on January 6, 2015, and even after that date, Defendant exhibited a clear and consistent practice of privately and publicly repudiating the beliefs expressed in the book. As has already been demonstrated, the record is replete with evidence demonstrating that Defendant's substantive disagreement with the content of Chief Cochran's book played a substantial and decisive role in their decision to suspend him. *See supra* at

15

4-6 (outlining Defendant's stubborn and persistent concerns with the content of Chief Cochran's book). In light of those undisputed facts—especially given the sheer number and consistency of the private and public pronouncements by Defendant focused on the beliefs expressed in Chief Cochran's book—it cannot be seriously argued that the content of the book did not play a substantial part in its decision to suspend and later terminate him. The entire affair was precipitated by one individual's personal offense taken at the book, and that initial preoccupation with content never abated, was indeed taken up in earnest by Defendant, persisting even after Chief Cochran's termination had been fully effectuated. And although Defendant later manufactured other reasons for Chief Cochran's suspension and termination, those reasons are immaterial to the question of whether speech played a substantial role in the discipline Defendant meted out to Chief Cochran. The evidence shows beyond doubt that it clearly did.

### D. **Defendant Cannot Show That It Would Have Suspended and Terminated Chief Cochran Absent His Speech.**

This showing, for which Defendant bears the burden, "has been referred to as a 'but for' test; the employer must show that 'its legitimate reason, standing alone, would have induced it to make the same decision.'" *Bryson*, 888 F.2d at 1566 (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989)). Defendant is unable to sustain that burden here, because the content of Chief Cochran's book—and

Defendant's preoccupation with it—pervaded its entire handling of the disciplinary process. *See supra* at p. 4-6.[3]

Defendant would not have suspended Chief Cochran absent the book's content. Content triggered the controversy, was a main point of discussion at the suspension meeting, was the reason Defendant decided to launch an investigation, and was the reason it ordered remedial sensitivity training. *See supra* at 4-6; Yancy Dep. at 62-64, 76. Defendant maintains it would have suspended Chief Cochran solely for his failure to secure approval to write his book, *see* Yancy Dep. at 104-105, but its persistent, orchestrated efforts to distance itself from the substance of the book belies that assertion.[4] *See*, *e.g.*, Pl's Ex. 10; Pl's Exs. 80-84; Pl's Ex. 14 at 1-2; Torres Dep. at 76-77; Pl's Ex. 77. Any other conclusion would render Defendant's communications strategy—which broadly castigated the beliefs expressed in the book—inexplicable.

The same holds true with respect to termination. Defendant has claimed that the investigation was designed to ascertain whether Chief Cochran's religious

---

[3] As an initial matter, it must be stated that it is undisputed that nothing related to Chief Cochran's job performance would have justified either his suspension or termination, and no record evidence exists to dispute this conclusion. *See* Pl's Ex. 2; Yancy Dep. at 114; Taylor-Parks Dep. at 56.

[4] Such a disciplinary decision would itself have been unconstitutional in any event. *See infra* at 20-29. Moreover, the record reveals that requesting permission would have been futile, as Defendant would never have granted permission to Chief Cochran to write the book even if he had requested it.

beliefs—revealed in his book—affected his leadership of the AFRD. Yancy Dep. at

62-64; Geisler Dep. at 57 l. 17-58 l. 6. Yet even after the investigation exonerated

Chief Cochran as to this concern, *see* Pl's Ex. 13 at 3-4, Defendant terminated him

anyway. Defendant maintains it did so because Chief Cochran failed to get

permission to write the book. *See, e.g.*, Yancy Dep. at 102 l. 14-19; Reed Dep. at 167

l. 14-17.[5]  But the problem with this clearly pretextual fallback position is that it is

contradicted by Defendant's own statements. Defendant already knew—before it

suspended Chief Cochran and before the investigation began—that Chief Cochran

had not secured approval to write and/or publish the book from the Board of Ethics

or from Mayor Reed. *See* Geisler Dep. at 84 l. 21-25 ("Yvonne Yancy in that initial

visit [before the suspension] brought up that permission had not been granted, and

