## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**KELVIN J. COCHRAN**,

                    Plaintiff,

    v.

**CITY OF ATLANTA, GEORGIA; and MAYOR KASIM REED, IN HIS INDIVIDUAL CAPACITY,**

                    Defendants.

Case No. 1:15-cv-00477-LMM

**PLAINTIFF'S STATEMENT OF MATERIAL FACTS NOT IN DISPUTE**

Pursuant to Local Rule 56.1 and Fed.R.Civ.P. 56, Plaintiff presents his Statement of Material Facts Not in Dispute as follows:

1.    In 1981, Kelvin Cochran was hired by the Shreveport Fire Department. First Amended Verified Complaint ¶40.

2.    Cochran was promoted to training officer in the Shreveport Fire Department in 1985, which position entailed training new recruits on operating fire trucks, hoses, and other fire apparatuses. First Amended Verified Complaint ¶¶44-45.

3.    In 1990, Cochran was promoted to Assistant Chief Training Officer at the Shreveport Fire Department, in which position he managed and conducted training programs for other fire department officers. First Amended Verified Complaint ¶¶47-48.

4.     In 1999, Cochran was appointed Fire Chief of the Shreveport Fire Department. First Amended Verified Complaint ¶49.

5.     Cochran served as Fire Chief of the Shreveport Fire Department until January 2008, when he was appointed Fire Chief of the Atlanta Fire Rescue Department by then-mayor Shirley Franklin. First Amended Verified Complaint ¶¶50-51; Def's Ex. 1.

6.     In July 2009, President Obama nominated, and in August 2009 the Senate confirmed, Cochran to the post of U.S. Fire Administrator for the U.S. Fire Administration. First Amended Verified Complaint ¶52; Exhibit 131 (FEMA 00004).

7.     The U.S. Fire Administration is a component of the U.S. Department of Homeland Security's Federal Emergency Management Agency ("FEMA"). First Amended Verified Complaint ¶53; Exhibit 131 (FEMA 00004).

8.     As U.S. Fire Administrator, Cochran oversaw, coordinated, and directed national efforts to prevent fires and improve fire response; and led fire prevention and safety education programs and professional development opportunities for emergency responders. First Amended Verified Complaint ¶56.

9.     Cochran resigned as U.S. Fire Administrator on June 18, 2010 to resume his duties as Fire Chief of the Atlanta Fire Rescue Department. Exhibit 130 (FEMA 00001); First Amended Verified Complaint ¶58.

10.     In 2012, Cochran was awarded Fire Chief of the Year by *Fire Chief* magazine at the International Association of Fire Chief's Fire-Rescue International Conference.  Pl's Ex. 2; First Amended Verified Complaint ¶60.

2

11.     Mayor Reed issued a press release congratulating Cochran on the award and highlighting his exceptional leadership of Atlanta's Fire Rescue Department. Pl's Ex. 2; First Amended Verified Complaint ¶61.

12.     The Mayor's press release included the following summary of Cochran's achievements:

> Under Chief Cochran's leadership, the department has seen dramatic improvements in response times and staffing. In July, the department reached full staffing of four firefighters per engine and zero vacant firefighter positions for the first time in the history of the department. The department also reached a new level of responsiveness on fire emergencies, meeting the National Fire Protection Association Codes and Standards for response coverage 81% of the time, up from 65% in 2010.

Pl's Ex. 2; First Amended Verified Complaint ¶62.

13.     Mayor Reed thanked Cochran in his press release for his "pioneering efforts to improve performance and service within the Atlanta Fire Rescue Department," applauded "Chief Cochran and all of Atlanta's brave firefighters for the commitment to excellence shown throughout the department," and recognized that Cochran's "national recognition" as Fire Chief of the Year was "much-deserved." Pl's Ex. 2.

14.     Under Chief Cochran's leadership, the Insurance Services Office gave the City a Class 1 Public Protection Classification (PPC) rating for the first time in Atlanta's history. Pl's Ex. 7; Reed Dep. at 86 lines 9-15; First Amended Verified Complaint ¶64.

15.     The rating, which went into effect on November 1, 2014, indicates "an exemplary ability to respond to fires," resulted in insurance premiums being lowered throughout the City, and is a rating shared by only 60 cities nationwide. Pl's Ex. 7; First Amended Verified Complaint ¶¶65-66.

3

**Cochran's Religious Beliefs and Their Centrality to His Vocation**

16.    Cochran is an evangelical Christian who holds to historic Christian beliefs. First Amended Verified Complaint ¶67.

17.    Cochran's sincerely held religious beliefs include a historical Christian view of vocation and work, which view compels him to honor God in all aspects of his work by doing everything with excellence throughout his job. First Amended Verified Complaint ¶¶70-71.

18.    Cochran is a member of, attends, and is a Deacon at Elizabeth Baptist Church. First Amended Verified Complaint ¶68.

19.    Cochran believes that performing his public, secular job with excellence results in the private, religious benefit of bringing God glory. First Amended Verified Complaint ¶72.

20.    Cochran's religious beliefs also compel him to treat all fire department staff under his command, and all members of the community he serves, with dignity, justice, equity, and respect, regardless of their personal traits, characteristics, and beliefs. First Amended Verified Complaint ¶73.

21.    Cochran's religious beliefs thus require him to run an inclusive fire department that respects the diverse traits, characteristics, and beliefs of all his employees. First Amended Verified Complaint ¶74.

22.    Cochran's leadership and management philosophy is centered on ensuring that every member of a fire department he leads is treated with dignity, justice, equity, and respect, regardless of any personal characteristic that sets them apart. First Amended Verified Complaint ¶75.

