## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**KELVIN J. COCHRAN**,

                          Plaintiff,

    v.

**CITY OF ATLANTA, GEORGIA;
and MAYOR KASIM REED, IN
HIS INDIVIDUAL CAPACITY,**


                    Defendants.

Case No. 1:15-cv-00477-LMM

## PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL UNDISPUTED FACTS

Pursuant to Northern District of Georgia Local Rule 56.1, Plaintiff provides the following responses to Defendants' statement of material undisputed facts[1]:

1.    Plaintiff first served as Fire Chief of the Atlanta Fire and Rescue Department ("AFRD") under former Mayor Shirley Franklin in 2008-2009.

---

[1] As the Court knows, Chief Cochran has filed his own Motion for Summary Judgment and therein contends that there are no disputed issues of material fact warranting a trial on the merits. By responding to Defendants' Statement of Material Undisputed Facts, Chief Cochran is in no way admitting that any disputes regarding facts are necessarily material to, or otherwise affect, Chief Cochran's position that he is entitled to summary judgment.

(Deposition Transcript of Kelvin Cochran ("KCT"), relevant portions attached as **Ex. A**, at 17:3-8, Exs. 1-2).

**Response:**

Chief Cochran does not dispute this factual allegation.

2.      Mayor Kasim Reed later appointed Plaintiff to reprise his role as Fire Chief in his administration in 2010. (Deposition Transcript of Kasim Reed ("KRT"), relevant portions attached as **Ex. B**, 19:23-24; 62:6-15; KCT, Ex. 6).

**Response:**

Chief Cochran does not dispute this factual allegation.

3.      As Fire Chief, Plaintiff was an at-will employee, and served at the pleasure of the Mayor. (KCT, 17:9-17; 83:16-84:14 and its Ex. 15, at p. 2).

**Response:**

Chief Cochran disputes this factual allegation. Defendants' citation to Exhibit 15 to the Deposition of Kelvin Cochran does not support Defendants' contention that Plaintiff "was an at-will employee, and served at the pleasure of the Mayor." Moreover, Cochran objects to this factual allegation because it is a legal conclusion. Local Rule 56.1 (B)(1)(c).

4.     The Fire Chief position is an "unclassified" position within the City, as are all AFRD position above the rank of captain. (KCT, 37:2-7; 60:22-61:14).

**Response:**

Chief Cochran objects to this factual allegation because whether "[t]he Fire Chief position" and "all AFRD position above the rank of captain" are "'unclassified'" is a question of law. Local Rule 56.1 (B)(1)(c).

5.     Unclassified employees have no due process rights with respect to their employment. (KCT, 39:25-40:11; KCT, 61:10-24, Ex. 11, at §§ 9.1-9.2).

**Response:**

Cochran objects to this factual allegation because it is a legal conclusion; what due process rights employees—including Chief Cochran—are entitled to is a question of law. Local Rule 56.1 (B)(1)(c).

**A.     Plaintiff's Role as Fire Chief of AFRD.**

6.     AFRD provides fire and rescue, homeland security, and emergency medical services for the City of Atlanta, as well as Hartsfield-Jackson International Airport. (KCT, 51:10-20; 52:4-24).

**Response:**

Chief Cochran does not dispute this factual allegation.

3

7.     As Fire Chief, Plaintiff was responsible for overseeing and ensuring AFRD's successful operation. (KRT, 63:2-6; KCT, 42:1-4, Ex. 8).

**Response:**

Chief Cochran does not dispute this factual allegation.

8.     Plaintiff reported to the City's Chief Operating Officer, Michael Geisler, who in turn reported directly to the Mayor. (KCT, 21:13-16; KRT, 18:23-19:10).

**Response:**

Chief Cochran does not dispute this factual allegation.

9.     Plaintiff was a member of the Mayor's Cabinet, which includes the heads of all major departments within the City as well as the Mayor's advisors. (KRT, 18:20-19:5).

**Response:**

Chief Cochran does not dispute this factual allegation.

10.     AFRD's mission is to provide fire and rescue, homeland security, and emergency medical services to the City of Atlanta. (KCT, 51:10-20; 52:4-24).

**Response:**

Chief Cochran does not dispute this factual allegation.

4

11.     Plaintiff's responsibility was to ensure that AFRD was successful in its mission. (KCT, 51:10-20; 52:4-24).

**Response:**

Defendants' citations do not support Defendants' factual allegation.

12.     To do so, a key component of Plaintiff's job was to attract and retain an inclusive and diverse workforce necessary to garner the trust and respect of Atlanta's diverse community. (KCT, 47:25-48:6).

**Response:**

Defendants' citation does not support Defendants' factual allegation.

13.     According to Plaintiff, this requires AFRD to be "ism free," or free of racism, sexism, favoritism, and all forms of prejudice and discrimination, including that based on religious identity, sexual orientation, and/or marital status. (KCT, 47:2-20; 85:10-20; 130:22-25).

**Response:**

Chief Cochran does not dispute this factual allegation to the extent that it accurately portrays the fact that he endeavored to establish an "ism free" environment at AFRD. Chief Cochran disputes this factual allegation to the extent that it suggests that this "ism free" environment was a key component of Chief Cochran's job, the parameters of which Defendants have failed to establish. *See supra* response to ¶ 12.

5

14.     Plaintiff testified that absent a positive relationship with the community, AFRD's core mission is threatened. (KCT, 49:13-20). As Plaintiff testified:

> Q:     Would you agree with this premise, that if the fire department     was not successful in creating an alliance with stakeholders in     the citizenry that that could make a firefighter's job tougher?
>
> A:     Yes.
>
> Q:     That it could cause a member of the community to delay or fail     to seek assistance when necessary?
>
> A:     Yes.
>
> Q:     And that it could ultimately tear away at the fabric of the     cohesive body of firefighters that you were trying to mold?
> A:     Yes.
>  (KCT, 49:13-20).

**<u>Response:</u>**

Chief Cochran disputes this factual allegation as stated. Chief Cochran does not dispute this factual allegation to the extent that it accurately quotes his deposition testimony (although that testimony begins at line 8 rather than line 13). However, Chief Cochran disputes Defendants' characterization of Chief Cochran's testimony as pertaining to a "core mission" of the AFRD.

Defs.' Ex. 9 (revealing the core mission of AFRD "is to provide prompt quality services to our stakeholders.").

15.   In August 2012, an AFRD firefighter posted a comment on a Facebook photo of AFRD firefighters, dressed in uniform, in which he used the word "fags." (KCT, 293:14-294:2, 294:25-295:5).

**Response:**

Chief Cochran does not dispute this factual allegation.

