**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

**KELVIN J. COCHRAN**,

    Plaintiff,

vs.

**CITY OF ATLANTA, GEORGIA; and**
**MAYOR KASIM REED, IN HIS**
**INDIVIDUAL CAPACITY**,

    Defendants.

Case No. 1:15-cv-00477-LMM

**DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF**
**ADDITIONAL FACTS PURSUANT TO LOCAL RULE 56.1(B)(2)(b)**

Pursuant to Local Rule 56.1(B)(2)(b), Defendants City of Atlanta (the "City")
and Mayor Kasim Reed hereby respond to Plaintiff's Statement of Additional Facts as
follows:

1.    Union President Stephen Borders could have continued to work for Chief
Cochran even with the knowledge that Chief Cochran held the religious beliefs
expressed in his book. *See* Borders Dep. 108:11-14.

RESPONSE:    Defendants admit that Borders testified that he felt he could
have continued to work under Plaintiff even though his religious views were known.

Borders also testified that while he had no problem with Plaintiff's religious beliefs, Plaintiff's decision to connect those beliefs with the workplace was concerning:

> I didn't have a problem with his beliefs. … but there was -- there's an issue of -- there's some things that you don't officially talk about and put out that this is -- and I was concerned about the members being represented fairly when you had someone who felt like we crossed the line of expressing that they're in this position, and this is how they believe, and this is how they believe in that capacity of their position. … We were afraid that there was a line that either had been crossed or was going to be crossed [or] that there would be -- the beliefs from Sunday would carry over while you're in uniform, and that was our concern as the union.

(Deposition Transcript of Stephen Borders, ("SBT"), relevant portions attached as **Exhibit A**, at 106:16-107:8).

2.      Chief Cochran wrote his book "for Christian men who struggle with issues of condemnation." Cochran Dep. 188:21-24; Pl.'s Ex. 11 at vii ("I thank God for choosing me to deliver this message to redeemed men of the Body of Christ who wrestle with the stronghold of condemnation.").

RESPONSE:      Admitted.

3.      Chief Cochran's book was not intended to be a condemnation or a singling out of any individual or group. *See* Cochran Dep. 188:21-24, 109:10-11, 191:23-193:1, 209:8-24; Pl.'s Ex. 11 at vii ("Sharing the lesson plan with my brothers on Friday mornings convinced me that more men would be blessed from this study.").

RESPONSE:        Defendants admit that Plaintiff's stated intent behind his book was to provide counsel to Christian men struggling to overcome condemnation. However, Plaintiff's intent is not material to the claims at issue. Rather, the actual language of the book, which condemns and passes judgment on multiple groups of people, is. Based on the dichotomy of the concepts of "naked" vs. "clothed," Plaintiff identifies broad categories of people he considers naked. This list includes homosexuals, murderers, rapists, pedophiles, those who have sex outside of marriage, those who engage in bestiality, and all non-Christians. (Deposition Transcript of Kelvin Cochran ("KCT"), relevant portions attached as **Exhibit B**, at 191:11-22; 193:2-4, Ex. 36, at 82; 195:12-15; 196:17-24; 197:1-10). Plaintiff characterizes these individuals as "wicked," "un-Godly," "deceitful," "loathsome," and "evildoer[s]," (KCT, 176:24-177:5; 178:18-23), and writes that there will be "celebration" when they perish.  (KCT, 177:6-178:17). Plaintiff's book also presents his view on women, including his belief that mankind would never have fallen from grace if Eve had consulted with Adam before eating the forbidden fruit. (KCT, 183:17-24; 186:20-187:4; 182:15-183:4). Positive examples of women are conspicuously absent.  (KCT, 188:18-190:2).   Instead, Plaintiff presents examples such as Delilah, who he describes as "a nagger," "devious," and someone who "used sex as a manipulative weapon," thereby destroying a man, Samson, with her sinful ways.  (*See Who Told You That You Were Naked?* at p. 116, attached as **Exhibit C**).

4.      Chief Cochran wrote his book to encourage people to "come into a conviction, not to condemnation, to realize that [we] need a Savior." Cochran Dep. 209:8-11.

RESPONSE:      Defendants admit that is what Cochran testified was his motivation in writing the book.  However, Plaintiff's intent is not material to the claims at issue. Rather, the actual language of the book, which condemns and passes judgment on multiple groups of people, is. *See* Defendants' Response to ¶ 4.

5.      Chief Cochran never discriminated against anyone, loves all categories of people, and in his capacity as Fire Chief would have laid down his life for anyone should the circumstances have required it. Cochran Dep. 45:21-46:6 ("Because the core of our mission is to protect the lives and property of the citizens we serve. . . . people who do what we do for a living have to love . . . all categories of people . . . because . . . we may at any time may have to pay the ultimate sacrifice to lay down our life for a person that we've never met before."); Yancy Dep. 102:11-14; Reed Dep. 156:10-13; Geisler Dep. 47:8-13, 66-67.