part of her concern had to do with the fact that the ethics board . . . had not

---

[5] It is disputed what was said between Chief Cochran and Ethics Officer Nina Hickson during their conversations, and whether Hickson gave Chief Cochran permission to write and publish his book. *See* Cochran Dep. at 110 ("She [Hickson] did specifically point out that as long as it doesn't have to do with subject matter pertaining to my job as fire chief or my role in city government, based on the description that I gave her, that it was permissible."); Yancy Dep. at 55 ("I spoke with Ms. Hickson, and I spoke with Mr. Cochran, and both concurred they had a conversation. They do not agree on the content of that conversation."). One of the duties of the Ethics Officer is to "[e]ducat[e] and train[] all city officials and employees to have an awareness and understanding of the mandate for and enforcement of ethical conduct and advising of the provisions of the code of ethics of the city."  Pl's Ex. 1. This dispute is not material to finding a legal violation on this claim, however.

18

approved of the book . . ."); Reed Dep. at 118-119. Thus the investigation merely confirmed what Defendant already knew on that score. Moreover, even with the knowledge that Chief Cochran failed to secure approval from the Board of Ethics or Mayor Reed, Defendant is on record indicating that it nonetheless intended to retain him once the suspension period ended. *See* Yancy Dep. at 105 l. 22-106 l. 9; 129 l. 21-23 ("We intended to bring him back to work. I contracted to do sensitivity training with the vendor."). In sum, Defendant clearly discarded Chief Cochran's alleged failure to get permission to write the book as a predicate for termination from the outset, so it should not be credited—at this late date and only for purposes of bolstering Defendant's summary judgment prospects—as an independent reason for termination.[6]

In sum, given these undisputed facts, the *Pickering* analysis reveals that Chief Cochran suffered an unconstitutional deprivation of his constitutional right to free speech. By writing and publishing his book, Chief Cochran spoke as a private citizen on a matter of public concern, and that book did not disrupt or

---

[6] This conclusion is only further strengthened when it is again considered that Defendant continued to publicly take issue with the content of Chief Cochran's book even after it terminated him, which fact casts serious doubt on any claim that it was something other than the content of the book that formed the predicate for termination. *See supra* at 5-6, 16. For if content were immaterial, Defendant's persistent attempts to distance themselves from it would make no sense.

negatively impact Defendant's administration of City government or AFRD internal operations. Because no evidence suggests that Chief Cochran would have been similarly disciplined absent the particular content of his book, he is entitled to summary judgment on his retaliation claim.

## II. Defendant Engaged in a Policy and Practice of Prohibiting the Constitutionally Protected Free Speech Rights of Chief Cochran.

### A. <u>Defendant Engaged in Content and Viewpoint Discrimination By Suspending and Terminating Chief Cochran as a Result of His Writing and Publishing His Book.</u>

The "government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995); *see also Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993) (internal quotations and citations omitted) (holding that the "First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others"). Because "[g]overnment discrimination among viewpoints . . . is a more blatant and egregious form of content discrimination," strict scrutiny is demanded, which means that the government must "prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2230-31 (2015) (internal quotations and citations omitted).

In this case those who opposed the beliefs expressed in Chief Cochran's book prosecuted his disciplinary process from start to finish. Defendant consistently and deliberately repudiated those beliefs. *See supra* at 4-6.[7] Defendant even publicly characterized Chief Cochran's beliefs as discriminatory, after he was terminated, and after their official investigation found precisely to the contrary. *Id.* Finally, Defendant ordered Chief Cochran to attend sensitivity training to remediate his wayward views and beliefs. Yancy Dep. at 67-69, 76 l. 6-9; Pl's Ex. 10.

Given these undisputed facts, it cannot be plausibly denied that Chief Cochran was disciplined because of the views he communicated in his book. *See* Yancy Dep. at 69 l. 8-9 ("[H]e espoused beliefs that were offensive to many different groups."). Nor can it be denied that there exists no support for the conclusion that similar discipline or remedial training would have been meted out to a City employee who wrote a book praising same-sex marriage or sexual activity outside of marriage, or to a City employee who wrote a how-to book on an anodyne topic such as home gardening or competitive duck herding. As such, the differential treatment

---

[7] Many of Defendant's consistent pronouncements were the official product of its communications department. *See, e.g.*, Pl's Ex. 10; Pl's Ex. 77; Pl's Exs. 80-84. These official statements were deliberately announced and timed for maximum effect. *See* Torres Dep. at 69-78. Defendant should therefore not be permitted to dismiss them as merely personal or random musings.