23.    In 2008, when Cochran first became Atlanta's Fire Chief, he set out to achieve this goal by instructing his subordinates to assemble a group of

4

firefighters that fully represented the diverse backgrounds, characteristics, and beliefs within AFRD. Pl's Ex. 117 at No. 14; First Amended Verified Complaint ¶76.

24.    Cochran knew that at least two LGBT employees were members of this group. First Amended Verified Complaint ¶77.

25.    Cochran worked with this group to develop a vision, mission, and governing philosophy for AFRD. Pl's Ex. 117 at No. 14; First Amended Verified Complaint ¶78.

26.    This process resulted in a document called the Atlanta Fire Rescue Doctrine.  Pl's Ex. 117 at No. 15; Pl's Ex. 18; First Amended Verified Complaint ¶79.

27.    Cochran followed this procedure for developing the fire department's policies and procedures because he believes it is the best way for him to discharge his duty to God that he treat every employee within a fire department with dignity, justice, equity, and respect—thereby cultivating an inclusive culture and high level of performance that glorifies God. First Amended Verified Complaint ¶80.

28.    Cochran personally experienced being treated differently based on his race during his early years within the fire service, so he worked diligently throughout his career to ensure that no one under his command would be mistreated because of their membership in a particular group. First Amended Verified Complaint ¶¶81-82.

29.    Commissioner of Human Resources Yvonne Yancy testified that Chief Cochran "was really good at his job.  He was nationally recognized at it . . ." Yancy Dep. at 114 lines 22-24.

5

30.     Katrina Taylor Parks, Deputy Chief of Staff to Mayor Reed, testified that Chief Cochran had a "good reputation . . . as the chief of fire." Taylor-Parks Dep. at 56 lines 23-24.

**Cochran's Self-Published Book**

31.     In 2012, Cochran was facilitating a men's Bible study at his Church, a unit of which focused on God's purpose for men, including the teaching on God's question to Adam in Genesis, "Who told you that you were naked?" *See* Gen. 3:11. First Amended Verified Complaint ¶¶83-85.

32.     Cochran thought about this question often after facilitating the study and eventually felt led by God to write a Bible study on the matter. First Amended Verified Complaint ¶¶86-88.

33.     Cochran soon discovered, however, that he had enough information to write a book. First Amended Verified Complaint ¶89.

34.     Cochran worked on the book over the next year on his personal time.  First Amended Verified Complaint ¶90; Cochran Dep. at 136-137.

35.     On October 31, 2012—around the same time he set out to write the book—Cochran also contacted Nina Hickson, the City of Atlanta Ethics Officer, for ethics advice "regarding [the] non-city-related book he [was] authoring."  Hickson Dep. at 44 lines 14-21; Cochran Dep. at 107 line 17 – 111 line 13; First Amended Verified Complaint ¶105.

36.     One of the duties of the Ethics Officer is to "[e]ducat[e] and train[] all city officials and employees to have an awareness and understanding of the mandate for and enforcement of ethical conduct and advising of the provisions of the code of ethics of the city."  Pl's Ex. 1.

37.    The book expresses Cochran's personal religious beliefs and is the product of the private religious study he undertook for his church. First Amended Verified Complaint ¶¶115-16.

38.    The book, entitled *Who Told You That You Were Naked?: Overcoming the Stronghold of Condemnation*, was written for Christian men, and was intended to help them fulfill God's purpose for their life. First Amended Verified Complaint ¶¶92-93; Cochran Depo. at 143 line 1 – 144 line 21.

39.    One of the book's goals is to guide men to live faith-filled, virtuous lives.  First Amended Verified Complaint ¶94.

40.    The book addresses sexual morality from a Biblical standpoint, including topics such as the propriety of same-sex marriage and premarital sex. First Amended Verified Complaint ¶¶96, 103; Cochran Dep. at 162 line 3 – 164 line 11; Pl's Ex. 11 at 78-85.

41.    With respect to sexual morality, the book teaches that God created sexual acts for procreation and marital pleasure in holy matrimony between a man and a woman, and further teaches that engaging in sex outside the confines of marriage between a man and woman—including fornication, homosexual acts, and all other types of non-marital sex—is contrary to God's will. Cochran Dep. at 162 line 3 - 163 line 15; Pl's Ex. 11 at 78-85; First Amended Verified Complaint ¶¶98, 100.

42.    These teachings are consistent with the Bible and historic Christian teaching.  Cochran Dep. at 163 line 19 – 164 line 11; First Amended Verified Complaint ¶¶99, 101.

7

43.     The rest of the book deals with Christian teaching concerning original sin and the ability of Christians to overcome the influence of sin in their lives through fully embracing and understanding the sacrifice of Jesus Christ. First Amended Verified Complaint ¶104.

44.     Cochran finished the book in the Fall of 2013 and self-published it in late November 2013. First Amended Verified Complaint ¶91; Pl's Ex. 116 at No. 23.

45.     From approximately January-March 2014, Chief Cochran gave a few free copies of his book to AFRD members who he knew to be Christians and had established a prior relationship with, who knew he was writing a book, and who had requested to receive copies of it upon its completion.  First Amended Verified Complaint ¶¶126-27, 129; Cochran Dep. at 217 lines 3-5.

46.     Chief Cochran gave a copy of the book to Mayor Reed's assistant, Lilly Cunningham, about a week before the mayor's State of the City address in February 2014.  Cochran Dep. at 152-53.

47.     Chief Cochran spoke to Mayor Reed after his address and the mayor confirmed that he had received a copy of the book and intended to read it on an upcoming flight.  *Id*. at 153.

48.     Director of Communications Anne Torres testified that the mayor did receive the book but had not read it.  *See* Torres Dep. at 52-56; Pl's Ex. 72 ("He did not read the book when he handed it to him.")