16.   A member of the public saw the posting and submitted a complaint to Plaintiff, explaining that the comment made him question the firefighter's -- and AFRD's -- ability to serve the LGBT community. (Aug. 2, 2012 S. Deaderick Email to K. Cochran, attached as **Ex. C**). In particular, the complaint stated:

> The part that makes me most uncomfortable with this is that he could potentially be saving the lives of people who may identify as gay, lesbian, or bisexual. The clearly homophobic language that he uses does not necessarily mean that he is bigoted or that you are not teaching an appreciation of diversity in your office, but I must question whether or not your staff receives appropriate training when it comes to working with and working for a diverse community. I would personally be uncomfortable if this person were to come into my home using language like that. … This picture is in a public place and I know the comment that was made is not reflective of the values that you and your department stand for.

(*Id.*).

**Response:**

Defendants' proffered evidence has not been properly authenticated, Federal Rules of Evidence 901, constitutes inadmissible hearsay to the extent that it is used to show that "the comment made [a member of the public] question the firefighter's—and AFRD's—ability to serve the LGBT community," Federal Rules of Evidence 801 and 802, and Defendants' assertion is otherwise unsupported.

17.     Plaintiff promptly responded to this complaint by suspending the perpetrating AFRD employee for thirty days without pay. (KCT, 300:21-24).

**Response:**

Chief Cochran disputes this factual allegation as stated. The testimony cited by Defendants demonstrates that this was the discipline Chief Cochran recalled handing down, "to the best of his recollection." Cochran Dep. 300:21-22. Chief Cochran does not otherwise dispute this factual allegation.

**B.    As a City Employee, Plaintiff Was Subject to Certain Ethical Requirements.[2]**

18.     Under the City's Code of Ordinances (the "City Code"), all employees, regardless of position, are required to obtain the approval of their

---

[2] To the extent that this constitutes a factual allegation, Chief Cochran does not dispute it.

department head prior to accepting paid outside employment in order to ensure that no conflict of interest with their City employment exists. (City of Atl. Code, § 114-436; KCT, 19:11-24, 20:7-12; Deposition Transcript of Nina Hickson ("NHT"), relevant portions attached as **Ex. D**, 54:11-55:15).

**Response:**

Cochran objects to this factual allegation because what the City's Code requires and to whom the code's provisions apply are questions of law. Local Rule 56.1 (B)(1)(c). Cochran thus objects to the cited deposition testimony as irrelevant and therefore not admissible, pursuant to Federal Rules of Evidence 401 and 402. Cochran also objects because the citation to the City of Atlanta Code does not support the proposition that "all employees, regardless of position, are required to obtain the approval of their department head prior to accepting paid outside employment."

19.   This requirement is also reflected in the City's Ethics Pledge, which Plaintiff signed and agreed to abide by at the commencement of his 2010 City employment:

> I will not hold investments, engage in outside employment, or be paid to render services for a private interest when the work is adverse to and incompatible with the proper discharge of my official duties. ***I will seek permission from my department head for any extra job that I have.***

(KCT, 72:1-3, 72:22-73:5 and its Ex. 12, at ¶ 7) (emphasis added).

**Response:**

Cochran admits that he signed the City's Ethics Pledge at the commencement of his 2010 City employment. Cochran admits that the quoted language above is accurate. Cochran disputes this factual allegation to the extent that it seeks to indicate that he agreed to abide by anything beyond the City's Code of Ethics. Cochran also objects to this factual allegation to the extent that it seeks to incorporate Defendants' conclusions as to the questions of law discussed in paragraph 18 above. Local Rule 56.1 (B)(1)(c).

20.    Plaintiff was well aware of this requirement, as he approved outside employment requests submitted by his subordinates in his role as Fire Chief. (KCT, 63:3-20).

**Response:**

Cochran admits that he approved outside employment requests submitted by his subordinates in his role as Fire Chief. Cochran objects to this factual allegation to the extent that it seeks to incorporate Defendants' conclusions as to the questions of law discussed in paragraph 18 above. Local Rule 56.1 (B)(1)(c).

21.    Plaintiff testified that this approval requirement was necessary to allow him to ensure that outside employment did not conflict with his subordinates' City employment:

> [I]t helps us to really assess whether their employment actually
> is in conflict with laws, codes, and ordinances that may govern
> that sort of behavior outside of work, or if it conflicts with their
> work schedules.

(KCT, 64:25-65:12).

**<u>Response:</u>**

Cochran objects to this factual allegation to the extent that "this approval requirement" refers to the questions of law at issue in paragraph 18 above. Local Rule 56.1 (B)(1)(c). Cochran admits that his testimony is accurately quoted. Cochran admits that he testified it was "a good idea," (KCT 64:25-65:2), to have a requirement that he approve his subordinates' city employment for the reasons described in the excerpt and admits that he testified that he thought "this was a necessary requirement," (KCT 65:10-12). The material cited by Defendants does not establish that it was "necessary" for the reasons described in the excerpt.

22.     City employees are subject to the City's Code of Ethics, which is interpreted and enforced by the City's Ethics Office. (NHT,15:3-20).

**<u>Response:</u>**

Chief Cochran does not dispute this factual allegation.

23.     The Ethics Office is led by an Ethics Officer who reports to a seven-member Board of Ethics. (*Id.*).

**Response:**

Chief Cochran does not dispute this factual allegation.

24.     This ordinance required Plaintiff to also obtain written approval from the City's Board of Ethics ("the Board") before engaging in any outside employment for remuneration. (KCT, 23:12-24:8, Ex. 4; 55:18-23; 56:8-57:10, Ex. 10 at § 2-820(d)).

**Response:**

Chief Cochran objects to this factual allegation as it is a legal conclusion on a matter of law that is reserved for the court to decide; it is not a fact. Local Rule 56.1 (B)(1)(c). Chief Cochran objects to this statement because it is not clear to what the term "This ordinance" means or refers. Chief Cochran objects to the extent that this allegation seeks to indicate that he was required to do something not described in the statement by using the word "also." In addition, the cited material does not establish the proposition claimed. Chief Cochran notes that KCT, 23:12-24:8, Ex. 4 actually demonstrates that the City's Board of Ethics approved some requests regarding outside employment after the events at issue had occurred, not "before," as asserted in the allegation.

25.     Plaintiff was aware of this additional requirement prior to his return to the City in 2010, as he had previously sought and received

permission to engage in several paid leadership training engagements under Mayor Franklin pursuant to this provision. (KCT, 23:12-24:8 and its Ex. 4; Declaration of Nina Hickson ("Hickson Dec."), attached as **Ex. E**, at ¶ 8 and its Ex. C).

**Response:**

Chief Cochran objects to this factual allegation to the extent that it seeks to incorporate the questions of law regarding what employees are required to do prior to engaging in outside employment and to whom sections of the code apply as discussed in paragraphs 18 and 24. Local Rule 56.1 (B)(1)(c). Chief Cochran objects to this statement to the extent that it seeks to establish that his request for approval from the Board of Ethics in 2008 was "pursuant to" an unidentified provision of law.

### C. Plaintiff Self-Publishes *Who Told You That You Were Naked?*[3]

26.   Plaintiff describes himself as a well-known, devout evangelical Christian. (KCT, 34:3-20; 206:8-17).

**Response:**

---

[3] To the extent that this constitutes a factual allegation, Chief Cochran does not dispute it.