RESPONSE:      Defendants admit that there is no evidence in the record that Plaintiff engaged in unlawful discrimination. Defendants object to the remainder of this statement as inadmissible speculative lay opinion testimony.  Fed. R. Evid. 701.

6.     Because "all have sinned," Chief Cochran considers himself in need of a Savior as well. Cochran Dep. 192: 9-18, 176:13-18.

RESPONSE:        Defendants admit that Plaintiff believes he is in need of a Savior. However, this fact is not material to Plaintiff's claims.

7.     The Atlanta Fire and Rescue Doctrine was instituted by Chief Cochran to ensure the department was "ism" free, meaning various "isms" like "racism, sexism, territorialism, and cronyism" were not tolerated. Cochran Dep. at 47:5-20.

RESPONSE:        Admitted.

8.     Chief Cochran's disciplining of the firefighters involved in the Chick-Fil-A incident is consistent with the Atlanta Fire and Rescue Doctrine and with City nondiscrimination policies. *See* Cochran Dep. 294-297.

RESPONSE:        Admitted.

9.     Chief Cochran was suspended approximately four business days after Defendant City of Atlanta became aware of Chief Cochran's book. Yancy Dep. 20:23-21:1.

RESPONSE:        Admitted.

10.     Defendant Reed was informed of the book's contents less than two full business days before directing that Chief Cochran be suspended. Yancy Dep. 20:23-21:1, 22:3-22, 24:23-25:24, 26:7-8, 26:22-27:10, 42:6-11; Reed Dep. 124:7-25.

RESPONSE:        Admitted. Mayor Reed testified that he learned about the book on or around the Friday before he made the decision to suspend Plaintiff, which occurred on the following Monday.  (Deposition Transcript of Kasim Reed ("KRT"), relevant portions attached as **Exhibit D**, at 124:5-25).

11.    The Ethics Board approved a request from Chief Cochran for outside employment in March 2008. Defs.' Ex. 4.

RESPONSE:        Admitted.

12.    Chief Cochran called Nina Hickson to discuss his book because it was a "common practice for commissioners and department heads to call whoever is the subject matter [expert] on an issue" to get advice on the matter. Cochran Dep. 112:11-113:7.

RESPONSE: Defendants admit that Plaintiff called Hickson to discuss a book that he was writing.  However, Hickson denies that this book was *Who Told You That You Were Naked?*  Hickson testified that during this conversation, Plaintiff told her that he was writing a book about leadership, and asked her if that was a matter the ethics board would be concerned with.   (Deposition of Nina Hickson ("NHT"), relevant portions attached as **Exhibit E**, at 45:6-13).  Hickson further testified that she responded in the affirmative, and that Plaintiff then told her that it "wasn't happening anytime soon, but he would get back with [her] in about six months." (NHT, 45:14-18). Plaintiff has

no notes of this conversation. (KCT, 110:19-21). Hickson's handwritten, contemporaneous notes of this conversation state: "Advise regarding non-city-related book he is authoring; Will check back w/me in about 6 months." (NHT, 44:1-21 and its Exhibit 23). When presented with Hickson's notes, Plaintiff had no explanation for the "six months" reference. (KCT, 109: 15-16). However, this disputed fact is immaterial, as Hickson lacked authority to grant or deny permission to Plaintiff to publish and sell his book. Only the Ethics Board can grant such permission, and must do so in the form of a written opinion. (KCT, 55:18-23; 56:8-57:10 and its Exhibit 10 at § 2-820(d)).

13.    Rule 3 of the City of Atlanta Rules of the Board of Ethics states in part:

Rule 3. Informal Advice

3.1    Verbal or Written Request. The Ethics Code gives the ethics officer the duty to advise all city officials and employees about the provisions of the code. The official or employee may seek advice in writing, over the telephone, or in person.

3.2    Time and Content of Opinions. The ethics officer shall respond to each request in a timely manner. Routine inquiries should be answered within seven days and no later than fourteen days after receipt. The ethics officer may give a written or verbal response.

RESPONSE:        Admitted. Rule 2.7 also expressly provides that:

The Code of Ethics gives the *board* responsibility for approving outside employment to all employees who work as department heads, deputy department heads, and bureau directors. The request must be in writing and state the type and place of employment, the proposed work hours, and the employer's name and address. The board shall provide written approval or disapproval within 30 days.

(Dkt. No. 143-6, at 1-2) (emphasis added).

14.    The acknowledgement portion of the City of Atlanta Employee Ethics Pledge, which Kelvin Cochran signed on June 21, 2010, states in part: "I understand . . . that I can seek advice from the Ethics Office or Board of Ethics if I need guidance on how to avoid a conflict of interest and comply with the Code of Ethics." Defs.' Ex. 12.

RESPONSE:    Admitted.

15.    On October 31, 2012, Chief Cochran inquired of City Ethics Officer Nina Hickson by phone whether he needed to seek approval from the Board of Ethics to write and publish a non-city related book. Hickson Dep. 52:14-16, 53:8-10; Cochran Dep. 108:3-15.