21

accorded Chief Cochran by Defendant justifies a grant of summary judgment in his favor on his content and viewpoint discrimination claim.

**B.** **Defendant's Written and Unwritten Policies Requiring Pre-Clearance To Publish Written Works Unrelated to the Subject Matter of Government Employment Violate the First Amendment.**

**1.** **Defendant's Policies Constitute Impermissible Prior Restraints When Applied to Such Written Works.**

A prior restraint exists whenever a speaker must obtain permission before speaking. *See Alexander v. United States*, 509 U.S. 544, 550 (1993); *Cooper v. Dillon*, 403 F.3d 1208, 1215 (11th Cir. 2005) (a "prior restraint . . . prohibits or censors speech before it can take place"). "[P]rior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights," *Nebraska Press Association v. Stuart,* 427 U.S. 539, 559 (1976), and thus any such system "comes [with] a heavy presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963). Indeed, absent the most exceptional of circumstances, a prior restraint will pass constitutional muster only where it is "narrowly tailored to serve a significant governmental interest." *Forsyth Cty., Ga. v. Nationalist Movement*, 505 U.S. 123, 130 (1992); *see also Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975) ( "[A] free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them and all others beforehand.").

Section 2-820(d) of the City of Atlanta Code of Ethics provides that "[City officials and employees] . . . may engage in private employment or render services for private interests only upon obtaining prior written approval from the board of ethics." Defendant has interpreted this provision to mean that city officials and employees like Chief Cochran must get permission from the City before they write and/or publish *any* work. *See* Reed Dep. at 107 l. 14-17, 118-19; Pl's Ex. 15; Pl's Ex. 36. Defendant also enforces an informal policy requiring those who work for the Mayor to get pre-clearance from him—personally—before writing and/or publishing *any* work. *See* Reed Dep. at 119 l. 2-5 ("[A]t no time did my chief . . . come in my office  . . . and say, I am writing a book and I would like you to support me"); Pl's Ex. 14; Pl's Ex. 22; Pl's Ex. 71 at 3-4.

Tellingly, Defendant maintains that these requirements remain in full force and effect even where, as here, the speech at issue concerns subjects wholly unrelated to government employment. *See* Yancy Dep. at 87-88; Reed Dep. at 118-119. In other words, neither context nor content matters—the City has simply ceded unto itself the final authority over speech, before that speech can be uttered. This is clearly improper, as is made clear by the United States Supreme Court's holding in *NTEU*, which is particularly instructive here.

In *NTEU* the Court confronted a congressional enactment which threatened to "chill[] potential speech before it happens" by prohibiting "federal employees

23

from accepting any compensation for making speeches or writing articles." 513 U.S. at 468, 457. That prohibition applied "even when neither the subject of the speech or article nor the person or group paying for it ha[d] any connection with the employee's official duties," thus imposing a "wholesale deterrent to a broad category of expression by a massive number of potential speakers." *Id.* at 457, 467. The sheer sweep of the law led the Court to conclude that the "government's burden [was] heavy." *Id.* at 466.

That burden required the "Government [to] show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by th[e] expression's necessary impact on the actual operation of the Government." *Id.* at 468 (internal quotations and citations omitted). The Court conspicuously noted that this burden was greater even than the burden imposed by the *Pickering* balancing test, which necessarily involves post-hoc "supervisory decision[s]" rather than *ex ante* decisions. *Id.* at 467-68, 481. Not surprisingly, given these strictures, the Court ultimately found that the "honoraria ban . . . abridges speech under the First Amendment" and could not pass constitutional muster. *Id.* at 470. The Court specifically found that although the government's asserted interest in "operational efficiency is undoubtedly a vital governmental interest," the law's sweeping ban was not "a reasonable response" to any concerns on that score. *Id.* at 473.