**The City Suspends Chief Cochran Without Pay**

49.     From the time Chief Cochran's book was published in late November 2013 until late 2014, the City received no complaints about the book, including from any member of the AFRD.  Pl's Ex. 117 at No. 1.

8

50.   In late October or early November 2014, Chief Christopher Wessels brought the book to the attention of Atlanta Professional Firefighters Union President Steven Borders.  Borders Dep. at 54 line 9 – 55 line 6.

51.   Cochran had provided a free copy of the book to Chief Wessels— who had previously shared his Christian faith with him—in late June or early July 2014. Cochran Dep. at 141-42; 217; First Amended Verified Complaint ¶132.

52.   Cochran never conveyed to Chief Wessels that reading or following the teachings of his book was in any way relevant to his status or advancement within AFRD. First Amended Verified Complaint ¶135.

53.   Wessels, according to Borders, "finally got around to reading [the book] or reading part of [the book], and there were some passages that were disturbing" to him, most notably "some very explicit conservative Christian ideals" contained in the book.  Borders Dep. at 54 line 12 – 55 line 17.

54.   After ordering a number of copies of the book online to review it himself, Borders took a copy of the book to Councilman Alex Wan, to seek "his counsel and advice on how [the union executive board] should handle it, how the City should handle it."  Borders Dep. at 59 line 22 – 60 line 16.

55.   Councilman Wan is gay, and testified that he believes Borders initially took the book to him, rather than to the City's human resources department, because of the fact that he is gay.  Wan Dep. at 52 lines 11-13.

56.   Borders "gave [Councilman Wan] one of the copies of the book and let him take it from there."  Borders Dep. at 60 lines 14-16.

9

57.    When Councilman Wan received the copy of the book from Borders, "there were Post-its in the book" marking certain passages.  Wan Dep. at 46 lines 4-6.

58.    Borders "expressed concern about the content" of the book to Councilman Wan.  Wan Dep. at 48 lines 15-18.

59.    Councilman Wan read the passages in the book that had been marked by the Post-its and "had concerns" about those passages that "were in reference to the gay and lesbian community."  Wan Dep. at 46 lines 11-15.

60.    Councilman Wan thanked Borders for bringing the book to him and told Borders that "while [he] didn't know what to do right on that moment, that [he] would keep the book and [he] would determine the next step about this."  Wan Dep. at 47 lines 14-18.

61.    At about the same time that Borders met with Councilman Wan about Chief Cochran's book, one of the Atlanta Professional Firefighters Union executive board members also contacted retired AFRD Chief Cindy Thompson, who happened to be in Atlanta at the time, in order to "get her opinion about th[e] matter."  Borders Dep. at 69 line 3 – 70 line 22.

62.    Borders knew Cindy Thompson to be "well versed on social issues" and also knew her to be "an out homosexual." Borders Dep. at 70 line 18 – 71 line 1.

63.    Thus Borders concluded that Cindy Thompson would be a good person to consult, as he was "concerned about any response from the gay community in Atlanta, as well as many homosexual employees that" the AFRD had.  *Id.* at 71 lines 2-4.

64.    At a lunch meeting with Cindy Thompson, Borders showed her the same passages in the book that he had showed to Councilman Wan. Borders concluded, based upon their conversation, that Cindy Thompson was "personally offended" by the "LGBT issues expressed in the book."  Borders Dep. at 71 line 14, 73 lines 10-11.

65.    On November 23, 2014, a day before Chief Cochran was suspended, Cindy Thompson sent an e-mail to Mayor Reed's LGBT Advisor, Robin Shahar, informing her that a "handful of LGBT firefighters I know, and others, are extremely insulted and saddened by the discriminatory text in the book." Pl's Ex. 50.

66.    Meanwhile, Councilman Wan, after meeting with Borders, eventually concluded that "based on the concerns that [he] had about the content [of the book]," that this situation presented "an HR matter."  Wan Dep. at 51 lines 23-24.

67.    Wan then "went and delivered the book to [City of Atlanta Human Resources Commissioner Yvonne Yancy] in person in her office." Wan Dep. at 53 lines 2-3.

68.    At that meeting, which took place on Wednesday, November 19, 2014, just five days before Chief Cochran was suspended, Wan expressed his concerns to Yancy regarding the passages in the book dealing with sexual morality.  *Id*; Yancy Dep. at 20 line 4 – 21 line 9.

69.    Wan also expressed concerns to Yancy that Chief Cochran had identified himself as Chief of the AFRD in the book. Wan Dep. at 53 lines 11-13.

70.    Yancy told Councilman Wan that she would read the book and "follow up appropriately." Yancy Dep. at 22 lines 4-6.

71.    Yancy read the entire book on Thursday, November 20, 2014. *Id*. at 22 lines 20-22.

72.    Yancy was concerned that the City "had not given permission for the book" to Chief Cochran. *Id*. at 26 lines 11-16.

73.    Yancy was concerned that the book contained a reference to Chief Cochran's role as Chief of AFRD. *Id*.

74.    Yancy "thought the content was problematic," and was "offended by how women were referenced, and how Jews were referenced, and how the LGBT community was referenced." *Id*. at 26 line 22 - 27 line 7.

75.    Yancy has testified that Cochran, by writing his book, "espoused beliefs that were in conflict with how women are treated, people of different faiths are treated, how the LGBT community was treated." *Id*. at 63 lines 22-25.

76.    Yancy also testified that Chief Cochran, by writing the book, "espoused beliefs that were offensive to many different groups." *Id*. at 69 lines 8-9.