Chief Cochran objects to this factual allegation to the extent that it indicates that he is some sort of celebrity, which is not supported by the testimony cited. Chief Cochran admits that he is a devout evangelical Christian.

27.    Reed hired Plaintiff with full knowledge of Plaintiff's strong religious faith. (KCT, 31:4-32:1).

**Response:**

Chief Cochran objects to this factual allegation as the citation does not support the proposition claimed.

28.    Plaintiff also highlighted his evangelical faith on the resume he submitted to Reed. (*See* KCT 29:14-22; 30:2-11, Ex. 5, at p. 7).

**Response:**

Chief Cochran objects to the extent that the word "also" seeks to incorporate some other factual allegation, but otherwise admits that his resume included a reference to his involvement with the Billy Graham Association.

29.    In January 2013, Plaintiff decided to turn some of his bible study materials into a book. (KCT, 115:1-12).

**Response:**

Chief Cochran does not dispute this factual allegation.

30.     In May 2013, he contacted a publisher about self-publishing and selling a book, which he titled *Who Told You That You Were Naked?,* (KCT, Ex. 25), via outlets such as Barnes and Noble and Amazon. (*Id.*, 122:1-25, Ex. 25, at ¶ IV).

**Response:**

Chief Cochran disputes this factual allegation to the extent that it suggests he initially contacted a publisher in May 2013 as the material cited does not establish that proposition. Cochran admits that in May 2013 he received a proposed contract from a publisher about self-publishing a book and offering it online through BarnesandNoble.com and Amazon.com.

31.     In or around November/December 2013, Plaintiff submitted his book for publication. (KCT, 138:6-11; 139:5-10).

**Response:**

Chief Cochran does not dispute this factual allegation.

32.     Plaintiff targeted his book to Christian men struggling with overcoming condemnation. (KCT, 108:15-109:11; 143:1-3).

**Response:**

Chief Cochran does not dispute this factual allegation.

33.     Therein, Plaintiff presents the dichotomy of the words "naked" and "clothed" as used throughout the Bible. (KCT, 172:15-19).

**Response:**

As an initial matter, Cochran questions whether his religious beliefs and/or the content of his book are material to Defendants' Motion for Summary Judgment, as Defendants assert that his "Beliefs Played No Role in the Mayor's Decision to Suspend and Then Terminate His Employment." Defs.' Br. 17, *but see id.* at 16 ("Plaintiff's condemnation of non-Christians . . . and others threatened AFRD's ability to operate effectively and risked destroying the public's trust in the Department;"); *id.* at 18 (taking issue with the "language" of "Plaintiff's book"); *id.* at 22 (stating the City could terminate Cochran as "a lawful act of free expression" since "Plaintiff . . . expressed views antithetical to the City's."). Should the Court find this factual allegation material to Defendants' motion, Chief Cochran does not dispute it.

34.     According to Plaintiff, a "naked" man is one who lacks a working relationship with God. Conversely, a "clothed" man is one who enjoys a working relationship with God because he has accepted Jesus Christ as his Lord and Savior. (KCT, 173:3-174:8).

**Response:**

Should the Court find this factual allegation material to Defendants' motion, *see supra* response to ¶ 33, Chief Cochran does not dispute it.

35.     To be clothed, a man must be a born-again Christian. (KCT, 174:9-10). Those who are clothed are righteous; those who are naked are sinners. (KCT, 176:2-4).

**Response:**

Should the Court find this factual allegation material to Defendants' motion, s*ee supra* response to ¶ 33, Chief Cochran's testimony speaks for itself. Cochran objects to the extent that this statement takes his testimony out of the context in which it was given and seeks to create a dichotomy between the clothed as "good" and the naked as "sinners." *See*, *e.g.*, KCT 176:15-18 ("[E]ven though we [the clothed] have issues in our carnal nature, . . . the blood of Christ covers our sins, and in him we are righteous."), 192:9-10 ("all have sinned.").

36.     Per Plaintiff, no gradations or degrees of nakedness exist -- every person, if naked, is equally sinful. (KCT, 176:5-9).

**Response:**

Should the Court find this factual allegation material to Defendants' motion, s*ee supra* response to ¶ 33, Chief Cochran does not dispute it.

37.     Based on this framework, Plaintiff identifies categories of people he considers naked. This list includes homosexuals, murderers, rapists, pedophiles, those who have sex outside of marriage, those who engage in

bestiality, and all non-Christians. (KCT, 191:11-22; 193:2-4, Ex. 36, at 82; 195:12-15; 196:17-24; 197:1-10).

**Response:**

Should the Court find this factual allegation material to Defendants' motion, *see supra* response to ¶ 33, Cochran disputes it as unsupported by the record. Cochran's testimony and his book make clear that (1) the list Defendants refer to above is a list that originated from a Bible passage and a Bible dictionary, (2) it describes sins as opposed to identifying categories of people, (3) it is all encompassing, and (4) Cochran believes it applies to both "naked" and "clothed" people—including Chief Cochran himself—but it was intended to target "clothed" people.

First, Cochran testified that the partial list on the page of his book cited by Defendants came from Galatians 5:19-21. KCT 192:1-3, 192:5-6 ("These are specifically from the Holy Scripture."); Pl.'s MSJ Ex. 11 at 81 "[W]e will review the seventeen *works of the flesh* describe in Galatians 5:19-21."). Cochran used "a credible source and list[ed] the definition of all 17 of these works of the flesh" because he thought it would be helpful for Christian men. KCT 192:13-22 ("over the years, I can't tell you how many times I've read those works of the flesh, and at the end I would say, man, . . . I don't

know what over half of those words mean."); *see also* Pl.'s MSJ Ex. 11 at 159-160 (listing references).

Second, the complete list describes sins, not categories of people. Pl.'s MSJ Ex. 11 at 82-84 (defining "Adultery," "Idolatry," "Hatred," "Strife," and "Envying," amongst others); *see also* Pl.'s MSJ Ex. 11 at 81 (emphasis added) (text immediately preceding the list: "For the purpose of this study, we will review the seventeen *works of the flesh* describe in Galatians 5:19-21."). Cochran testified:

> "The challenges with using these singular items on this list is that multiple of these 17 *applies to all of humanity*, and the difference is their confession of faith . . . and their desire to want to repent, which is to turn away from those *behaviors* that's on this list."

KCT 196:8-16 (emphasis added); Pl.'s MSJ Ex. 11 at 92 (emphasis added) (discussing "[w]hen clothed men are caught up in these *behaviors*"), 191:24-192:5 ("[T]his was not written intended to single out one sin or one group of people. . . .the intent . . . is to point out that all have sinned."), KCT 192:24-193:1 ("[B]ecause all have sinned . . . it doesn't just point out and isolate one sin or one group of people that may be affected by these sins.").