RESPONSE:    Admitted. However, Hickson denies that this book was *Who Told You That You Were Naked? See* Defendants' Response to ¶ 12. Further, this fact is immaterial, as Hickson lacked authority to grant or deny permission to Plaintiff to publish and sell his book.  Only the Ethics Board can grant such permission, and must do so in the form of a written opinion.  (KCT, 55:18-23; 56:8-57:10 and its Exhibit 10 at § 2-820(d)).

16.    Nina Hickson did not tell Chief Cochran that he needed to seek approval for his book from the Board of Ethics. Hickson Dep. 52:25-53:3 ("Q. So you did not advise him that it's a matter that he should bring to the ethics board? . . . A. No."),

52:19-20 ("I didn't advise him of anything other than to say that this is an ethics matter.").

RESPONSE:   Objection, mischaracterizes Hickson's testimony.   Hickson's more complete testimony is as follows:

> Q:   What did you tell him about the book?
>
> A:   I answered his question, which was whether this was a matter that the ethics board would be concerned with, **yes**.  He says, well, it's not going to happen anytime soon, and I'll check back with you in six months. But I interpreted the question as, is this something that I would need to run by the ethics board, that's the way I took it. Because he said it was non-city related but it was on leadership.
>
> Q:   And so you advised him to --
>
> A:   I didn't advise him of anything other than to say this is an ethics matter. I didn't -- you know, and he said, okay, I don't think -- this is my memory, that he didn't think it would be happening anytime soon and he would check back with me in about six months.
>
> A:   So you did not advise him that it's a matter that he should bring to the ethics board?
>
> Ms. Hinton: Object to form.
>
> Q:   No. **I told him that it was -- it was a matter that the ethics board would be concerned with**, but he didn't --  the impression he gave me was that this was something that he was considering and is this something that would come to the ethics board, that was the question as I understood it. I didn't understand that he already had the book. I thought he was contemplating writing the book, and it was about leadership. That's all he told me.

(NHT, 52:8-53:15) (emphasis added). Further, this fact is immaterial, as Hickson lacked authority to grant or deny permission to Plaintiff to publish and sell his book. Only the Ethics Board can grant such permission, and must do so in the form of a written opinion. (KCT, 55:18-23; 56:8-57:10 and its Exhibit 10 at § 2-820(d)).

17.    Ms. Hickson did not tell Chief Cochran that he needed to seek approval from Mayor Reed or inform Mayor Reed of his book. Hickson Dep. 52:19-20 ("I didn't advise him of anything other than to say that this is an ethics matter.")

RESPONSE:       Admitted.  However, this fact is immaterial, as Hickson lacked authority to grant or deny permission to Plaintiff to publish and sell his book.  Only the Ethics Board can grant such permission, and must do so in the form of a written opinion.  (KCT, 55:18-23; 56:8-57:10 and its Exhibit 10 at § 2-820(d)).

18.    When Ms. Hickson advises someone that they need to seek approval from the Board of Ethics, her notes typically reflect that guidance. Hickson Dep. 58:8-15 (testifying that if she "told someone that they needed ethics board approval . . . for something" her notes would "typically" reflect that).

RESPONSE:       Admitted.

19.    Ms. Hickson's notes from her telephone conversation with Chief Cochran on October 31, 2012 "regarding [the] non-city-related book he [was] authoring" do not

indicate any directive to seek approval from Mayor Reed or from the Board of Ethics. Hickson Dep. 44:14-21; Pl.'s Ex. 23 at 1.

RESPONSE:      Admitted.   However, Hickson testified that she did inform Plaintiff he would need to refer to the ethics board when and if he decided to publish his book.  (NHT, 52:8-53:15). Further, this fact is immaterial, as Hickson lacked authority to grant or deny permission to Plaintiff to publish and sell his book.  Only the Ethics Board can grant such permission, and must do so in the form of a written opinion. (KCT, 55:18-23; 56:8-57:10 and its Exhibit 10 at § 2-820(d)).

20.    Chief Cochran understood Ms. Hickson's response to his inquiry regarding writing a non-city-related book to be that he could go forward without seeking approval from the Board of Ethics. Cochran Dep. 110:11-18 (testifying he understood "that it was permissible."); *see generally* Cochran Dep. 108-111; Cochran Dep. 111:3-13 ("Q. . . . Based on your description of it, she said that it sounded as if it was fine. A. Yes. Q. Consequently, you did not understand that you were denied permission to proceed with your book by Ms. Hickson, correct? A. No. My understanding of our conversation was I was given the permission to go forward. Q. It was green lighted? A. Yes.").