24

A similar conclusion is compelled here, where the Code, much like the law in *NTEU*, applies to a broad swath of City personnel, *see* Pl's Ex. 1 at Section 2-820(d), and where Defendant has interpreted it to permit it to approve or disapprove of works written on personal time that in no way implicate the concerns of City government. Most important to the analysis, however, is the fact that any concerns regarding potential or actual "conflict[s]" expressed by the City, Yancy Dep. at 81 l. 13-20, much like the concerns proffered by the government and ultimately found wanting in *NTEU*, do not justify the all-encompassing speech restrictions found in Section 2-820(d) and the Mayor's informal policy, as they have been interpreted and enforced by Defendant.

Authority from myriad other jurisdictions only tends to bolster this conclusion. *See, e.g.*, *Liverman v. City of Petersburg*, 844 F.3d 400, 407 (4th Cir. 2016) (holding that police department's social networking policy, which contained a sweeping "Negative Comments Provision" that operated as a "virtual blanket prohibition on all speech critical of the government employer," was constitutionally infirm pursuant to the analysis required by *NTEU*); *Crue v. Aiken*, 370 F.3d 668 (7th Cir. 2004) (employing *NTEU* analysis in concluding that university president's preclearance directive to plaintiff university faculty members and students, effectively banning them from speaking with prospective student athletes about their belief that the university's mascot was degrading, constituted a prior restraint

and ultimately an infringement of plaintiffs' free speech rights); *Swartzwelder v. McNeilly*, 297 F.3d 228, 241 (3d Cir. 2002) (finding that police bureau's policy requiring pre-authorization before officers could provide expert testimony constituted a "broad[] prior restraint," and concluding that district court did not abuse its discretion in concluding that plaintiff was likely to succeed in his constitutional challenge to that policy); *Harman v. City of New York*, 140 F.3d 111 (2d. Cir. 1998) (holding that city press policy with regard to child welfare and social service agency employees, which required pre-clearance from city before employees could speak to media, violated the First Amendment, and was not justified by city's concern with municipal effectiveness); *Tucker v. State of Cal. Dep't of Educ.*, 97 F.3d 1204 (9th Cir. 1996) (rejecting government claim that workplace ban on religious advocacy was necessary because it adversely impacted the actual operation of the government, and resolving *NTEU* analysis in favor of plaintiff); *Sanjour v. E.P.A.*, 56 F.3d 85 (D.C. Cir. 1995) (holding that EPA regulations prohibiting employees from being reimbursed from private sources for unofficial speaking or writing engagements concerning the subject matter of their work, while permitting reimbursement for officially authorized speech on the same issues, ran afoul of the First Amendment).

Given the record facts, and the relevant controlling and persuasive authority, Defendant's pre-clearance policies—Section 2-820(d) and Mayor Reed's informal

26

requirement—must fail. Both policies constitute impermissible prior restraints on speech for which no justification exists. Defendant cannot advance a significant interest to support its policies, and the blunderbuss approach it seeks to enforce those policies would fail the narrow tailoring standard in any event. As a result Chief Cochran is entitled to summary judgment on his prior restraint claim.

### 2. Defendant's Application of Its Policies Impermissibly Grant It Unbridled Discretion.

Prior restraints must also "not delegate overly broad . . . discretion to [] government official[s] . . . and must not be based on the content of the message." *Forsyth Cty., Ga.*, 505 U.S. at 130. But here Defendant—through Section 2-820(d) and Mayor Reed's informal pre-clearance policy—has arrogated to itself virtually unfettered discretion to pass upon the speech of its employees, even speech that does not implicate the concerns of City government and does not interfere with its operations.

Section 2-820(d) provides that "[t]he board of ethics shall review each request [for private employment] individually," but the Code is entirely silent as to the criteria the board is to be guided by in making its determination. Pl's Ex. 1. The Mayor's informal policy, while not codified, is similarly restrictive and arbitrary, in that it too cedes total control over non-work related speech to the Mayor while offering no standards to adjudicate requests, and no notice as to what is required of

27

the employee seeking clearance to speak or write. *See* Reed Dep. at 121 l. 10-14 (admitting pre-clearance requirement not based on codified policy).