77.    Yancy testified that Wan was concerned that the employees who found the book offensive were going to protest at an upcoming fire foundation breakfast later in the week. Yancy Dep. at 21 lines 21-24. ("[H]e really didn't want us to have a sort of PR nightmare of employees protesting us at a foundation breakfast that was scheduled for later that week.").

78.    Yancy came to share that concern and testified that she was "concerned about employees having a protest or this issue being raised to embarrass us at the breakfast." *Id.* at 27 lines 15-16.

79.    Yancy spoke to Mayor Reed about the book and "pointed out the passage regarding members of the Jewish community, she pointed out a passage that related to women, and she pointed out a passage that related to homosexuality." Reed Dep. at 94 lines 18-21.

80.    Mayor Reed testified that upon reading those passages he "didn't agree . . . with some of the provisions that were highlighted and shown [to him] by Yvonne Yancy." Reed Dep. at 125 lines 11-13.

81.    Mayor Reed further testified that he did not "agree with the comments [in the book] around homosexuality," "other parts of the book that [he] thought were insensitive to women," and "other parts of the book that [he] thought were insensitive to Jewish people." Reed Dep. at 126 line 25 - 127 line 5.

82.    Mayor Reed further testified that he "was offended by comments" in the book, "[b]ased upon [his] beliefs." Reed Dep. at 135 lines 4-8.

83.    Sometime after Yancy showed the passages to Mayor Reed, Councilman Wan called Mayor Reed to express his concerns about the book. Reed Dep. at 92 lines 14-24, 95 lines 16-25, 124 lines 7-25.

84.    Yancy eventually concluded that because of the content of the book an investigation had to be conducted into whether Cochran's beliefs had affected his leadership of the department.  Yancy Dep. at 62 line 10 – 63 line 16.

85.   Yancy testified that "at the end of the day, you can have a viewpoint, but you have to get permission to do it."  Yancy Dep. at 121 lines 21-22.

86.   COO Michael Geisler testified that in addition to the concern that Chief Cochran had not received permission to write and/or publish his book, "[t]here was also the issue with respect to the content of the book."  Geisler Dep. at 41 lines 14-15.

87.   A meeting was held in Yancy's office with Chief Cochran on Monday, November 24, 2014, with Yancy, Chief of Staff Candace Byrd, and Robert Godfrey from the City Law Department in attendance.  Yancy Dep. at 44, 74 lines 17-21.

88.   At that meeting Chief Cochran was suspended for 30 days without pay, informed that the City would investigate the matter, and notified that he would be required to attend sensitivity or diversity training. *Id.* at 74 line 6 - 76 line 9; Reed Dep. at 149 lines 12-15; First Amended Verified Complaint ¶145; Pl's Ex. 9.

89.   The November 24, 2014 suspension meeting included a preliminary inquiry into whether Chief Cochran had ever received permission to write the book. Yancy Dep. at 93 lines 9-12.

90.   Yancy testified that at the time of the suspension meeting, Defendants "already knew he didn't have permission for the book."  Yancy Dep. at 105 lines 23-24.

91.   Yancy testified that the failure to get permission for the book constituted "enough to fire [Chief Cochran] right on its face," but that

Defendants "didn't separate him.  We chose to bring him back to work . . ." Yancy Dep. at 106 lines 5-9.

92.    There was also at that meeting a discussion surrounding "religion, women, and the LGBTQ issues that [were] raised in the book specifically." Yancy Dep. at 93 lines 15-18.

93.    Yancy explained to Cochran at the meeting that the book contained offensive content, including content "offensive to members of the LGBT community."  Cochran Dep. at 200 line 18 – 202 line 13.

94.    Yancy also informed Cochran that Councilman Wan was offended by comments in the book.  *Id*. at 202 lines 11-13.

95.    One of the reasons Defendants claim that Chief Cochran was suspended was because he failed to follow city policy in writing and publishing the book, including the failure to abide by the requirements of the ethics code and the failure to notify the mayor about the book.  *See* Reed Dep. at 107 lines 12-15 (Q. What cause of action is being referred to here [in the suspension letter given to Chief Cochran]?  A. Creating and producing a book for sale without authorization of the ethics board."); Reed Dep. at 118 lines 24-25, 119 lines 1-5, 17-19 ("He was suspended without pay because, in my opinion, writing a book and earning money off of it, which we knew pretty quickly, was completely inappropriate and wrong. And at no time did my chief of -- at fire and rescue come in my office and sit down and have an in-person conversation and say, I am writing a book and I would like you to support me. He was suspended because he wrote a book without getting an opinion from our ethics officer in writing."); Pl's Ex. 70 ("We suspended the Chief because he published the book without the City's knowledge . . ."); Pl's

Ex. 71 ("Chief Cochran . . . failed to notify the Mayor of the book before it was published.  City policy requires employees to notify their supervisor if they are publishing a book identifying themselves as City of Atlanta employees."); Geisler Dep. at 84 line 21 – 85 line 1 ("Yvonne Yancy in that initial visit [before the suspension] brought up that the permission hadn't been granted, and part of her concern had to do with the fact that the ethics board and Nina Hickson, the ethics officer, had not approved of the book or prior to its being published."); Yancy Dep. at 75 lines 14-16 ("[A]t that juncture [at the suspension meeting], we had not found anything that indicated he had received permission from his manager or the ethics board."); Yancy Dep. at 104-05.

96.    Defendants publicly identified, for media consumption, the beliefs expressed by Chief Cochran in his book as a predicate for discipline, stating that Chief Cochran "was informed at the time of his suspension that . . . he was espousing theories about certain groups of people that were in conflict with the City's policy of inclusiveness."  Pl's Exs. 80-84.