Third, the list is all encompassing. This point is illustrated by examining the broad scope of activities on the list. For example, "Hatred" is defined in part as "bitter dislike . . . and ill-will against anyone," "Variance"

19

includes "quarreling," "Emulations" includes "seeking to surpass and out do others," "Lasciviousness" includes "unchastity (sexually suggestive)," "Murders" includes "to spoil or mar the happiness of another," and "Strife" includes "angry contentions." Pl.'s MSJ Ex. 11 at 82-83. Cochran explained "the intent behind these in the Bible is to point out that all have sinned." KCT 192:3-5, 192:7-10 ("[A] person that takes it upon themselves to . . . read those and know what they mean would get to the end and say, I have issues because all have sinned.").

Fourth, the list applies to naked and clothed individuals—including Chief Cochran—but was intended to target clothed people. Cochran's book and testimony make clear that his intent in identifying these works of the flesh is to help clothed men. Immediately before the list in the book he writes:

> Lust and works of the flesh are described in several scriptures. The more comprehensive are captured in . . . Galatians 5:19-21, . . . which are *specific to redeemed men* who have the tendencies of wicked or evil men, or men who have the appearance of being redeemed, but are in fact imposters . . .

Pl.'s MSJ Ex. 11 at 81 (emphasis added); *see also* KCT 194:20-195:1 ("[C]lothed people and naked people have issues with these 17 works of the flesh. Clothed people get to a place to where they just don't want to do these 17 things because they want to please God. And through Christ . . . when we have a transgression, we have forgiveness from him."), 193:6-9 ("there can be

20

a person who has accepted Christ as their Savior and their Lord and still have issues with these 17 works of the flesh."), 197-198 ("One act – one act does not constitute nakedness."). Cochran further testified that individuals identified by Defendants above, for example, "a murderer" "can be clothed." (KCT 196:5-8; *see also* KCT 193:22–196:24). Cochran testified "Clothed men transgress. I'm a testimony to that. I have transgressions. Clothed men transgress." KCT 199:1-3. He summarizes the chapter by referring back to the list of works of the flesh, saying it "has caused and continues to cause men to fall short of being all God has called us to be." And he invites men to join in a prayer: "Heavenly Father . . . Help me stand on your word that if we obey and serve you, we will spend our days in prosperity and our years in pleasures." Pl.'s MSJ Ex. 11 at 92-93. The Chapter ends with his recounting of the Biblical parable of the Prodigal Son and with an exhortation "Get up O naked man! The Father is waiting on you to come back home. He will clothe you with his best robe and shoes and restore to you all the rights and benefits of a beloved son." *Id*. at 94-96.

38.     Plaintiff characterizes these individuals as "wicked," "un-Godly," "deceitful," "loathsome," and "evildoer[s]," (KCT, 176:24-177:5; 178:18-23), and touts that there will be "celebration" when they perish. (KCT, 177:6-178:17).

**Response:**

Should the Court find this factual allegation material to Defendants' motion, *see supra* response to ¶ 33, Cochran disputes it as unsupported by the record. *See supra* response to ¶37 (explaining that Cochran's book does not categorize groups of people, but rather lists behaviors identified in the Bible as sins to which both naked and clothed people are susceptible). Cochran's book and testimony make clear that his word study involved exploring the use of biblical synonyms for the terms naked and clothed in scripture. Cochran testified that his research disclosed that there were synonyms used in the Bible for naked and clothed. KCT 177:20-23; *see also* Pl.'s MSJ Ex. 11 at 61 ("In these books of the Holy Bible, consider the following words in contrast, which are all synonymous to either clothed or naked . . ."). Cochran explained:

> If you look at the words that fall under the heading of naked, wicked, evildoer, scorner, it's talking about one type of man, the naked man. And so I use those Psalms to replace words that fall under those categories to see how that translates into the Scripture.

KCT 178:3-8; *see also* Pl.'s MSJ Ex. 11 at 62-63 ("Consider how the writer of Proverbs from Chapters 10 through 13 makes comparison after comparison of this distinction, replacing all synonyms with either clothed or naked as appropriate."). Cochran's book lists 32 contrasts from 32 separate verses in

22

Proverbs Chapter 10 through 13 between the naked and the clothed, including Proverbs 11:10, "When it goes well with the clothed the city rejoices; when the naked perish there is shouting." Pl.'s MSJ Ex. 11 at 63. In the context of discussing that chapter of his book, Cochran testified:

> 11      Q.   And so, for example, in your book you
> 12   write that the naked, "When the naked perish, they
> 13   are shouting," which I think means that there's joy
> 14   and celebration?
> 15      A.   Yes.  And the word synonymous to that in
> 16   Scripture is when the wicked, so rather than use
> 17   wicked, naked.

KCT 178:11-17.

Further, Cochran's book and testimony make clear that he does not want anyone to perish. At the conclusion of the list of contrasted scriptures, Cochran writes:

> These verses . . . remove any doubt as to how the Lord judges between the clothed and the naked. We cannot be double-minded . . . clothed one minute and naked the next. . . This double-minded, half-naked way of life for a son of God is a result of the stronghold of condemnation.

Pl.'s MSJ Ex. 11 at 64. He then goes on to discuss a passage in Deuteronomy in which Moses exhorts Israel to "'choose life, that you and your children may live.'" *Id.* at 64-65. He finishes the chapter by exhorting the reader:

> A clothed man does not have an excuse for living below God's standard for his life. . . .The choice is ours to make! . . . Choose life! That you and your children may live!!!

*Id.* at 66.

Cochran further testified:

> Because the core of our mission is to protect the lives and property of the citizens we serve. . . . people who do what we do for a living have to love . . . all categories of people . . . because . . . we may at any time have to pay the ultimate sacrifice to lay down our life for a person that we've never met before.

KCT 45:21–46:6.

39.     Plaintiff also presents his views on women in the book, including his belief that mankind would never have fallen from grace if Eve had consulted with Adam before eating the forbidden fruit. (KCT, 183:17-24; 186:20-187:4; 182:15-183:4). (KCT, 182:15-183:4).

**<u>Response</u>:**

Should the Court find this factual allegation material to Defendants' motion, *see supra* response to ¶ 33, Chief Cochran disputes it as unsupported by the record. The record is clear that the purpose and theme of the book was to help Christian men overcome condemnation, not to present Cochran's views on women. Pl.'s MSJ Ex. 11 at vii ("I thank God for choosing me to deliver this message to redeemed men of the Body of Christ who wrestle with the stronghold of condemnation."); KCT 152:2-3 ("the theme of the book, Christian men overcoming the stronghold of condemnation."), 123:23-124:1 ("my motive was – for writing this book was to get it in the hands of Christian

men who struggle with the issue of condemnation"), 109:10-11 ("And that was
pretty much the theme of the book, overcoming condemnation."). Cochran
further testified:

> virtuous women, you know, really are not – is really not the
> content or topic subject matter. Condemnation deals with
> categories that men actually wrestle with, and that there are
> many Christian men who have women issues, issues with women.
> And so it's point out those particular challenges that men have
> with women.
> Q. I think I hear you saying . . . that's not the purpose of my book.
> A. It wasn't the purpose of the book.