RESPONSE:      Defendants admit this is an accurate recitation of Plaintiff's testimony on this subject.  However, Hickson testified that she did inform Plaintiff he

would need to refer to the ethics board when and if he decided to publish his book. (NHT, 52:8-53:15). Further, this fact is immaterial, as Hickson lacked authority to grant or deny permission to Plaintiff to publish and sell his book.  Only the Ethics Board can grant such permission, and must do so in the form of a written opinion.  (KCT, 55:18-23; 56:8-57:10 and its Exhibit 10 at § 2-820(d)).

21.    Chief Cochran sought advice from Ms. Hickson on or about July 9, 2013, as to whether it was permissible for him to engage in a multi-level marketing business, called Life Leadership. Cochran Dep. 125:13-126:16.

RESPONSE:    Defendants admit that Plaintiff contacted Hickson on or about July 9, 2013 and asked her about a multi-level marketing campaign.  However, Hickson testified that she believed this request was in some way related to the book Plaintiff had called her about previously.  (NHT, 53:25). Further, this fact is immaterial, as Hickson lacked authority to grant or deny permission to Plaintiff to publish and sell his book. Only the Ethics Board can grant such permission, and must do so in the form of a written opinion.  (KCT, 55:18-23; 56:8-57:10 and its Exhibit 10 at § 2-820(d)).

22.    Ms. Hickson told Chief Cochran that he would need to seek permission from the Board of Ethics and the Mayor in order to engage in that multi-level marketing venture. Cochran Dep. 126:13-16; Hickson Dep. 46:25-47:6, 47:22-48:17.

RESPONSE:    Admitted.

23.    Ms. Hickson's notes from her phone conversation with Chief Cochran, dated July 9, 2013, with regard to that multi-level marketing venture, state: "told him to clear it with the mayor and then get authorization from the Board of Ethics." Hickson Dep. 48:15-17, 49:19-50:5; Pl.'s Ex. 23 at 2.

RESPONSE:        Admitted.

24.    Chief Cochran ultimately decided not to take part in the multi-level marketing venture. Cochran Dep. 126:18-19.

RESPONSE:        Admitted. However, this fact is immaterial to Plaintiff's claims.

25.    Chief Cochran received permission from Nina Hickson to identify himself in the "About the Author" section of his book as AFRD Fire Chief. Cochran Dep. 127:5-8, 147:3-8, 18-21; Hickson Dep. 58:24-59:8 (testifying that Ms. Hickson's notes could pertain to this request by Chief Cochran).

RESPONSE:        Disputed.  Hickson has no memory of Plaintiff making such a request.   (NHT, 58:24-59:5).   Further, this fact is immaterial, as Hickson lacked authority to grant or deny permission to Plaintiff to publish and sell his book.  Only the Ethics Board can grant such permission, and must do so in the form of a written opinion.  (KCT, 55:18-23; 56:8-57:10 and its Exhibit 10 at § 2-820(d)).

26.     On a separate occasion, Ms. Hickson told Chief Cochran that she looked forward to reading his book. Hickson Dep. 57:12-21.

RESPONSE:          Defendants admit that Hickson ran into Plaintiff in City Hall one day and told him that she looked forward to reading his book. However, Hickson thought the book Plaintiff was working on was a leadership book, not *Who Told You That You Were Naked?* (NHT, 57:7-11; 53:11-15).

27.     Anne Torres gave an interview to WSB reporter Aaron Diamant concerning Chief Cochran's book and his suspension, but she did not permit Chief Cochran to speak. Torres Dep. 33-35.

RESPONSE:          Defendants admit that Anne Torres gave an interview to WSB reporter Aaron Diamant regarding Plaintiff's suspension, and that she denied WSB's request to interview Plaintiff. As Torres testified:

> [I]f there is a media inquiry that comes in, then one person is delegated to speak on behalf of the administration.  At this point, Chief Cochran was still an employee, and I didn't feel like it was appropriate for him to speak on a book that we didn't have any knowledge about or didn't have any other further information on, so I decided to speak only [on] behalf of the administration. … [I]t's normal for me to make those types of decisions on a daily basis.

(Deposition Transcript of Anne Torres ("ATT"), relevant portions attached as **Exhibit F,** at 34:22-35:7).

14

28.   Defendants, in addition to releasing the Mayor's Facebook post commenting on the matter, released a number of statements concerning Chief Cochran's suspension to the press. *See* Pl's Ex. 69 (stating that Mayor Reed was "deeply disturbed by the sentiments expressed in [Chief Cochran's book]") & 70 (responding to a reporter's inquiry and stating, before the investigation had concluded, that "[t]here are a number of passages in the book that directly conflict with the City's non-discrimination policies").

RESPONSE:      Defendants admit that the City released statements regarding Plaintiff's suspension given his high-profile role within the City. As Mayor Reed stated:

> [W]hen you suspend a person who is [as] high profile as the chief of your fire department, there is a role to play in assuring the public that the fire department is going to continue to run and operate.  And so the comments that I made reflected the reality that we had to explain where the fire chief was going to be for 30 days. I know you've got important litigation, but I have a city to run. And there was a role as mayor of the City of Atlanta of letting the public know that we had an issue, that the issue was being investigated, but that if you call the fire department, we were going to continue to respond.