Notwithstanding the lack of identifiable standards or criteria, Defendant claims that both policies can stand as a predicate for punishment. *See* Yancy Dep. at 105 l. 22-106 l. 9 (concluding that the failure to get permission for a book is "enough to fire you right there on its face"); Reed Dep. at 118 l. 19-120, l. 3-4 (concluding that "this offense was very serious and needed to be acted on immediately" because "there was a book that was written without my permission"); Yancy Dep. at 37 l. 20-21(concluding that if the Mayor had not approved Chief Cochran's book, Defendants "were going to have to suspend or terminate him"); Yancy Dep. at 87 l. 21-88 l. 5 (concluding that if an employee fails to follow the processes required to get approval to write a book, discipline is "absolutely" appropriate). Defendant has even gone so far as to claim it retains discretion to make decisions based on the content of a proposed book. *See* Reed Dep. at 54 l. 5-6 (concluding that the question as to whether an opinion from the ethics board is necessary "depends [upon] what the content of the book was").

The ineluctable conclusion to be drawn from these undisputed facts is this: City employees who wish to publish written material unrelated to City government are subject to a review system entirely bereft of any guidelines or standards. Their publication requests may be greeted sympathetically by City officials or they may

not, but there is no way to tell whether and why such requests will be granted or denied. Such a system—which cedes power to whim and personal predilection rather than to judgment based on objective criteria—is an intolerable form of unbridled discretion. *See Bloedorn v. Grube*, 631 F.3d 1218, 1236 (11th Cir. 2011) ("To avoid unbridled discretion, the permit requirements should contain narrowly drawn, reasonable, and definite standards to guide the official's decision."). This is especially egregious given that the policies in question pose the "potential for censorship," *Harman*, 140 F.3d at 120, which "justifies an additional thumb on the employee['s] side of [the] scale[]." *Sanjour*, 56 F.3d at 97.

In sum, given Defendant's unabashed defense of its censorious policies, and given the clear weight of legal authority looking askance at such policies, their application to Chief Cochran and their continued enforcement cannot survive constitutional scrutiny. Chief Cochran is therefore entitled to summary judgment on his unbridled discretion claim.

### III. Chief Cochran is Entitled to Summary Judgment on His Procedural Due Process Claim under Section 114-528 of the City of Atlanta Code of Ordinances and under Section 2-820 of the City of Atlanta Code of Ethics.

Defendants—both the City of Atlanta and Mayor Reed in his individual capacity—deprived Chief Cochran of a property interest in his employment without affording him the procedural due process to which he was entitled.

29

The 14th Amendment to the United States Constitution provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV; *see also Warren v. Crawford*, 927 F.2d 559, 562 (11th Cir. 1991) (holding that the government must provide "procedural due process" when it seeks to deprive a person of "liberty or property"). In order to "have a property interest in a benefit" sufficient to warrant constitutional protection, "a person . . . must . . . have a legitimate claim of entitlement" to that benefit. *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). Once such a claim obtains, "the right to some kind of prior hearing is paramount." *Id.* at 569-70.

"[P]roperty interests subject to procedural due process protection are not limited by a few rigid, technical forms." *Perry v. Sindermann*, 408 U.S. 593, 601 (1972) (internal quotations and citations omitted). Rather, "[a] person's interest in a benefit" will be afforded due process protection "if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing." *Id.* Courts look to state law in order to determine whether a public employee like Chief Cochran has a property interest in his job. *Warren*, 927 F.2d at 562; *see also Dixon v. Metro. Atlanta Rapid Transit Auth.*, 242 Ga. App. 262, 264 (2000) (same). This court has previously recognized that "[u]nder Georgia law, a public employee has a property interest in employment when that

employee can be fired only for cause." *Cochran*, 150 F. Supp. 3d at 1325 (internal quotations and citations omitted).