97.    On numerous occasions City officials publicly and conspicuously took issue with the contents of the book. *See* Pl's Ex. 10; Wan Dep. at 84 lines 1-6; Pl's Ex. 108.

98.    In his Facebook statement issued on November 24, 2014 announcing Chief Cochran's suspension, Mayor Reed stated that "[t]he contents of the book do not reflect the views of  . . . the Administration."  Pl's Ex. 10.

99.    Mayor Reed further stated the following with respect to Chief Cochran's book: "I profoundly disagree with and am deeply disturbed by the

sentiments expressed in the paperback regarding the LGBT community." Pl's Ex. 10.

100. Mayor Reed also stated that "the material in Chief Cochran's book is not representative of my personal beliefs, and is inconsistent with the Administration's work to make Atlanta a more welcoming city for all of her citizens—regardless of their sexual orientation, gender, race and religious beliefs." Pl's Ex. 10.

101. Mayor Reed also announced in the Facebook post that Chief Cochran would "be required to complete sensitivity training." Pl's Ex. 10.

102. With regard to the passages in Chief Cochran's book that Councilman Wan took to be referring to the "LGBT community," Councilman Wan made the following statement to the Atlanta Journal Constitution, and repeated this statement on other occasions: "I respect each individual's right to have their own thoughts, beliefs and opinions, but when you're a city employee, and those thoughts, beliefs and opinions are different from the city's, you have to check them at the door." Wan Dep. at 84 lines 1-6; Pl's Ex. 108.

103. Chief of Staff Candace Byrd testified that she and the Mayor discussed Chief Cochran's book and that "some of the excerpts . . . didn't line up with [their] personal beliefs." Byrd Dep. at 50 lines 14-19.

104. Robin Shahar, the Mayor's LGBT Advisor, was offended by the comments in the book related to Jews, women, and the LGBT community, including the beliefs expressed in the book related to same-sex marriage. Shahar Dep. at 40 line 12 – 41 line 5; Geisler Dep. at 30 lines 12-15.

105.   The Anti-Defamation League ("ADL") was invited by Shahar to give their opinion on Chief Cochran's book.  *See* Mullinax Dep. at 35 lines 14-16 ("She [Shahar] thought it would be a good idea to reach out to ADL for their—not analysis, but for their opinion of this.").

106.   Shahar thought it "was very important that other religious perspectives be put in the public domain."  Shahar Dep. at 81 lines 1-10.

107.   Special Advisor to the Mayor Melissa Mullinax testified that the ADL was "an ally" of the administration.  Mullinax Dep. at 36 lines 2-9.

108.   Mayor Reed testified that the ADL "came to [his] office to meet with [him]" regarding Chief Cochran's book.  Reed Dep. at 118 lines 11-13, 120 lines 15-19.

109.   Mayor Reed testified that the ADL representatives "came to meet with [him] about how offensive they found" Chief Cochran's book.  *Id*. at 120 lines 17-19

110.   After the meeting, the ADL sent a letter to Mayor Reed concluding that the "statements of personal belief contained in [Chief Cochran's] book blatantly contradict [the City's nondiscrimination] policy."  Pl's Ex. 12.

111.   The ADL concluded that Chief Cochran could not "check his prejudices at the door and lead the City of Atlanta Fire Department."  *Id*.

**The City Terminates Cochran as AFRD Fire Chief**

112.   Yancy testified that Defendants "intended to bring [Chief Cochran] back to work [after the suspension]." Yancy Dep. at 129 lines 21-22.

113.   Yancy testified that she had already "contracted to do sensitivity training with the vendor." *Id*. at 129 lines 22-23.

18

114.  Yancy testified that the "purpose of that investigation was to ensure that Mr. Cochran in his capacity as fire chief had not treated anyone differently because of the views he espoused in the book." *See* Yancy Dep. at 107 lines 5-8.

115.  Yancy further testified that the City "had to ensure that the actions of Mr. Cochran were reflective of our policy. We don't particularly care how you feel about stuff. We care about what you do in our workplace. So we had to ensure that our workplace was consistent with the values and things that we espouse in our code." Yancy Dep. at 64 lines 8-13.

116.  COO Michael Geisler concurred in his testimony regarding the purpose of the investigation, stating that the investigation "would have looked at whether or not the chief could keep a fair and unbiased view of his operations, or whether it was unduly influenced by his views as expressed in the book." Geisler Dep. at 58 lines 2-6.

117.  Geisler also testified that another purpose of the investigation "was to address any concerns, different community groups, the LGBT would have had about the chief's stand on things." Geisler Dep. at 57 line 24 – 58 line 1.

118.  Tasked with answering these questions, the Law Department concluded in its Investigative Report that "[n]o interviewed witness could point to a specific instance in which any member of the organization has been treated unfairly by Chief Cochran on the basis of his religious beliefs." Pl's Ex. 13 at 4.

119. The Law Department further concluded in its Investigative Report that there was "no indication that Chief Cochran allowed his religious beliefs to compromise his disciplinary decisions." Pl's Ex. 13 at 3.

120. In fact, Yancy testified that this finding was consistent with her experience of working with Chief Cochran: "The investigation showed that he had in fact not treated people differently, which I was actually, frankly, ecstatic to see and hear, and it's consistent with my knowledge of Mr. Cochran." Yancy Dep. at 102 lines 11-14.

121. Chief Cochran was never disciplined at any time during his tenure with the City for any act of discrimination against any AFRD employee. Pl's Ex. 117 at No. 11.

122. Chief Cochran was never disciplined at any time during his tenure with the City for creating or enforcing any discriminatory policy against any AFRD employee. Pl's Ex. 117 at No. 12.

123. Chief Cochran was never disciplined at any time during his tenure with the City for permitting discrimination by or against any AFRD employee. Pl's Ex. 117 at No. 13.