KCT 189:17-190:2. Cochran further objects that this factual allegation
mischaracterizes the content of his book and his beliefs. *See* Pl.'s MSJ Ex. 11
at 47 (emphasis added) (questioning whether a different outcome may have
been possible: "*Ever wondered what would have happened if* Eve would have
said, 'You need to talk to my husband.' . . . The scriptural account *could have
possibly been*, 'And the Spirit of the Lord came upon Adam, and he cut off the
serpent's head and they lived happily ever after.'"). Cochran further testified
about his beliefs:

> in the role of the family, . . . on decisions that impact the entire
> household, there should be collaboration between a husband and
> a wife . . .
> In the book of Ephesians it talks about the roles of husbands and
> wives, fathers and mothers. That section starts off by saying
> submitting yourselves to one another. Later on it talks about the
> husband's role of laying down his life for his family. . . . if Adam
> and Eve were to collaborate over what was taking place, it would

have put them in a position to making a better decision that quite possibly would not have led to the outcome.

KCT 183:18–184:12.

40.     In the "About the Author" Section of his book, Plaintiff states that he "is currently serving as Fire Chief of the City of Atlanta Fire Rescue Department (GA)." (KCT, 171: 2-6, Ex. 34).

**Response:**

Should the Court find this factual allegation material to Defendants' motion, Chief Cochran does not dispute it. *See supra* response to ¶ 33.

41.     Plaintiff also asserts that his religious beliefs guide the manner in which he leads AFRD: "My job description as a fire chief of Atlanta Fire Rescue Department is [t]o cultivate its culture for the glory of God." (KCT, 180:2-10, Ex. 35 at p. 76).

**Response:**

Should the Court find this factual allegation material to Defendants' motion, *see supra* response to ¶ 33, Chief Cochran does not dispute it to the extent that it contemplates that his faith informs everything he does in his life, including every job that he's ever had. KCT 181:24-182:5, 180:11-22; *see also* Pl.'s Ex. 11 at 76 (discussing his fire service career generally and specifically referencing his position as United States Fire Administrator).

42.     Plaintiff never sought or received written permission from the Ethics Board to sell his book. (KCT, 76:3-13).

**<u>Response</u>:**

Chief Cochran disputes this factual allegation to the extent that it implies that his book was available online through Amazon and Barnes and Noble in order to derive a profit. Chief Cochran testified that the book was not undertaken for profit and was made available online because that was the most efficient distribution method "to Christian men." Cochran Dep. 80:8-18. Chief Cochran does not otherwise dispute this factual allegation.

43.     Plaintiff never discussed his plan to sell his book with either of his supervisors. (KCT, 152:11-14; Deposition Transcript of Michael Geisler ("MGT"), relevant portions attached as **Ex. F**, at 27:17-23; 28:21-23).

**<u>Response</u>:**

Chief Cochran disputes this factual allegation to the extent that it implies that his book was available online through Amazon and Barnes and Noble in order to derive a profit. Chief Cochran testified that the book was not undertaken for profit and was made available online because that was the most efficient distribution method "to Christian men." Cochran Dep. 80:8-18. Chief Cochran does not otherwise dispute this factual allegation.

44.     Plaintiff contends that he obtained verbal approval from Ethics Officer Hickson; Hickson denies this. (KCT 110:9-18; NHT, 45:14-18).

**Response:**

Chief Cochran disputes this factual allegation to the extent that it seeks to portray his testimony as indicating that Hickson gave him the approval that the Code of Ethics requires the Board of Ethics to give, rather than that he understood from their conversation that it was permissible for him to go forward without getting board approval. Hickson testified that Chief Cochran had inquired whether he needed to seek approval from the Board of Ethics. Hickson Dep. 52:14-16, 53:8-10; *see also* Cochran Dep. 108:11-15 ("I asked Ms. Hickson was it appropriate and allowable for a currently sitting city official to write a faith-based book that has nothing to do with my job or city government."), 112:12-14 ("I just felt that she was the appropriate person to talk to about . . . whether or not this was permissible."). Rule 3 of the Rules of the Board of Ethics and the Ethics Pledge contemplate employees seeking advice of this kind from the Ethics Officer telephonically. Pl.'s Ex. 133. Cochran testified that he understood Hickson's response to indicate that he could go forward with his book. Cochran Dep. 110:14-18, 111:3-13. Ms. Hickson testified that if she "told someone that they needed ethics board approval . . . for something" her notes would "typically" reflect

28

that. Hickson Dep. 58:8-15. Ms. Hickson's notes from her telephone conversation with Chief Cochran on October 31, 2012 "regarding [the] non-city-related book he [was] authoring" do not indicate any directive to seek approval from the Mayor or from the Board of Ethics. Hickson Dep. 44:14-21; Pl.'s Ex. 23 at 1.

45. Hickson lacked the authority to grant Plaintiff Ethics Board approval for his book, and that she never did so in writing. (KCT, 110:9-18, Ex. 10 at §2-820(d)).

**Response:**

Chief Cochran disputes this factual allegation as unsupported by the citations provided, and as containing a legal conclusion, Local Rule 56.1 (B)(1)(c), and further states that the ethics code speaks for itself. Cochran further disputes the implicit allegation that he was seeking Board of Ethics approval from Hickson when he inquired about his book. *See supra* response to ¶44. Cochran also disputes this statement to the extent that it suggests that he was required to seek advice from her in writing, or that Hickson was required to respond in writing. *See* Rule 3 of the Rules of the Board of Ethics, Pl.'s Ex. 133 ("The official or employee may seek advice in writing, over the telephone, or in person. . . . The ethics officer may give a written or verbal response.").

46.     Plaintiff distributed copies of his book to between nine and twelve of his subordinates, including all of his direct reports (deputy chiefs) and four of the six assistant chiefs who reported to them. (KCT, 139:16-20; 142:8-11; 216:21-217:18).

**Response:**

Chief Cochran disputes this factual allegation. Chief Cochran did not "distribute" his book; he gave it as a free gift to individuals with whom he had a previous relationship as Christians, many of whom had requested a copy. KCT 140-142. Moreover, he did not give his book to each of his direct reports. *See* Ward Dep. 15:10-25, 56:1-14.

47.     Plaintiff contends that several of these individuals requested a copy of his book, but that he handed out at least three unsolicited copies as well. (KCT, 140:2-141:15; 142:8-11; 216:21-217:18).

**Response:**

Chief Cochran disputes this factual allegation as stated. Defendants have cited no evidence that Chief Cochran handed out more than three copies that were not requested. Chief Cochran does not dispute that several individuals requested a copy of his book.

48.     In or around late October 2014, Assistant Chief Wessels, one of Plaintiff's subordinates, brought Plaintiff's book to the attention of Stephen

Borders, president of the firefighters' union. (Deposition Transcript of Stephen Borders ("SBT"), relevant portions attached as **Ex. G**, at 54:5-11, 55:5-7; KCT, 142:2-4; 217:6-15).