(KRT, 140:6-19).

29.   Comments objecting to Defendants' treatment of Chief Cochran began "right away" after news of his suspension was posted on the Mayor's Facebook page. Reed. Dep. 136:1-24; Yancy Dep. 109:8-22.

RESPONSE:        Objection. This statement mischaracterizes testimony.  Mayor Reed testified that soon after he posted his statement about Plaintiff's suspension on Facebook, members of the public began posting responses.  (KRT, 136:1-9).  However, he did not testify that his Facebook post sparked the broader public backlash that arose after Plaintiffs' suspension.  Instead, he testified that he believed the outcry arose after Plaintiff made public appearances at which he discussed his suspension.  (KRT, 138:19-139:9).

30.    After Defendants' statements concerning Chief Cochran's suspension were publicly broadcast, the issue of Chief Cochran's suspension became widely known, and fellow Christians asked Chief Cochran to share his  testimony with them as a result. Cochran Dep. 265:1-8, 268:16-22, 271:8-12, 274:23-275:5.

RESPONSE:        Defendants admit that after the City issued statements regarding Plaintiff's suspension, fellow Christians contacted Plaintiff to offer their support.  However, Defendants dispute that the City's statements caused Plaintiff's suspension to be "widely known."  Instead, Plaintiff's support for and encouragement of a public relations campaign against Mayor Reed and the City initiated by the Georgia Baptist Convention ("GBC") led to Plaintiff's suspension being widely broadcast.  The GBC's initiative included the publication of a web-based editorial criticizing Plaintiff's suspension, which Plaintiff reviewed and approved; an online petition linked to a forum

16

on which to purchase Plaintiff's book; a social media campaign directed at pressuring the Mayor to reconsider Plaintiff's suspension; and the posting of a recording of Plaintiff's GBC speech to the GBC website. (KCT, 251:21-252:18; 257:16-18; 261:22-262:14; 264:16-24, Exs. 49, 50 at PL 001902). (*See also* GBC Mission Board, "Help Us Defend Religious Liberty!", available at https://gabaptist.org/petition/, last visited April 17, 2017, attached to Defendants' Brief in Support of Motion for Summary Judgment ("DMSJ") as Ex. I).

In mid-December, Plaintiff approved yet another public relations "offensive fire attack" against the City, which included a social media campaign calling on the public to contact the Mayor and demand that he apologize to Plaintiff for violating his First Amendment rights. (KCT, 268:10-18, 269:12-270:15, Ex. 51). Plaintiff also spoke to the congregations of two churches, arguing once again that the Mayor suspended him solely because of his religious beliefs.  (KCT, 274:13-22)

31.    Defendants gave Chief Cochran no written instructions as to their expectations during his suspension. *See* Cochran Dep. 222:23, 267:1-2.

RESPONSE:        Admitted.  Instead, during the meeting at which Plaintiff was suspended, Mayor Reed's Chief of Staff Candace Byrd verbally informed Plaintiff that the Mayor had instructed that he not publicly comment on his suspension during his leave. (Deposition Transcript of Yvonne Yancy ("YYT"), relevant portions attached

hereto as **Exhibit G**, at 76:22-25; Deposition Transcript of Candace Byrd ("CBT"), relevant portions attached as **Ex. H**, at 40:7-11, 43:1-3, 43:20-44:2; KRT, 105:3-7; KCT, 222:13-223:2).   While Plaintiff insists that Chief of Staff Byrd only advised him not to hold any press conferences or respond to any requests for interviews, he admits that the intent behind her directive was clear: "she didn't want me to publicly disclose my side of the story." (KCT, 257:4-13).

32.   A number of churches and religious organizations offered their assistance to Chief Cochran during his suspension. *See* Cochran Dep. 254:22-255:1, 265:4-8.

RESPONSE:      Admitted.   However, this fact is immaterial to Plaintiff's claims.

33.   Chief Cochran reviewed plans of assistance created by those who volunteered to help him, but he did not create or implement those plans. *See* Cochran Dep. 254:22-255:1, 265:4-8.

RESPONSE:      Admitted.   Nor did Plaintiff take any steps to moderate or prevent the implementation of those plans, even when given the opportunity to do so by the organizers. (KCT, 264: 16:24; KCT, 271:11-13).

34.   Chief Cochran accepted offers of assistance from co-religionists because he found it helpful in dealing with the stress brought about by his public suspension.

Cochran Dep. 265:1-4 (testifying that "at the time [his suspension] was taking place, due to the tremendous amount of stress and pressure, support from my church . . . really was helpful.").

RESPONSE:       Admitted. However, this fact is immaterial to Plaintiff's claims.