Chief Cochran had a property interest in his employment by operation of Section 114-528 of the City of Atlanta's Code of Ordinances, which provides that "[n]o employee shall be dismissed from employment . . . except for cause."[8]  Because a property interest obtained, he was entitled "to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story."  *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985). None of the procedures required by *Loudermill*, or by Section 114-530[9]—which mirrors *Loudermill*'s due process requirements—were ever afforded to Chief Cochran by Defendants. Cochran did not receive notice of the charges at least

---

[8] Defendant delivered to Chief Cochran at his suspension meeting a letter which stated that he was being disciplined for a "cause of action as outlined in Section 114-528 of the Code of Ordinances, City of Atlanta." Pl's Ex. 9. Commissioner of Human Resources Yvonne Yancy claimed after the fact that that notification was an "administrative error," and that Chief Cochran should have received a letter without any mention of cause. Yancy Dep. at 71-73. Defendant's post-hoc assertion does not defeat Chief Cochran's claim under Section 114-528 and such a self-serving repudiation of the actual events should not be countenanced.

[9] Section 114-530(a) provides that "[a]n employee against whom an adverse action is to be taken shall be given a written notice of proposed adverse action, signed by the appointing authority or designee, at least ten working days prior to the effective date of the proposed adverse action."  Section 114-530(b) provides that the employee shall be apprised of the "specific and detailed charges and reasons for the adverse action."  And Section 114-530(c) provides that the "employee shall be given the opportunity to respond to charges before the appointing authority or designee who has authority to affirm or modify the proposed adverse action."

10 working days prior to his suspension; he did not receive a detailed explanation of the basis for his suspension or termination; and he did not receive an opportunity to respond to Defendants' decision to both suspend and terminate him. Yancy Dep. at 74-77; Geisler Dep. at 74-75; Am. Comp. ¶¶319-321.

In addition to the "for cause" property interest this Court has already recognized, state law also provides that a property interest in employment can be "created by local ordinance or by implied contract," and may exist where an "employment arrangement is modified by additional contractual or statutory provisions." *Dixon*, 242 Ga. App. at 264. Indeed, "if they impose requirements or procedures regarding dismissals which are analogous to requiring cause," "personnel rules and regulations may create a property interest." *Brown v. Ga. Dep't of Revenue*, 881 F.2d 1018, 1026 (11th Cir. 1989). Such an interest may obtain even where it would appear that an employee's employment is at-will. *Doss v. City of Savannah* is instructive on this point. 290 Ga. App. 670 (Ga. Ct. App. 2008).

In *Doss* the Plaintiff claimed that as a public employee she had a property interest in her job. But the record revealed that the City's Employee Handbook had been revised to state that it did not "constitute an express or implied contract," and further provided that a city employee was entitled to "separate from his/her employment at any time," while the "City of Savannah reserve[d] the right to do the same." *Id*. at 673. Notwithstanding these procedures, however, the Savannah

Police Department Standard Operating Procedure Manual ("SOP"), which the plaintiff had received upon her hiring, set out "procedures to be followed for disciplinary matters." *Id*. The plaintiff argued that the SOP's disciplinary protocols created a requirement that she could only be terminated for cause, despite the other documentation otherwise suggesting an at-will employment relationship. The court found that "the SOP and other city policies . . . applied in th[e] case prevent[ed] a finding as a matter of law that [the plaintiff's] employment was terminable at will." *Id*. at 674.

Consistent with *Doss* and *Brown*, which establishes that "personnel . . . regulations may create a property interest if they impose . . . procedures . . . which are analogous to requiring cause," 881 F.2d at 1026, Chief Cochran had a property interest in his employment by virtue of the rights and remedies contained in the City of Atlanta's Code of Ethics, which constitute "additional . . . statutory provisions" entitling him to procedural due process. *Dixon*, 242 Ga. App. at 264. Put simply, because Defendants (after the fact) allege they specifically and almost singularly punished Chief Cochran for his alleged failure to acquire approval for his book from the Board of Ethics, they were required to afford him all the procedural protections contained therein, before they suspended and terminated him.