124. Melissa Mullinax testified that in her experience Chief Cochran had "always been very supportive" of "gay pride events" and "gay firefighters and others involved in pride." Mullinax Dep. at 19 line 19 – 20 line 1.

125. Mullinax also testified that it was her impression that the Mayor agreed with her assessment that Chief Cochran had been supportive of LGBT firefighters and events. *Id*.

126.   In fact, Mayor Reed testified that he was not aware of any instances in which Chief Cochran "was unable to 'check his prejudices at the door.'"  Reed Dep. at 156 lines 10-13.

127.   COO Michael Geisler testified that he was not aware of any evidence suggesting that Chief Cochran based his decisions regarding the individual career paths of AFRD members on the content of his personal religious beliefs.  Geisler Dep. at 47 lines 8-13.

128.   Geisler also testified that he was not aware of any evidence that Chief Cochran had discriminated against anyone in the AFRD.  *See* Geisler Dep. at 66-67.

129.   Despite the fact that the Law Department could not identify a single instance in which Cochran had ever discriminated against any AFRD employee based upon his religious beliefs, the views he expressed in his book, or for any other reason, and had never let his personal beliefs affect his disciplinary regime, Defendants terminated Cochran at a meeting held on January 6, 2015, the day his unpaid suspension ended.   First Amended Verified Complaint ¶169; Pl's Ex. 34; Yancy Dep. at 122-23.

130.   The termination meeting was staffed by Commissioner of Human Resources Yvonne Yancy, COO Michael Geisler, and City Law Department attorney Robert Godfrey.  Yancy Dep. at 122-23; Geisler Dep. at 72 line 25 - 74 line 7.

131.   Defendants have claimed that Chief Cochran was terminated as a result of his failure to get permission to write his book, either through the ethics process or from his supervisors.  *See* Yancy Dep. at 102 lines 14-17. ("But our decision to separate Mr. Cochran was about his failure to go

through the process and to speak with the people he worked for."); Reed Dep. at 167 lines 14-17 ("If someone had done this investigation and showed me a letter from the ethics board that granted him approval to write this book, I wouldn't have made the judgment that I made."); Pl's Ex. 14 ("Chief Cochran's book . . . was published in violation of the City's Standards of Conduct, which required prior approval from the Ethics Officer and the Board of Ethics . . . Not one time during the course of preparing this book did Chief Cochran ever think that it was appropriate to have a conversation with me despite the fact that I have made my opinion and this administration's opinion clear on this topic.  So if anybody wants to know the most important factor that lead me to my decision—that is it."); Pl's Ex. 10 ("Chief Cochran's book . . . was published in violation of the city's Standards of Conduct, which required prior approval from the Board of Ethics."); Pl's Ex.22 ("Chief Cochran's book . . . was published in violation of the city's Standards of Conduct, which required prior approval from the Board of Ethics. . . . Chief Cochran also failed to notify me, as Mayor and Chief Executive of the City of Atlanta and his employer, of his plans to publish the book and its inflammatory content."); Pl's Ex. 36 ("Mr. Cochran ignored the City's Ethics Code which establish a clear protocol which *must* be followed before a Commissioner may engage in private activity for pay. Mr. Cochran made numerous judgment decisions regarding the book that are unacceptable for a leader in City of Atlanta government: he sold the Book without the requisite approval . . . and he published the book without ever mentioning it to me."); Pl's Ex. 15 ("Chief Cochran . . .  was fired because he failed to adhere to city policy.  He published a book . . . without asking for approval from the mayor

22

or his ethics office."); Pl's Ex. 74 ("Chief Cochran was not let go because of his religious beliefs.  He was let go because he exercised poor judgment and violate [sic] the city's ethics code by not notifying the proper city officials, Mayor included."); Geisler Dep. at 73 lines 10-13, 75 lines 18-22 ("[The Mayor] was concerned that . . . there had been a violation of the city policy on going forward with publishing the book.  It was an ethics violation . . . it comes down to the ethics issue.  It comes down to the publication of the book on—without adequate disclosure of the publication of the book . . .").

132. After terminating Chief Cochran Defendants continued to publicly take issue with the contents of his book.  *See* Pl's Ex. 14 ("Because he [Chief Cochran] made the judgment that he should write a book that contains material that is clearly inflammatory and never ask me how I felt, felt about it."); Pl's Ex. 22 ("Chief Cochran also failed to notify me, as Mayor and Chief Executive of the City of Atlanta and his employer, of his plans to publish the book and its inflammatory content."); Pl's Ex. 36 ("Mr. Cochran made numerous judgment decisions regarding the book that are unacceptable for a leader in City of Atlanta government: . . .  he distributed the book at work, despite the fact that its content expressed opinions which are contrary to the City's and my personal commitment to nondiscrimination").

133. In fact, just one week after Defendants terminated Chief Cochran, Director of Communications Anne Torres sent out for distribution—to all of the City's "supporters and organizations"—myriad social media posts suggesting that the content of the book constituted discrimination against AFRD members.  Torres Dep. at 76 lines 23-25 ("With the book we felt that

23

there were passages in the book that violated our City's antidiscrimination policy."); Pl's Ex. 77.

134. Torres sent out for distribution a suggested Tweet that read "#IStandwithKasim because all employees have a right to a boss who does not speak of them as 2nd class citizens." Pl's Ex. 77.

135. She sent out for distribution another suggested Tweet which read "#IStandwithKasim because there is no place for discrimination in the workplace." Pl's Ex. 77.