**Response:**

Chief Cochran does not dispute this factual allegation.

49.    Wessels informed Borders that Plaintiff gave him a copy "during a work event," and that he found that the book contained statements related to homosexuality that concerned him, particularly in light of the fact that Plaintiff had also "very clearly and explicitly" identified himself as AFRD's Fire Chief in the book. (SBT, 55:17-20; SBT, 62:2-9; 63:21-64:2).

**Response:**

Chief Cochran objects to this factual allegation as hearsay that is not admissible. Federal Rules of Evidence 801, 802.

50.    Borders, in turn, brought Wessel's complaint and a copy of Plaintiff's book to the attention of City Councilman Alex Wan, a member of the Atlanta City Council. (SBT, 60:9-12, 64:25-65:16, 65:17-25; Deposition Transcript of Alex Wan ("AWT"), relevant portions attached as **Ex. H,** at 46:3-11).

**Response:**

Chief Cochran does not dispute this factual allegation.

51.     Councilman Wan concluded that the book constituted an HR matter and took the book to Yvonne Yancy, the City's HR Commissioner. (AWT, 51:22-52:2).

**Response:**

Chief Cochran does not dispute this factual allegation.

52.     Yancy read Plaintiff's book, informed Geisler and the Mayor of its existence, and asked if either knew about or had approved its publication, but neither did. (Deposition Transcript of Yvonne Yancy ("YYT"), relevant portions attached as **Ex. I,** at 22:10-18; 26:1-6, 26:11-27:2).

**Response:**

Chief Cochran objects to this factual allegation because the material cited by Defendants does not support that (1) Yancy "informed Geisler . . . of [the book's] existence," (2) Yancy asked if Geisler "knew about or had approved its publication," (3) Geisler did not know about its publication, or (4) Geisler did not approve its publication. Cochran further disputes the factual allegation that (1) "Yancy . . . informed . . . the Mayor of [the book's] existence" and that (2) the Mayor did not "kn[ow] about . . . its publication." Cochran testified that he had given a copy of the book to the Mayor's executive assistant to give to Reed in 2014 and that he had a conversation with the Mayor after the State of the City address in which Reed confirmed

receiving it, said the title of the book, and said that he was going to read it on an upcoming flight. KCT 152:14–153:3. Reed testified that "Sometime during the course of 2013 Chief Cochran had referenced that he was writing a book or had written a book . . . during a cabinet meeting," KRT 88:1-18, 89:19-90:2, and that he did not "have any specific recollection one way or the other" as to whether Chief Cochran gave his executive assistant Lilly Cunningham a copy of the book for him and that Chief Cochran had a conversation about that with Reed in February of 2014. KRT 89:14–90:25. *See also* Torres Dep. 52–56; Pl.'s Ex. 72 (discussing the matter by email with an inquiring reporter saying "He did not read the book when he handed it to him.").

53.    Yancy informed Reed that she was concerned that Plaintiff had referenced his position with the City without permission, and that she personally found parts of the book offensive, especially those related to women, as well as members of the Jewish and LGBT communities. (YYT, 26:11-27:2; KRT, 93:13-15; 94:18-21).

**Response:**

Chief Cochran does not dispute this factual allegation.

54.    Yancy also expressed concern that Plaintiff's decision to distribute his book in the workplace could create a hostile work environment

under Title VII of the Civil Rights Act and local law. (YYT, 87:9-13, 94:7-19, 97:15-20).

**Response:**

Chief Cochran objects in part to this factual allegation as not supported by the citations given; specifically, there is nothing in the citations concerning the distribution of his book in the workplace. Further Chief Cochran did not "distribute" his book; he gave it as a free gift to individuals with which he had a previous relationship as Christians, many of whom had requested a copy. KCT 140-142. Chief Cochran does not otherwise dispute this factual allegation.

55.     Reed asked Yancy to investigate whether Plaintiff had received the Ethics Board's written approval to sell the book, and to forward her concerns to City Attorney Cathy Hampton. (YYT, 32:21-33:7; KRT, 99:1-2, 16-23).

**Response:**

Chief Cochran does not dispute this factual allegation.

56.     Several days later, Yancy informed Reed that Plaintiff had published his book during his administration; that Plaintiff's book was for sale on Amazon; and that she did not believe Plaintiff had obtained written

consent from the Board of Ethics to sell his book. (YYT, 42:15-43:18; 45:20-24; 47:2-4; 49:2-7).

**Response:**

Chief Cochran objects to the characterization of time in this factual allegation as "several days later" because it was less than two business days later. *See* YYT 32:14-33:7 (describing conversation with the Mayor in which the Mayor asked for additional information as occurring on Thursday evening), 45:23-24 (referring to time of successive conversation as "Monday morning"), 41:23-42:11 (identifying time of conversation as occurring on the same day but prior to the conversation in which Chief Cochran was suspended); *see also* YYT 20:23–21:1 ("Q. So you found out about the book the Wednesday prior to the Monday that Chief Cochran was suspended? A. Correct."). Chief Cochran further objects to this factual allegation because Defendants' citations do not establish that Yancy informed Reed "that Plaintiff's book was for sale on Amazon."

57.   Yancy further confirmed that Plaintiff explicitly identified himself as the AFRD Fire Chief in his book and that he had distributed copies of his book to City employees. (KRT, 100:2-11).

**Response:**

Chief Cochran objects to the evidence proffered in support of this factual allegation as hearsay that is not admissible. Federal Rules of Evidence 801, 802. Chief Cochran did not "distribute" his book to employees; he gave it as a free gift to individuals with which he had a previous relationship as Christians, many of whom had requested a copy. KCT 140-142.

58.     Yancy recommended terminating Plaintiff's employment, which the Mayor declined to do. (YYT, 47:4-6; KRT, 101:6-9).

**Response:**

Chief Cochran does not dispute this factual allegation.

59.     Reed opted to suspend Plaintiff for thirty days without pay in order to discipline Plaintiff for selling his book without obtaining the requisite notification or approval and to investigate AFRD's potential Title VII liability. (KRT, 102:19-103:1; 104:12-13; YYT, 47:9-16, 48:17-50:10; KRT, 119:2-9, 119:17-21, 119:21-120:1, 121:10-14).

**Response:**

Chief   Cochran   disputes   this   factual   allegation.   The   record demonstrates that the City suspended Chief Cochran based on the content of his book. Yancy Dep. 67:24-69:18, 76:6-9, 93:13-94:1; Pl's Ex. 10; Cochran

Dep. 200:13-202:13; KRT 101:6-104:1, 123:9-125:13, 126:17-134:6, 134:17-135:8.

60.     Yancy, Chief of Staff Candace Byrd, and Chief Counsel Bob Godfrey then met with Plaintiff to inform him of his suspension. (YYT, 74:17-23; 75:22-76:2; 76:3-7; 93:13-94:1).

**Response:**

Chief Cochran does not dispute this factual allegation.