35.    At the time Chief Cochran was terminated, Defendants knew no details of the efforts of support for Chief Cochran undertaken by various churches and organizations during his suspension, nor did they have any knowledge of his communications with these churches or organizations. *See* Yancy Dep. 128:23-129:1 (admitting that Defendant did not terminate Chief Cochran based upon facts related to the support he received from churches and religious organizations during his suspension), 128:10 ("At the time I didn't know that, but I know it now . . ."); Reed Dep. 137:11-24 (revealing the Defendants only became aware of support for Chief Cochran from churches and other religious organizations, and of Chief Cochran's communications with them, during discovery).

RESPONSE:       Disputed.   Mayor Reed testified that he suspected Plaintiff was involved in the massive public relations campaign launched against the City and him personally during his suspension.  (KRT, 137:19-138:13).  Specifically, Mayor Reed testified that during Plaintiff's suspension, he "had a strong suspicion that Chief

Cochran was coordinating with members from certain communities that didn't agree

with the judgment that I made to communicate their displeasure to that." (KRT, 137:20-

24). He further testified that he was aware of Plaintiff's public conduct during his

suspension, when asked why he suspected Plaintiff of being involved:

> Q:    What was that susp[icion] based upon?
>
> A:    My suspicion was that -- it was based upon my instinct and a person who's been in politics for almost 20 years, that the opposition was coordinated and manufactured.
>
> Q:    What was your -- why did you think that Chief Cochran was involved in that coordination?
>
> A:    Because I watched his behavior.  He went out, after -- after we made it very clear that during the course of this investigation related to your employment that you should not comment on issues related to your employment, he went out and gave public speeches that were covered by the press that I thought inflamed a certain part of the community.
> …
> A:    … I do remember the media reports and I remember being shocked that after communicating that he should not discuss issues related to employment, that he was in public forums discussing it. And then shortly after being in those public forums, we were inundated with electronic communications and calls to my home throughout the holidays, included death threats, including calling me the anti-Christ, including calling me a nigger and other inflammatory comments that we got by the thousands.

(KRT, 137:25-139:5).

36.     Chief Cochran did not speak to the various religious organizations (who requested him to share his testimony) in order to discuss his suspension.  *See* Cochran Dep. 256:2-6. (revealing that during his speech to the Georgia Baptist Convention, Chief Cochran stated that he did not come to talk about his suspension).

RESPONSE:        Defendants admit that Plaintiff purports not to have intended to discuss his suspension when speaking to religious organizations during his suspension.   However, that fact is immaterial, as Plaintiff did in fact discuss his suspension during at least two of his speaking engagements.   (KCT, 259:24-260:6; 274:13-22).  At one, Plaintiff went so far as to state that the City suspended him *because of his religious beliefs.*  Specifically, Plaintiff stated:

> In the book I deal with sexuality as God intended it.  God intended for a man and a woman to be married and to have children to populate the earth, and that any sex outside of marriage and outside of a man and a woman, outside of holy matrimony is against the word of God, and *for that stand, I've been laid off for 30 days without pay.*

(KCT, 275:15-277:15) (emphasis added).

37.     The purpose of Chief Cochran's appearance at the Georgia Baptist Convention was to "share[] [his] testimony . . . which is a common Christian practice." Cochran Dep. 260:14-20, 255:21-24.

RESPONSE:        Admitted.

21

38.     Chief Cochran briefly alluded to his suspension at the beginning of his talk to the First Baptist Church of Newnan, because his "invitation to speak  was extended based on" news of that suspension. Cochran Dep. 274-75.

RESPONSE:     Defendants admit that Plaintiff discussed his suspension during his speech to the First Baptist Church of Newnan.  Defendants dispute that Plaintiff merely "alluded" to the topic.  Instead, he explicitly stated that he had been suspended because of his religious beliefs. *See* Defendants' Response to No. 36.

39.     Defendants did not "typically talk about employment matters to the media," and preferred to "reserve comments surrounding suspensions or terminations." Byrd Dep. 44:2-5.

RESPONSE:     Admitted.

40.     Defendants' "policy [was] to not talk about employment matters." Yancy Dep. 71:12-13; 139:1-8.

RESPONSE:     Admitted.

41.     Defendants publicly announced Chief Cochran's suspension and termination. Pl.'s Exs. 10 & 49; Torres Dep. 32-35.

RESPONSE:     Admitted.  This was due to Chief Cochran's high-profile position as Fire Chief of AFRD.  While the City does not normally comment publicly

on employment matters, given Plaintiff's role, it had no choice but to notify the public of

what had occurred.  As Mayor Reed testified:

> I know that we had a press conference after the event, because when you --
> when you suspend a person who is high profile as the chief of your fire
> department, there is a role to play in assuring the public that the fire
> department is going to continue to run and operate.  And so the comments
> that I made reflected the reality that we had to explain where the fire chief
> was going to be for 30 days.  I know you've got important litigation, but I
> have a city to run. And there was a role as mayor of the City of Atlanta of
> letting the public know that we had an issue, that the issue was being
> investigated, but that if you call the fire department, we were going to
> continue to respond.

(KRT, 140:5-19).