With respect to those procedural protections, Section 2-806 of the City of Atlanta Code of Ethics provides that the "board of ethics shall conduct

33

investigations into alleged violations of the ethics code [and] hold hearings and issue decisions" resulting from that process. Pl's Ex. 1. More specifically, Section 2-806 provides that the "ethics officer shall conduct a preliminary investigation of any complaint and provide a written report to the board of ethics discussing the ethics officer's findings." *Id*. Section 2-806 further provides that "[i]f the board determines after a preliminary investigation . . . that . . . probable cause [exists to support the] belief that [an ethics violation has been committed]," it is required to "give notice to the person involved to attend a hearing to determine whether there has been a violation." *Id*. Finally, Section 2-806 guarantees that "[a]ny person who appears before the board [at a hearing] shall have all the due process rights . . . of a witness appearing before the courts of th[e] state [of Georgia]." *Id*.

Despite the clarity and unequivocal nature of these protections, promised to all those suspected of violating the City's Code of Ethics, Defendants never afforded any of them to Chief Cochran. *See* Hickson Dep. at 84 l. 9-11; Ex. 117 at No. 4 (admitting that the ethics board did not investigate the circumstances surrounding Chief Cochran's book). In fact, at the same time Defendants have invoked the Code of Ethics as a cause for their decision to suspend and terminate Chief Cochran, *see* Yancy Dep. at 49; 102, they have steadfastly maintained that he was not entitled to any of its explicit procedural guarantees. *See* Yancy Dep. at 58 l. 17-25, 60 l. 20-22 ("I don't need an ethics violation to discipline an employee for a matter that's

34

unethical."); Hickson Dep. at 98 l. 15-17 (contending that, "whether it's wise or not," the city's human resources department can independently discipline an employee for an alleged ethic violation). In fact, Defendants—once their own investigation demonstrated that Chief Cochran's beliefs had not affected his ability to lead the department—chose to deliberately bypass the independent ethics process legislated into existence by the City itself. *See* Reed Dep. at 41 l. 3-4 (admitting that the ethics process is an independent one); Yancy Dep. at 60 l. 16-17; 89-90 (same). Yet they looked to that statutory scheme to provide them with a reason for termination. Defendants, in other words, intentionally wielded the Code as a sword against Chief Cochran, yet deprived him of the shield that was his due by statutory right. Such treatment, which is not only undisputed by Defendants but positively defended as entirely proper by them, represents an egregious violation of procedural due process that entitles Chief Cochran to summary judgment on this claim.

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that this Court grant his Motion for Summary Judgment.

35

Respectfully submitted this 27th day of April, 2017.

By: /s/ Kevin Theriot

DAVID A. CORTMAN
Georgia Bar No. 188810
**ALLIANCE DEFENDING FREEDOM**
1000 Hurricane Shoals Road, NE
Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
(770) 339-6744 (facsimile)
dcortman@adflegal.org

KEVIN H. THERIOT
Georgia Bar No. 373095
KENNETH J. CONNELLY*
Arizona Bar No. 025420
JEANA HALLOCK*
Arizona Bar No. 032678
**ALLIANCE DEFENDING FREEDOM**
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
(480) 444-0028 (facsimile)
ktheriot@adflegal.org
kconnelly@adflegal.org
jhallock@adflegal.org

Garland R. Hunt
Georgia Bar No. 378510
**HUNT & ASSOCIATES**
12110 Helleri Hollow
Alpharetta, GA 30005
(770) 294-0751
(770) 777-5847 (facsimile)
garlandhunt1@gmail.com

JONATHAN D. CRUMLY, SR.
Georgia Bar No. 199466
**MANER CRUMLY CHAMBLISS LLP**
2900 Paces Ferry Road
Suite B-101
Atlanta, GA 30339
(770) 434-0310
(404) 549-4666 (facsimile)
Jcrumly@Manercc.com

*pro hac vice* admission

ATTORNEYS FOR PLAINTIFF

## **CERTIFICATE OF COMPLIANCE**

Undersigned counsel hereby certifies that this document was prepared in Century Schoolbook 13-point font and fully complies with Local Rules 5.1C and 7.1D.


<u>/s/ Kevin Theriot</u>
Kevin Theriot

## CERTIFICATE OF SERVICE

I hereby certify that on the 27th day of April, 2017, a copy of the foregoing document was filed with the Clerk of the Court using the ECF system, which will effectuate service on all parties.


/s/ Kevin H. Theriot
Kevin H. Theriot
*Attorney for Plaintiff*

38