136. These suggested Tweets and Facebook posts—which were focused on the content of various "passages in the book"—were sent out for distribution despite the fact that the City Law Department had concluded in its Investigative Report, released by the City that very day, that no evidence existed to show that Chief Cochran had discriminated in any way against anyone in the City's employ. Torres Dep. at 77 lines 5-7; Pl's Ex. 36; Pl's Ex. 13 at 3-4 ("There is . . . no indication that Chief Cochran allowed his religious beliefs to compromise his disciplinary decisions. . . . No . . . witness could point to a specific instance in which any member of the organization has been treated unfairly by Chief Cochran on the basis of his religious beliefs.").

137. Special Advisor to the Mayor Melissa Mullinax forwarded these suggested Tweets and Facebook posts to at least five recipients that same day, January 13, 2015. Pl's Exs. 93-96.

**The City of Atlanta's Code of Ethics and Related City Policies and Practices**

138. The City of Atlanta Law Department also concluded in its Investigative Report that Chief Cochran had not sought the approval of the

Board of Ethics prior to his writing of the book, and the Board of Ethics did not grant its approval to Chief Cochran.  Pl's Ex. 13 at 1.

139.   The City of Atlanta's news release announcing the release of the City Law Department's Investigative Report in Chief Cochran's case states that "Atlanta's Ethics Code establishes the required approval process for Department heads who wish to engage in outside activities 'for remuneration.'"  Pl's Ex. 36.

140.   The City news release also noted that with respect to that ethics requirement the City Law Department's Investigative Report "found that no such approval was sought or rendered in the publication" of Chief Cochran's book.  *Id*.

141.   Section 2-820(d) of the City of Atlanta Code of Ethics provides that:

> Commissioners, deputy commissioners, department heads, chief operating officer, deputy chief operating officers, chief of staff, deputy chiefs of staff, bureau directors, and employees of the office of the mayor who report directly to the mayor . . . may engage in private employment or render services for private interests only upon obtaining prior written approval from the board of ethics in accordance with this paragraph.

Pl's Ex. 1.

142.   Section 2-806 of the City of Atlanta Code of Ethics provides that the "board of ethics shall conduct investigations into alleged violations of the ethics code [and] hold hearings and issue decisions" resulting from that investigative process.  Pl's Ex. 1

143.   Section 2-806 specifically provides that the "ethics officer shall conduct a preliminary investigation of any complaint and provide a written report to the board of ethics discussing the ethics officer's findings."  Pl's Ex. 1.

144.   Section 2-806 further provides that "[i]f the board determines after a preliminary investigation . . . that . . . probable cause [exists to support the] belief that [an ethics violation has been committed]," it is required to "give notice to the person involved to attend a hearing to determine whether there has been a violation."  Pl's Ex. 1.

145.   Finally, Section 2-806 guarantees that "[a]ny person who appears before the board [at a hearing] shall have all of the the due process rights . . . of a witness appearing before the courts of th[e] state [of Georgia]."  Pl's Ex. 1.

146.   Section 2-807 of the City of Atlanta Code of Ethics provides that while the "decision of the board after a hearing shall be final," "such proceeding shall be subject to review by writ of certiorari to the superior court of the county."  Pl's Ex. 1.

147.   Defendants predicated both their suspension and termination of Chief Cochran in part upon his alleged failure to abide by the City of Atlanta's Code of Ethics and other city processes more broadly, as interpreted and enforced by Defendants. *See* supra at ¶¶95, 131; Yancy Dep. at 75 lines 14-16 ("[A]t that juncture [at the time of the suspension], we had not found anything that indicated that he had received permission from his manager or the ethics board."); Yancy Dep. at 49 lines 15-19 ("And so the discipline was about his failure to get approval, his failure to operate within the processes

26

that are clearly identified, not just in the code, but in general expectations as an employer."); Yancy Dep. at 51 lines 11-15, 55 lines 9-10 ("And then the ethics code requires that if you in fact are going to engage in receiving second income and you report the certain line in the organization, the ethics board has to actually give you approval for that as well. . . . There's no ethics board vote giving permission for this book."); Yancy Dep. at 102 lines 14-17 ("But our decision to separate Mr. Cochran was about his failure to go through the process and to speak with the people he worked for."); Yancy Dep. at 122 lines 6-7 ("This is a summary of the things we discussed at the termination meeting itself. . . .  [Bob Godfrey] references the standard of conduct of [Section] 2-820(d)").

148.  Defendants provided to Chief Cochran none of the procedural requirements or protections prescribed by the City of Atlanta Code of Ethics. *See* Hickson Dep. at 84 lines 9-11 ("Q. And there was never any ethics process with respect to the book or Chief Cochran? A.    Not while I was there, no."); Pl's Ex. 117 at No. 4 ("Defendant admits that the ethics board was not asked to, and thus did not, conduct an investigation into Chief Cochran with respect to his book, *Who told You That You Were Naked*."); Pl's Ex. 117 at No. 5 ("Defendant admits that the ethics board was not asked to, and thus did not, hold a hearing regarding Chief Cochran's publication of the book . . .").

149.  In fact, Defendants maintain that they can discipline a City employee for an ethics violation without the involvement of the Board of Ethics and were therefore not required to make available to Chief Cochran any of the procedural requirements or protections prescribed by the City of Atlanta Code of Ethics, even if they disciplined Chief Cochran for a breach of

the provisions contained in that very code.  *See* Hickson Dep. at 98 lines 7-17 ("[I]f they use that [the ethics process] as a means of disciplining somebody on the HR side, the ethics board wouldn't have anything to do with that.  Q. So the HR side can interpret the ethics code and apply it separately and independently from the independent ethics board?   A. They can. Now, whether it's wise or not is a different story, but they can—they can use that as a basis for—for dismissal."); Yancy Dep. at 58 lines 22-25, 60 lines 20-21 ("Q.   So you maintain that you can discipline an employee for ethics violation without any input from the ethics board?  A. Absolutely . . . I don't need an ethics violation to discipline an employee for a matter that's unethical.").