61.     Byrd conveyed to Plaintiff that the Mayor instructed that he not publicly comment on his suspension during his leave. (YYT,76:22-25; Deposition Transcript of Candace Byrd ("CBT"), relevant portions attached as **Ex. J** at, 40:7-11, 43:1-3, 43:20-44:2; KRT, 105:3-7; KCT, 222:13-223:2).

**Response:**

The citations provided by Defendants demonstrate that there is a dispute of fact as to what Byrd conveyed to Chief Cochran; thus Chief Cochran objects to this factual allegation as unsupported by the record and disputed. KCT 222:13-16 (testifying that Ms. Byrd told Chief Cochran "not [to] conduct any media interviews while you're on your 30-day suspension"), 22:23 ("They never gave me a letter or anything."), 266:25-267:2 ("I wish she would have given me a letter but I did not receive a letter.")

62.     Plaintiff understood the intent behind Byrd's directive was that "she did not want [him] to publicly disclose [his] side of the story." (KCT, 257:4-13).

**Response:**

Chief Cochran objects to this factual allegation as disputed. Chief Cochran testified:

> The only guidance I received in that regard was from Candace Byrd, who said that do not conduct any media interviews while you're on your 30-day suspension.
> Q. Any media interviews on any subject or about your employment or about the book or –
> A. About the entire circumstances regarding my 30-day suspension in the concept of do not respond to any – my interpretation.
> Q. Yes, sir.
> A. They never gave me a letter or anything. My interpretation was, don't hold any press conferences and don't respond to any requests for interviews. That was the context of the guidance, and that was the only guidance. My response to that is I would be honored to do so, no problem. Would you please send some media advisory out so that they would understand that and I wouldn't have to continue to deal with denying requests.

KCT 222:13–223:6

> . . . when I arrived home that afternoon, there was a news station on my front porch asking for an interview, and I advised them of what – the guidance that I had to abide by.
> Q. You informed that what, that you were not allowed to talk to them?
> A. Right.

KCT 224:6-12. KCT 260:25–261:2 ("It was not a press conference, and it was not a response to a media interview as I was directed by Candace . . . Byrd.)

### D. Plaintiff's Conduct, Results of Investigation Lead to His Termination.[4]

63.    Two days after his suspension went into effect, Plaintiff received an email of support from a chaplain for another local fire and emergency services department which stated, "I am praying for you and your family as you are in the cross-hairs of spiritual warfare." In response, Plaintiff wrote: "Thank you for your generous words. I am grateful for this divine opportunity to suffer this for Christ and rejoicing every day." (KCT, 247:12-24 and its Exhibit 46).

**Response:**

Cochran does not dispute this factual allegation.

64.    The following day, Plaintiff responded to another email of support with the following: "Thank you for your prayers and friendship. All is truly well! The Lord [is] with me during this time of spiritual warfare." (KCT, 248:14-17 and its Ex. 47).

**Response:**

---

[4] To the extent this constitutes a factual allegation, Chief Cochran objects to it because it is disputed, argumentative, and states a legal conclusion, rather than simply a fact. Local Rule 56.1 (B)(1)(c).

Cochran does not dispute this factual allegation.

65.     Plaintiff also spoke at the Georgia Baptist Convention's ("GBC") executive committee meeting consisting of approximately 200 pastors. (KCT, 255:3-19).

**Response:**

Cochran does not dispute this factual allegation.

66.     During his speech, Plaintiff referenced his suspension, stating: "Other than the $14,000 that I won't get, it's really a good blessing. Had I gone to Mayor Reed and asked him for a 30-day vacation, he would have flat out denied me the opportunity."(KCT, 259:24-260:6).

**Response:**

Chief Cochran disputes this factual allegation, as Defendants' record citation does not support it. Chief Cochran merely testified that he "could have possibly said that . . . when I was sharing my testimony." Cochran Dep. 260:5-6.

67.     The following week, Plaintiff coordinated with GBC in creating a comprehensive public relations "battle plan" to fight his suspension, including the publication of a web-based editorial criticizing his suspension, which Plaintiff reviewed and approved; an online petition linked to a forum on which to purchase Plaintiff's book; a social media campaign directed at

pressuring the Mayor to reconsider Plaintiff's suspension; and the posting of a recording of Plaintiff's GBC speech to the GBC website. (KCT, 251:21-252:18; 257:16-18; 261:22-262:14; 264:16-24, Exs. 49, 50 at PL 001902). *See also* GBC Mission Board, "Help Us Defend Religious Liberty!", *available at* https://gabaptist.org/petition/, last visited April 17, 2017, attached as **Ex. K**; December 15, 2014 Georgia Baptist Convention Press Release, *available at* https://gabaptist.org/wp-content/uploads/2014/12/GBC_News_Religious_Liberty_12-15-14.pdf, last visited April 19, 2017, attached as **Ex. L**).

**Response:**

Chief Cochran disputes these factual allegations as stated. Chief Cochran does not dispute that he reviewed a proposed editorial from the Christian Index. But he did not "approve" that editorial, but rather "provide[d] feedback on something that the Georgia Baptist Convention had initiated on their own initiative." Cochran Dep. 254:22-255:1. Cochran also did not "coordinate" with the Georgia Baptist Convention to create a "battle plan." *See* Cochran Dep. 265:6-16 ("I had no authority to pull back anything. They didn't need my permission to do what they did . . . I did not contribute to it.").

68.    In mid-December, Plaintiff approved a public relations "offensive fire attack" against the City, which included a social media campaign calling on the public to contact the Mayor and demand that he apologize to Plaintiff for violating his First Amendment rights. (KCT, 268:10-18, 269:12-270:15, Ex. 51) (emphasis added).

**Response:**

Chief Cochran disputes these factual allegations as stated. Chief Cochran did not "approve[] a public relations 'offensive fire attack.'" He rather accepted support from concerned churches and organizations which had found out about his plight after hearing about it from Defendants' announcements. *See* Cochran Dep. 274:23-275:4 (testifying that Chief Cochran was invited to speak at a church as a result of news of his suspension), 268:23-269:5 (testifying that Chief Cochran did not enlist the aid of Ed Elliot and that Mr. Elliot was acting on his own). Chief Cochran does not dispute that the support he received through the efforts of Mr. Ed Elliot included a social media campaign calling on the Mayor to apologize for suspending Chief Cochran for violating his First Amendment rights.

69.    Plaintiff spoke to the congregations of two churches, arguing once again that the Mayor suspended him solely because of his religious beliefs. (KCT, 274:13-22). In one of his speeches, Plaintiff stated:

In the book I deal with sexuality as God intended it. God intended for a man and a woman to be married and to have children to populate the earth, and that any sex outside of marriage and outside of a man and a woman, outside of holy matrimony is against the word of God, and *for that stand, I've been laid off for 30 days without pay.*

(KCT, 278:15-277:15) (emphasis added).