42.     In the "About the Author" section of his book Chief Cochran noted that he

was at the time of publication currently "serving as AFRD Fire Chief."  Pl.'s Ex. 11 at v.

RESPONSE:         Admitted.

43.     Chief Cochran also later noted in his book that he considered his religious

faith central to carrying out his mission as a fire professional. *Id*. at 76.

RESPONSE:         Admitted.

44.     It is Defendants' position that employees need to "get permission . . . to do

anything outside of work," even if compensation is only possible or perceived. *See*

Yancy Dep. 88:3-5, 52:5-7.

RESPONSE:        Objection. Mischaracterizes Commissioner Yancy's testimony. Commissioner Yancy testified that employees must seek approval for any outside work that has the potential to earn remuneration.   (YYT, 88:9-13).   Her testimony was specifically geared towards outside *employment* and activities that could be perceived as employment, not merely any activity outside of work.   (*Id.*).   Moreover, Defendants object to Plaintiff's attempt to rely upon the testimony of Commissioner Yancy as evidence of what the City's outside employment rules are.   Those rules are codified in the City Code and Code of Ethics, and they speak for themselves.   (City of Atl. Code, §§ 114-436-37; 2-820(d)).

45.    Commissioner of Human Resources Yvonne Yancy, Chief of Staff Candace Byrd, and Chief Counsel Bob Godfrey met with Chief Cochran to inform him that Mayor Reed had decided to suspend him. Cochran Dep. 200:4-6; s*ee also* Defs.' Statement of Facts at ¶¶59-60.

RESPONSE:        Admitted.

46.    Yvonne Yancy had a suspension notice drawn up prior to that suspension meeting, along with a termination letter, which action she recommended to Mayor Reed even before speaking to Chief Cochran at the suspension meeting. Yancy Dep. at 44:12-45:16; Defs.' Statement of Facts ¶58.

RESPONSE:        Admitted.

47.   Before informing him of his suspension, Defendants decided that sensitivity training would be required of Chief Cochran. Yancy Dep. 47:20-24.

RESPONSE:        Admitted.

48.   Chief Cochran was not given "all the reasons" he was being terminated at his termination meeting, but was merely told that his "services are no longer needed" and that Defendants "decided to go in a different direction." Yancy Dep. 134:1-7.

RESPONSE:        Defendants admit that Plaintiff was not given all of the reasons for his termination at his termination meeting.  However, Defendants dispute that Plaintiff was *only* informed that his services were no longer needed and that the City had decided to go in a different direction.  Instead, Chief Counsel Bob Godfrey discussed the Law Department's investigation that had taken place during Plaintiff's suspension, as well as the Law Department's finding that members of AFRD had expressed that they did not feel they could serve under his leadership as Fire Chief. (YYT, 134:8-135:4).   Further, Commissioner Yancy discussed the fact that Plaintiff had spoken publicly about his suspension, in violation of the Mayor's directive.  (YYT, 126:4-8).

49.   Chief Cochran's request to speak with Mayor Reed prior to his termination was denied, and he was instead told that "the proceeding was final. . .

25

[Defendants] were going to move forward . . . the opportunities had all been taken."
Geisler Dep. 75:11-13.

RESPONSE:        Admitted.

50.     After becoming aware of Chief Cochran's book, LGBT Advisor Robin
Shahar and Special Assistant to the Mayor Melissa Mullinax concluded that it was
"very important that other religious perspectives be put in the public domain."
Shahar Dep. 80-81; Mullinax Dep. 35:14-36:9.

RESPONSE:        Admitted. However, this fact is immaterial to Plaintiff's
claims.

51.     In order to accomplish this they enlisted the Anti-Defamation League
to provide a different religious perspective from that provided by Chief Cochran in his
book. Shahar Dep. 80-81; Mullinax Dep. 35:14-36:9.

RESPONSE:        Admitted.  However, this fact is immaterial to Plaintiff's
claims.

52.     The Anti-Defamation League later sent a letter to Mayor Reed
encouraging him to terminate Chief Cochran. Pl's Ex. 12.

RESPONSE:        Admitted. However, Mayor Reed neither requested nor
solicited the Anti-Defamation League's opinion. (Deposition Transcript of Robin Shahar
("RST"), relevant portions attached as **Ex. I,** at 82:7-24) (explaining that she made it

clear to the ADL that the Mayor had not requested their input, and that she was "requesting an objective look by them, and a decision that was 100 percent independent in terms of whether they thought anything, any response from them was needed, and if so, let them decide what they want to do.").

53.    In its letter the Anti-Defamation League concluded that Chief Cochran's religious beliefs were incompatible with the City's nondiscrimination policy. *Id*. ("The statements of personal belief contained in the book blatantly contradict [the City's nondiscrimination] policy.").