150.   Defendants concede that the Board of Ethics is an entity entirely independent of the human relations function of the City government.   *See* Reed Dep. at 41 lines 3-4 ("Well, the ethics office, I think, is independent, first and foremost.  That's why it has its own board."); Yancy Dep. at 60 lines 16-20 ("[T]he ethics board is independent, and ethics actions are handled by the ethics board.  Employment actions are handled by the administration and the operations groups that are led by me."); Yancy Dep. at 90 lines 4-9 (Q. So with respect to the bases for Chief Cochran's suspension, you mentioned that there was a failure to get approval from the board of ethics.  Is that an ethics issue?   A. It is an ethics issue, but I would defer to the ethics board on handling it."); Yancy Dep. at 91 lines 3-4 ("I cannot make an ethics determination. The ethics board makes a determination.").

151.   On its face, Section 2-820(d) does not apply to the writing or self-publication of a non-work-related, religious book. Pl's Ex. 1.

152.   Section 2-820(d) lacks any identifiable criteria or standards to guide the Board of Ethics in determining whether to approve or deny a covered employee's request to engage in "private employment or render services for private interests."  Pl's Ex. 1.

153.   Section 2-820(d) simply states that "[t[he board of ethics shall review each request individually and provide written approval or disapproval of the notification within 30 days."  Pl's Ex. 1.

154.   Defendants maintain that City employees must receive permission before they can write and publish a book, even one that is not related to their City employment.  *See* Yancy Dep. at 87 line 14 – 88 line 5 (Q. Now, if a book doesn't have any content that might lead to, in your view, a Title 7 issue, and isn't published for remuneration, is not done for profit, is not sold, and does not convey the impression of endorsement by the City, would you be able to discipline, in your view, an employee for such a book? A. If they did not follow the process to get approval to write said book, absolutely.   Q. So you need to get approval for any book whatsoever? A. Absolutely. You have to get approval for anything that creates a perception of a conflict, actually is a conflict, could be remuneration, could be perceived as remuneration. You have to get permission from who you work for to do anything outside of work. The form clearly says that.").

155.   Neither Section 2-820(d)—nor any other City policy or regulation—requires any City employee to get the Mayor's permission before they can write and publish a non-work related book.  *See* Reed Dep. at 121 lines 10-14 ("Q. The concern about him not talking with you first, is that

29

based upon any kind of policy or is that just a practice. A. No. It's based upon a professional courtesy, being a colleague.").

156. Defendants maintain that City employees like those in Chief Cochran's position must receive permission from the Mayor before they can write and publish a book, even one that is not related to their City employment. Reed Dep. at 134 lines 3-8 ("And he [Chief Cochran] concluded that he could write a book with content that would clearly be offensive to some without getting an approval and make a profit. And personally I feel it was wrong that he didn't have a sit-down with me. That's it."); Yancy Dep. at 37 lines 16-17 ("I just told him [the Mayor] that we would have to make an employment decision about this matter. . . . That if in fact he [Mayor Reed] had not approved the book, that we were going to have to suspend or terminate Mr. Cochran."); Yancy Dep. at 48 lines 23-25 ("[T]here had to be disciplinary activity for his failure to get approval from his direct manager for this book").

157. Mayor Reed testified that if a City employee wrote a book and did not sell it, the "content of the book" would determine whether an opinion from the ethics board would be required. Reed Dep. at 54 lines 2-6.

158. Mayor Reed testified that the disciplinary process with respect to Chief Cochran was not usual because "there was a book written without my permission." Reed Dep. at 118 lines 3-4.

Respectfully submitted this 27th day of April, 2017.

By: /s/ Kevin Theriot

DAVID A. CORTMAN
Georgia Bar No. 188810
**ALLIANCE DEFENDING FREEDOM**
1000 Hurricane Shoals Road, NE
Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
(770) 339-6744 (facsimile)
dcortman@adflegal.org

KEVIN H. THERIOT
Georgia Bar No. 373095
KENNETH J. CONNELLY*
Arizona Bar No. 025420
JEANA HALLOCK*
Arizona Bar No. 032678
**ALLIANCE DEFENDING FREEDOM**
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
(480) 444-0028 (facsimile)
ktheriot@adflegal.org
kconnelly@adflegal.org
jhallock@adflegal.org

Garland R. Hunt
Georgia Bar No. 378510
**HUNT & ASSOCIATES**
12110 Helleri Hollow
Alpharetta, GA 30005
(770) 294-0751
(770) 777-5847 (facsimile)
garlandhunt1@gmail.com

JONATHAN D. CRUMLY, SR.
Georgia Bar No. 199466
**MANER CRUMLY CHAMBLISS LLP**
2900 Paces Ferry Road
Suite B-101
Atlanta, GA 30339
(770) 434-0310
(404) 549-4666 (facsimile)
Jcrumly@Manercc.com

*pro hac vice admission

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF COMPLIANCE

Undersigned counsel hereby certifies that this document was prepared in Century Schoolbook 13-point font and fully complies with Local Rules 5.1C and 7.1D.

/s/ Kevin Theriot
Kevin Theriot

## CERTIFICATE OF SERVICE

I hereby certify that on the 27th day of April, 2017, a copy of the foregoing Plaintiff's Statement of Material Facts Not In Dispute was filed with the Clerk of the Court using the ECF system, which will effectuate service on all parties.


/s/ Kevin H. Theriot
Kevin H. Theriot
*Attorney for Plaintiff*