**Response:**

Chief Cochran disputes these factual allegations as stated. Chief Cochran does not dispute that he spoke to the congregations of two churches, upon their request. But Chief Cochran disputes the allegation that he "argu[ed] . . . that the Mayor suspended him solely because of his religious beliefs." Defendants' citations to the record do not support their allegation. The Mayor had publicly stated in his November 24, 2014 Facebook post that the "contents of [Chief Cochran's book] do not reflect [his] views" and that he was "deeply disturbed by the sentiments expressed" therein.

70.    As a result, the Mayor became the recipient of more than 17,000 angry emails, phone calls to his home, and even death threats. Among other things, Plaintiff's supporters called him a "nigger", a "terrorist", and the "anti-Christ." (KRT, 136:17-137:24; 151:18-22; 138:20-139:5).

**Response:**

Chief Cochran disputes these factual allegations as unsupported by Defendants' citations to the record. Perhaps most important, Defendants' statement that these alleged contacts ensued "as a result" of Cochran's communications is an unproven assumption, or conclusion as to causation, rather than a fact. The Mayor began receiving negative feedback as soon Chief Cochran's suspension was announced on the Mayor's Facebook page. *See* Pl.'s Ex. 10 (showing a negative comment on the very afternoon the suspension was announced); Yancy Dep. 109:8-22. Moreover, the reports provided by Mayor Reed as to what was said to him are inadmissible hearsay. Federal Rules of Evidence 801 and 802. Finally, the estimate of 17,000 e-mails received would appear to be in dispute. The Mayor himself testified that Defendants "stopped counting at 10,000 e-mails," Reed Dep. 136:19-20, but later stated that "17,000 people contacted" him, which figure was also noted by his counsel. *Id*. at 151:22, 139:19-21. Thus, while Cochran does not dispute that the Mayor appears to have received comments in the thousands, the precise number of those contacts is in dispute. Similarly unsupported is the allegation that each and every e-mail was an "angry" one. Defendants have provided no evidence to support this allegation, and the Mayor's testimony actually refutes it. *See* Reed Dep. 152:10-11 (predicting that an

"analysis of the e-mail will show that they were 80/20 in support of Kelvin Cochran's position.")

71.    The City's Law Department also conducted a Title VII investigation, the results of which were compiled in an investigative summary. (KRT, Ex. 13).

**Response:**

Chief Cochran does not dispute this factual allegation, except to the extent that Defendants characterize the "Investigative Report" as a "summary." As this was the only document released to the public or produced by Defendants pertaining to the investigation, it must be presumed to contain all the facts that Defendants intend to rely on with respect to the results of that investigation.

72.    It concluded that Plaintiff had not obtained the Ethics Board's written authorization prior to selling his book, in violation of Section 2-820(d) of the City's Ethics Code. (KRT, Ex. 13, at p.2).

**Response:**

Chief Cochran does not dispute that the City Law Department concluded that Chief Cochran did not receive prior written authorization from the Ethics Board before selling his book. But Chief Cochran does, however, object that the Investigative Report because it constitutes

inadmissible hearsay, including any factual conclusions contained therein. Federal Rules of Evidence 801 and 802.

73.    It also concluded that "[t]here … is general agreement the contents of the book have eroded trust and have compromised the ability of the chief to provide leadership in the future." (KRT, Ex. 13, at pp. 3-4).

**Response:**

Chief Cochran does not dispute that the City Law Department concluded in its Investigative Report that "[t]here is general agreement the contents of the book have eroded trust and have compromised the ability of the chief to provide leadership in the future." But Chief Cochran does, however, object to the Investigative Report because it constitutes, inadmissible hearsay, including the conclusion as to the "general agreement" about the "contents of the book." Federal Rules of Evidence 801 and 802.

74.    After learning of Plaintiff's speeches and suspecting his involvement in the orchestration of the PR campaigns during his suspension, and upon reviewing the Law Department's findings, Reed decided to terminate Plaintiff's employment given his lack of trust in Plaintiff and his sense that Plaintiff "could not continue with the support of the people that worked for him." (KRT,136:17-137:24;151:18-22;169:8-20).

**Response:**

46

Chief Cochran disputes these factual allegations to the extent they are not supported by Defendants' citations to the record and are legal conclusions. Chief Cochran does not dispute that the Mayor testified that he suspected that Chief Cochran "was a part of an effort to stimulate comment towards [him]," Reed Dep. 137:14-17, nor that the Mayor also testified that after meeting with various City officials, he concluded that Chief Cochran "could not continue with the support of the people that worked for him." *Id.* at 169:19-20. Chief Cochran disputes that this was the actual reason the Mayor decided to terminate him, and therefore disputes Defendants' conclusion to that effect, which is not a fact but rather an argument or an assertion. *See* Pl.'s Ex. 14 at 1-2 (denying that Chief Cochran's religious beliefs or the views expressed in the book were the reason for his punishment, but nonetheless focusing on the alleged "inflammatory" material in the book and the City's nondiscrimination policy); Pl.'s Ex. 77 (revealing the Defendants sent out social media posts suggesting that Chief Cochran was responsible for discrimination); Torres Dep. 76-77; Pl's Ex. 13 at 3-4 (focusing on the content of Chief Cochran's book); Pl.'s Br. 6-10, 19.

Respectfully submitted this 20th day of June, 2017.


By: /s/ Kevin Theriot

DAVID A. CORTMAN
Georgia Bar No. 188810
**ALLIANCE DEFENDING FREEDOM**
1000 Hurricane Shoals Road, NE
Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
(770) 339-6744 (facsimile)
dcortman@adflegal.org

KEVIN H. THERIOT
Georgia Bar No. 373095
KENNETH J. CONNELLY*
Arizona Bar No. 025420
JEANA HALLOCK*
Arizona Bar No. 032678
**ALLIANCE DEFENDING FREEDOM**
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
(480) 444-0028 (facsimile)
ktheriot@adflegal.org
kconnelly@adflegal.org
jhallock@adflegal.org


Garland R. Hunt
Georgia Bar No. 378510
**HUNT & ASSOCIATES**
12110 Helleri Hollow
Alpharetta, GA 30005
(770) 294-0751
(770) 777-5847 (facsimile)
garlandhunt1@gmail.com

JONATHAN D. CRUMLY, SR.
Georgia Bar No. 199466
**MANER CRUMLY CHAMBLISS LLP**
2900 Paces Ferry Road
Suite B-101
Atlanta, GA 30339
(770) 434-0310
(404) 549-4666 (facsimile)
Jcrumly@Manercc.com


*pro hac vice admission

ATTORNEYS FOR PLAINTIFF

## <u>CERTIFICATE OF COMPLIANCE</u>

Undersigned counsel hereby certifies that this document was prepared in Century Schoolbook 13-point font and fully complies with Local Rules 5.1C and 7.1D.

<u>/s/ Kevin Theriot</u>
Kevin H. Theriot

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of June, 2017, a copy of the foregoing document was filed with the Clerk of the Court using the ECF system, which will effectuate service on all parties.

/s/ Kevin H. Theriot
Kevin H. Theriot
*Attorney for Plaintiff*