> RESPONSE:       Admitted. The ADL also concluded that it had:
>
> …very serious concerns that the attitudes expressed in the book condemn homosexuality and reject, with very strong pejorative language, any faith other than Chief Cochran's brand of evangelical Christianity. … the Chief is the leader of the City of Atlanta Fire Department and a representative of a demographically diverse workforce and City. As such, the attitudes he has expressed contradict the value commitment to employees of respect, fairness and inclusion, and ultimately erode trust with employees and citizens of the City of Atlanta.

(KRT, Ex. 12). However, as the ADL was not a decision-maker, this fact is immaterial to Plaintiff's claims.

54.    Defendants admitted to the public that they disciplined Chief Cochran based on the content of his book. Pl's Ex. 83 (revealing that on February 19, 2015, the Mayor's Director of Communications Anne Torres responded to an

inquiry from an NBC reporter by stating in part that Chief Cochran was disciplined because "he was espousing theories in the workplace about certain groups of people that were in conflict with the City's nondiscrimination policy," and because of "his espousing these beliefs while identifying himself as the Atlanta Fire Chief").

RESPONSE:       Objection. Mischaracterizes evidence.   Torres did not state that Plaintiff was *disciplined* because of his espousal of such theories in the workplace. Rather, she stated that at the time of Plaintiff's suspension, he was informed "that the issue was not the religious nature of his book, but the fact that he was espousing theories in the workplace about certain groups of people that were in conflict with the City's nondiscrimination policy." (ATT, Ex. 83). Accordingly, Torres' statement merely refers to the fact that the City informed Plaintiff that his distribution of the book to his subordinates in the workplace raised Title VII concerns for the City, leading to the Law Department's Title VII investigation which followed.   Moreover, as Anne Torres was not the decision-maker with respect to Plaintiff's suspension or termination, this fact is immaterial to Plaintiff's claims. (ATT, 100:17-21).

55.    Chief Cochran's book, which was written to help Christian men fulfill God's purpose for their lives, was a direct outgrowth of a Bible study he undertook at Elizabeth Baptist Church. *See* Am. Comp. ¶¶83-89, 93-94; Cochran Dep. 143:1-3, 106-07; Pl.'s Ex. 11 at vii.

RESPONSE:        Admitted.

56.    Chief Cochran later shared lessons from his book with co-religionists in the broader Christian community, at the request of other churches and religious organizations. *See* Cochran Dep. 255:2-256:6, 274-78; Defs.' Ex. 52.

RESPONSE:        Admitted.

57.    The book was made available online at Amazon and Barnes & Noble because that was the most efficient "mechanism[] of distributing the book to Christian men." Cochran Dep. 80:8-18.

RESPONSE:        Admitted.

58.    Chief Cochran did not write the book in order to make a profit. *Id*.

RESPONSE:        Admitted.   However, Plaintiff's intent is irrelevant, as he admits that: (1) he made his book available for sale on Amazon, Barnes & Noble, and at speaking events; (2) he priced his book to provide for a profit margin; and that (3) he earned a profit as a result.  (KCT, 79:8-12; 80:19-81:2; 149:8-25).

59.    Defendants "did not know" whether Chief Cochran profited from the book, only that it was "for sale." Yancy Dep. 51:16-52:5; *see also id*. at 52:1-2 (testifying "Perhaps he donated it. I don't know.").

RESPONSE:        Admitted.  Defendants were aware that the book was for sale at the time Mayor Reed suspended him.  (YYT, 44:3-7; KRT, 102:1-4).

Respectfully submitted this 20th day of July, 2017.

s/Kathryn J. Hinton
David E. Gevertz
GA Bar No. 292430
Kathryn J. Hinton
GA Bar No. 542930
Hannah Jarrells
GA Bar No. 784478
**BAKER DONELSON BEARMAN
CALDWELL & BERKOWITZ, P.C.**
3414 Peachtree Rd NE
Monarch Plaza, Suite 1600
Atlanta, Georgia 30326
Phone: 404-221-6512
Fax: 678-406-8816
dgevertz@bakerdonelson.com
khinton@bakerdonelson.com

*Attorneys for Defendants*

## **CERTIFICATE OF COMPLIANCE**

Undersigned counsel certifies the foregoing document has been prepared with one of the font and point selections (Times New Roman, 14 point) approved by the Court in local rule 5.1(C) and 7.1(D).

This 20th day of July, 2017.

*s/ Kathryn Hinton*
Kathryn J. Hinton
GA Bar No. 542930

## **CERTIFICATE OF SERVICE**

I hereby certify that I have this day served a copy of the foregoing *Defendants'*
*Response to Plaintiff's Statement of Additional Disputed Facts* via the Court's ECF
filing notification which will automatically send an electronic copy of the foregoing to
the following attorney of record for Plaintiff:

Kevin Theriot, Esq.
Jeana Hallock, Esq.
Ken Connelly, Esq.
Alliance Defending Freedom
1000 Hurricane Shoals Road, NE
Suite D-1100
Lawrenceville, Georgia 30043

This 20th day of July, 2017.

s/ Kathryn  Hinton
Kathryn J. Hinton
GA Bar No. 542930
