IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |  |
|---|---|---|
| KELVIN J. COCHRAN, | : | |
| Plaintiff, | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 1:15-CV-0477-LMM |
| CITY OF ATLANTA, GEORGIA and MAYOR KASIM REED, in his individual capacity, | : | |
| Defendants. | : | |

## ORDER

This case comes before the Court on Defendants City of Atlanta, Georgia, and Mayor Kasim Reed's Motion for Summary Judgment [105] and Plaintiff's Motion for Partial Summary Judgment [107]. [1] This matter concerns whether the City could fire the Fire Chief of the Atlanta Fire and Rescue Department ("AFRD") for publishing a book to be used as a religious guide for men that contains passages identifying those who engage in homosexual and extramarital sex as "naked"—or "wicked," "un-Godly" sinners—whose deaths will be celebrated. See Cochran Dep., Dkt. No. [154] at 176:24-178:15. Plaintiff contends that he was fired because of his religious speech—which is grounded in

---

[1] Plaintiff's Motion is titled a "Motion for Summary Judgment" but, as his Motion does not discuss his free exercise and freedom of association claims, the Court will treat it as a Motion for Partial Summary Judgment. See Dkt. No. [107].

conservative Christian principles—in violation of the Constitution, while Defendants contend that he was fired because he did not comply with the City's pre-clearance rules for outside employment and for facilitating a massive public relations campaign against the Mayor and the City. Defendants also contend that Plaintiff's speech made the City potentially vulnerable to employment discrimination claims and substantial disruption.

### 1. **Factual Background**

Plaintiff Kelvin J. Cochran was first appointed Fire Chief of the Atlanta Fire Rescue Department ("AFRD") in 2008. Defs.' Resp. to Pl.'s Stm't of Facts, Dkt. No. [141] ¶ 5. In 2009, Plaintiff left the AFRD to serve as Administrator of the United States Fire Administration, but he returned ten months later. Id. ¶¶ 6, 9. Plaintiff remained the AFRD Fire Chief until January 6, 2015. Id. ¶ 129.

Plaintiff is also a devout evangelical Christian who holds "historic Christian beliefs" and is a member and Deacon at Elizabeth Baptist Church. Id. ¶¶ 16, 18. Plaintiff's Christian views compel him to "honor God in all aspects of his work by doing everything with excellence throughout his job," and "compel him to treat all fire department staff under his command, and all members of the community he serves, with dignity, justice, equity, and respect, regardless of their personal traits, characteristics, and beliefs." Id. ¶¶ 17, 20.

Plaintiff was generally regarded as an excellent Fire Chief. Id. ¶¶ 29-30. In 2008, when Plaintiff became Atlanta's Fire Chief, he set out to assemble a group of firefighters within the AFRD who represented diverse backgrounds,

characteristics, and beliefs. <u>Id.</u> ¶ 23. Plaintiff knew at least two LGBT employees were members of this group. <u>Id.</u> ¶ 24. Plaintiff also had experienced racial discrimination in his early years in fire service, so he worked diligently to ensure that no one in his command would be mistreated because of his or her membership in a particular group. <u>Id.</u> ¶ 28.

In late 2013, Plaintiff wrote and self-published a book entitled "Who Told You That You Were Naked?: Overcoming the Stronghold of Condemnation." <u>Id.</u> ¶¶ 38, 44. Plaintiff's book was inspired by a men's Bible study at Plaintiff's church, which included a unit on God's question to Adam, "Who told you that you were naked?" <u>Id.</u> ¶¶ 31-33.[2] Plaintiff's book was written primarily for Christian men and is intended to help them fulfill God's purpose for their lives. <u>Id.</u> ¶ 38. According to Plaintiff, one of the book's goals is to guide men to live faith-filled, virtuous lives. <u>Id.</u> ¶ 39.

The book includes passages indicating that sex was created for procreation and marital pleasure in holy matrimony, and that sex outside of the confines of marriage between a man and woman—including fornication, homosexual acts, and all other types of non-marital sex—is contrary to God's will. <u>Id.</u> ¶¶ 40-41. The book also categorizes the following as equally "unclean"—or "whatever is the

---

[2] According to Genesis, God created Adam and Eve, and they first lived naked and unashamed in the Garden of Eden. Following the serpent's temptation, Adam and Eve ate the forbidden fruit from the tree of knowledge. Their eyes were then opened, and at that moment they knew for the first time that they were naked. God later visited the Garden of Eden, and when Adam and Eve hid from him, he asked Adam, "Who told you that you were naked?"  Genesis 2-3.

opposite of purity": "sodomy, homosexuality, lesbianism, pederasty, bestiality, and all other forms of sexual perversion." Book, Dkt. No. [106-3] at 20. Plaintiff claims this list originated from his study of Galatians 5:19-21, which lists 17 "works of the flesh." Cochran Dep., Dkt. No. [154] at 192:1-6. The City has admitted that "[t]hese teachings are consistent with the Bible and historic Christian teaching." Defs.' Resp. to Pl.'s Stm't of Facts, Dkt. No. [141] ¶ 42.

The basic premise of the book is the dichotomy between being "naked" and "clothed" in the Bible. Pl. Resp. to Defs.' Stm't of Facts, Dkt. No. [144] ¶ 33. According to Plaintiff, a "naked" man is one who lacks a working relationship with God, and a "clothed" man is one who enjoys a working relationship with God because he has accepted Jesus Christ as his Lord and Savior. Id. ¶ 34. To become "clothed," one must be a born-again Christian. Cochran Dep., Dkt. No. [154] 174:9-10. Essentially, per Plaintiff, "naked means that you're a sinner, and clothed means you're righteous." Id. at 176:2-4.

Plaintiff writes that the Bible teaches the following are synonyms for nakedness: "wicked," "un-Godly," "evildoers," "deceitful," "mischievous," and "loathsome." Id. at 176:24-178:23. Citing Proverbs, Plaintiff writes that when the naked die, there is joy and celebration. Id. at 177:16-178:15. And there are not gradations of nakedness—every person, if naked, is equally sinful. Pl.'s Resp. to Defs.' Stm't of Facts, Dkt. No. [144] ¶ 36. But a clothed person can still transgress; Plaintiff states that he wrote his book to assist clothed men in

4

avoiding "issues" with these works of the flesh through their desire to please God. Cochran Dep., Dkt. No. [154] at 194:20-195:1, 199:1-3.

Plaintiff also wrote a section entitled, "You Need to Talk to My Husband." Book, Dkt. No. [107-9] at 25. It opens with a hypothetical that discusses what would have happened if Eve had, instead of eating the forbidden fruit, first told the serpent that he needed to talk to her husband. Id. Plaintiff suggests that had Eve first come and spoken to her husband, the Fall[3] would not have occurred. Id. Plaintiff believes those

> words coming from Eve would have empowered and emboldened Adam as the protector of Eve and the Garden. He would have responded with righteous indignation and killed the serpent on the spot—even cut off his head. The scriptural account could have possibly been, "And the Spirit of the Lord came upon Adam, and he cut off the serpent's head and they lived happily ever after."

Id. Plaintiff states that "[u]nfortunately, that's not what happened." Id. Rather, Eve ate the fruit and gave some to her husband. Id.

Plaintiff maintains that this book is not intended for women, so he was not concerned with including examples of virtuous, biblical women in his book. Instead, women were used as an "issue" or "challenge" that men "wrestle with." Cochran Dep., Dkt. No. [154] at 189:5-190:2. In the "About the Author" section of the book, Plaintiff states that he is "currently serving as the Fire Chief of the City

---

[3] "The Fall" generally refers to God's separation from humanity, which was caused by Adam and Eve's first sins (disobeying God and eating the fruit of knowledge). See Genesis 3.

of Atlanta Fire Rescue Department (GA)." Pl.'s Resp. to Defs.' Stm't of Facts, Dkt. No. [144] ¶ 40.

The City maintains three pre-clearance rules which require the AFRD Chief to seek permission from the Board of Ethics and his or her supervisors prior to beginning any outside employment (hereinafter, "Pre-Clearance Rules").[4] Plaintiff never sought or received permission from the Board of Ethics to sell his book, and he never discussed his plan to sell his book with either of his supervisors, Mayor Reed or Chief Operating Officer Michael Geisler. Id. ¶¶ 42-43; Defs.' Resp. to Pl.'s Stm't of Facts, Dkt. No. [141] ¶ 90. However, on October 31, 2012, Plaintiff called Nina Hickson, the City of Atlanta Ethics Officer, for advice about a "non-city-related" book he was authoring. Id. ¶ 35. It is disputed what was said during this conversation, including whether Plaintiff discussed the book's subject matter or if Hickson indicated Plaintiff would need Board of Ethics approval for such a book. Id. ¶ 44.[5]

In early 2014, after the book was published, Plaintiff provided book copies to between 9 and 12 of his Christian subordinates at the AFRD, all of whom were either: (1) close personal friends who asked for a copy before it was finished; (2) employees who asked about the book once they learned of its publication; or (3) men who Plaintiff gave an unsolicited copy of the book. Cochran Dep., Dkt. No.

---

[4] As further explained infra, the Pre-Clearance Rules are codified at Sections 2-820(d), 114-436, and 114-437 of the City's Code of Ordinances.

[5] As discussed in subsequent sections, this dispute is ultimately not material.

[154] at 140:2-141:15, 142:11. These subordinates included all four of his Deputy Chiefs and four of the six Assistant Chiefs. Id. at 216:21-217:18. Plaintiff also contends that he provided Mayor Reed with a copy via Mayor Reed's assistant, though Mayor Reed disputes that fact. Defs.' Resp. to Pl.'s Stm't of Facts, Dkt. No. [141] ¶ 46. From the time the book was published until late 2014, the City did not receive any complaints about the book. Id. ¶ 49.

In November 2014, Assistant Chief Wessels—one of Plaintiff's subordinates and one of the individuals who had received a copy of the book from Plaintiff during a work event—brought Plaintiff's book to the attention of Stephen Borders, the President of the local firefighter's union. Id. ¶¶ 50-51. Wessels had received the book in June or July 2014, but had only just read it. Wessels told Borders that some passages were disturbing to him—especially because Plaintiff referred to himself as the Fire Chief in the book. Id. ¶¶ 51, 53.

Borders then ordered copies of the book online to review himself and, following that review, took a copy of the book to Councilmember Alex Wan to seek his advice about how the City should handle the book. Id. ¶ 54. Borders expressed concern to Wan about the content of the book and its distribution at work. Id. ¶ 58. Councilman Wan then read the book and shared Borders's concerns about the passages that referenced the gay and lesbian community, specifically a risk of discrimination against LGBT members of the AFRD. Id. ¶ 59.

At the same time Borders approached Councilman Wan, another member of the union board contacted retired AFRD Chief Cindy Thompson, who

happened to be in Atlanta at the time. Id. ¶ 61. Borders then had lunch with Thompson and showed her the book. Id. ¶ 64. On November 23, 2014, Thompson sent an email to Mayor Reed's LGBT Advisor, Robin Shahar, stating that she and other LGBT firefighters she knew were extremely insulted and saddened by the book's discriminatory text. Id. ¶ 65.

Meanwhile, Councilman Wan decided the book presented a human resources matter. He delivered a copy of the book to City of Atlanta Human Resources Commissioner Yvonne Yancy on November 19, 2014. Id. ¶¶ 66-68. Wan advised Yancy that a current firefighter had brought the book to his attention, and that he was concerned with both the book's sexual morality passages and Plaintiff's references to himself as AFRD Chief. Id. ¶¶ 68-69. Wan also told her that he was concerned employees who found the book offensive were going to protest at a fire foundation breakfast later that week. Id. ¶¶ 77-78.

Yancy read the book the next day. She was concerned that Plaintiff had not received City permission to write the book, despite referring to himself as Fire Chief. And she thought the content of the book could implicate Title VII and other local laws, specifically with regard to gender and sexual orientation discrimination. Id. ¶¶ 71-76. Yancy then took the book to Mayor Reed, who read it. He testified that he did not agree with—and was offended by—many of the comments that were insensitive to women and the LGBT and Jewish communities. Id. ¶¶ 79-82. Yancy eventually concluded that, based upon the beliefs espoused in the book and Plaintiff's connection of the book to his position,

a Title VII investigation would need to occur to determine if Plaintiff's views affected his departmental leadership. Id. ¶ 84. Mayor Reed instructed Yancy to investigate whether Plaintiff had received Board of Ethics approval and to forward her concerns to City Attorney Cathy Hampton. Pl.'s Resp. to Defs.' Stm't of Facts, Dkt. No. [144] ¶ 55.

On November 24, 2014, a meeting was held in Yancy's Office with Plaintiff, Yancy, Chief of Staff Candace Byrd, and Law Department representative Robert Godfrey present. Defs.' Resp. to Pl.'s Stm't of Facts, Dkt. No. [141] ¶ 87. Plaintiff was suspended for 30 days without pay, told the City would investigate the matter, and advised that he would need to attend sensitivity training. Id. ¶ 88. It is disputed, however, what Plaintiff was told regarding what he could say publicly regarding his suspension: the City contends it told him not to comment publicly at all, but Plaintiff contends he was only told not to conduct media interviews. Pl.'s Resp. to Defs.' Stm't of Facts, Dkt. No. [144] ¶¶ 61-62.

At the meeting, the City expressed concerns with the content of Plaintiff's book and that he had not complied with City policy to obtain permission from the Board of Ethics and Mayor about the book prior to writing and publishing it. Defs.' Resp. to Pl.'s Stm't of Facts, Dkt. No. [141] ¶¶ 89-95. Yancy recommended terminating Plaintiff, but Mayor Reed instead elected to impose a 30 day suspension. Pl.'s Resp. to Defs.' Stm't of Facts, Dkt. No. [144] ¶¶ 58-59.

In a statement issued November 24, 2014, Mayor Reed stated "I profoundly disagree with and am deeply disturbed by the sentiments expressed in

the paperback regarding the LGBT community," and "the material in Chief Cochran's book is not representative of my personal beliefs, and is inconsistent with the Administration's work to make Atlanta a more welcoming city for all of her citizens—regardless of their sexual orientation, gender, race and religious beliefs." Defs.' Resp. to Pl.'s Stm't of Facts, Dkt. No. [141] ¶¶ 98-100. Mayor Reed's Facebook page stated that "[t]he contents of the book do not reflect the views of Mayor Reed or the Administration." Facebook Post, Dkt. No. [107-8] at 2. City Councilmember Wan made a statement to the Atlanta Journal Constitution that "I respect each individual's right to have their own thoughts, beliefs and opinions, but when you're a city employee, and those thoughts, beliefs and opinions are different from the city's, you have to check them at the door." Defs.' Resp. to Pl.'s Stm't of Facts, Dkt. No. [141] ¶ 102. Shahar also invited Anti-Defamation League ("ADL") members to give their opinions about the book. Following a meeting with the City, the ADL sent Mayor Reed a letter that the statements in Plaintiff's book blatantly contradicted the City's non-discrimination policy. Id. ¶¶ 105-111.

During his suspension, Plaintiff interacted with many members of the public regarding his situation. Plaintiff exchanged emails with two members of the public in which he described his situation as a time of "spiritual warfare" and stated that he was "grateful for this divine opportunity to suffer this for Christ and rejoicing every day." Pl.'s Resp. to Defs.' Stm't of Facts, Dkt. No. [144] ¶¶ 63-64. Plaintiff also provided his testimony at the Georgia Baptist Convention's

("GBC") executive committee meeting, a group of 200 pastors. Id. ¶¶ 65-67. The GBC later: published a web-based editorial criticizing Plaintiff's suspension; created an online petition linked to a forum through which Plaintiff's book could be purchased; instituted a social media campaign to pressure the Mayor to reinstitute Plaintiff; and, posted Plaintiff's testimony to its website. Id. ¶ 67. It is undisputed that Plaintiff reviewed the proposed editorial prior to publishing, but it is disputed whether Plaintiff "coordinated" with the GBC or was merely generally aware of its actions. Id.

Another Christian fire chief from Virginia, Ed Elliot, also began a social media campaign that called on the Mayor to reinstitute Plaintiff. While it is disputed whether Plaintiff affirmatively enlisted his assistance, it is undisputed that Plaintiff did not deny his assistance. Cochran Dep., Dkt. No. [154] at 264:3-5, 268:23-269:5. Plaintiff also spoke at two churches that invited him during his suspension. Pl.'s Resp. to Defs.' Stm't of Facts, Dkt. No. [144] ¶ 69.

During Plaintiff's suspension, Mayor Reed received thousands of angry emails.[6] Pl.'s Resp. to Defs.' Stm't of Facts, Dkt. No. [144] ¶ 68. Mayor Reed also received phone calls to his home in which he was called a racial slur, the Anti-Christ, and a terrorist. Some calls even included death threats. Id. ¶ 70.

The City contends it initially intended to bring Cochran back to work after his suspension, assuming the Title VII investigation revealed that Plaintiff had

---

[6] The exact number is disputed. Mayor Reed testified that he "stopped counting" at 10,000 emails but also stated 17,000 people contacted him. Compare Reed Dep., Dkt. No. [130] at 136:20, with id. at 151:22.

not discriminated against anyone because of the views expressed in his book. Defs.' Resp. to Pl.'s Stm't of Facts, Dkt. No. [141] ¶¶ 112-16. The Title VII investigation by the Law Department concluded that "[n]o interviewed witness could point to a specific instance in which any member of the organization has been treated unfairly by Chief Cochran on the basis of his religious beliefs." Id. ¶ 118. But it also concluded that Plaintiff had not obtained the Board of Ethics's approval in violation of Section 2-280(d) of the City's Ethics Code. Pl.'s Resp. to Defs.' Stm't of Facts, Dkt. No. [144] ¶ 72. And that "[t]here . . . is general agreement the contents of the book have eroded trust and have compromised the ability of the chief to provide leadership in the future." Id. ¶ 73.

On January 6, 2015, the day Plaintiff's unpaid suspension ended, the City fired Plaintiff. Defs.' Resp. to Pl.'s Stm't of Facts, Dkt. No. [141] ¶ 129. Why is hotly disputed. Plaintiff contends he was fired because of the book's content. The City contends he was fired because (1) he did not comply with the Pre-Clearance Rules; and (2) he refused to comply with the directive not to comment publicly on his suspension, instead instituting a firestorm and "falsely perpetuating the narrative that [Plaintiff] was being punished for his religious beliefs, and encourag[ing] and facilitat[ing] a massive PR campaign against the Mayor personally." Id. ¶ 131.

Plaintiff subsequently filed suit against the City and Mayor Reed. Following the Court's rulings on Defendants' Motion to Dismiss, Plaintiff now asserts the following claims under 42 U.S.C. § 1983 against the City of Atlanta and Mayor

12

Reed for violation of his constitutional rights: First Amendment free speech and freedom of association retaliation; unlawful prior restraint and unbridled discretion in violation of the First Amendment; violation of the First Amendment right to the free exercise of religion and the no religious tests clause of article VI, cl. 3 of the Constitution; and, violation of the Fourteenth Amendment right to procedural due process. Defendants move for summary judgment on all of Plaintiff's claims, and Plaintiff moves for summary judgment on all of his claims except those grounded in the free exercise and freedom of association clauses of the First Amendment.

### 2. **Legal Standards**

Federal Rule of Civil Procedure 56 provides "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A factual dispute is genuine if the evidence would allow a reasonable jury to find for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if it is "a legal element of the claim under the applicable substantive law which might affect the outcome of the case." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (citing Anderson, 477 U.S. at 248).

The moving party bears the initial burden of showing the Court, by reference to materials in the record, that there is no genuine dispute as to any

material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). The moving party's burden is discharged merely by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support [an essential element of] the nonmoving party's case." Celotex Corp., 477 U.S. at 325. In determining whether the moving party has met this burden, the district court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. Johnson v. Clifton, 74 F.3d 1087, 1090 (11th Cir. 1996).

Once the moving party has adequately supported its motion, the non-movant then has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). There is no "genuine [dispute] for trial" "when the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Id. (citations omitted). All reasonable doubts, however, are resolved in the favor of the non-movant. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).

The same standard of review applies to cross-motions for summary judgment, but the Court must determine whether either of the parties deserves judgment as a matter of law on the undisputed facts. S. Pilot Ins. Co. v. CECS, Inc., 52 F. Supp. 3d 1240, 1242-43 (N.D. Ga. 2014) (citing Am. Bankers Ins. Grp. v. United States, 408 F.3d 1328, 1331 (11th Cir. 2005)). Each motion must be

considered "on its own merits, [with] all reasonable inferences [resolved] against the party whose motion is under consideration." Id. at 1243.

### 3. **Analysis**

Plaintiff has brought claims against Defendants under 42 U.S.C. § 1983 for violating his constitutional rights. To prevail in a Section 1983 civil rights action, "a plaintiff must make a prima facie showing of two elements: (1) that the act or omission deprived plaintiff of a right, privilege or immunity secured by the Constitution or laws of the United States, and (2) that the act or omission was done by a person acting under color of law." Marshall Cty. Bd. of Educ. v. Marshall Cty. Gas Dist., 992 F.2d 1171, 1174 (11th Cir. 1993) (quoting Bannum, Inc. v. City of Ft. Lauderdale, 901 F.2d 989, 996-97 (11th Cir. 1990)). It is undisputed Defendants were acting under color of law in regard to Plaintiff's claims. Thus, the Court must determine whether Defendants' conduct violated the Constitution.

Plaintiff has brought three First Amendment claims which ultimately go to his alleged speech-based firing: (1) free speech retaliation; (2) freedom of association retaliation; and (3) viewpoint discrimination. Plaintiff has also brought claims which contend that the City's Pre-Clearance Rules are unconstitutional because they are: (1) a prior restraint; (2) an exercise of unbridled discretion; and (3) a violation of the First Amendment free exercise of religion clause and the no religious tests clause of article VI, cl. 3 of the Constitution. Additionally, Plaintiff contends that Defendants fired him in

violation of the procedural due process clause of the Fourteenth Amendment. The Court will consider each claim in turn.

### a. Free Speech Retaliation

Plaintiff first claims the City terminated him in retaliation for exercising his First Amendment right to free speech. The City disagrees and argues that Plaintiff's claims fail because (1) the City's interest as an employer outweighed the Plaintiff's interest as a citizen; and (2) Plaintiff was not fired because of his book.

A public employer may not terminate a public employee in retaliation for speech protected by the First Amendment. Alves v. Bd. of Regents, 804 F.3d 1149, 1159 (11th Cir. 2015) (citing Bryson v. City of Waycross, 888 F.2d 1562, 1565 (11th Cir. 1989)). Although a citizen "must accept certain limitations on [her] freedom[s] upon entering government service, she does not relinquish the First Amendment rights [she] would otherwise enjoy as [a citizen] to comment on matters of public interest." Id. (alterations in original) (citation omitted). Therefore, the goal is to "arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the [City], as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968).

The Supreme Court employs a four-part test based on Pickering and its progeny to determine whether a public employee can prove retaliation in violation of the First Amendment. Cook v. Gwinnett Cty. Sch. Dist., 414 F.3d

1313, 1318 (11th Cir. 2005). "To prevail under this analysis, an employee must show that: (1) the speech involved a matter of public concern; (2) the employee's free speech interests outweighed the employer's interest in effective and efficient fulfillment of its responsibilities; and (3) the speech played a substantial part in the adverse employment action." Id. If the employee establishes the first three elements, the burden then shifts to the government to prove by a preponderance of the evidence it would have reached the same decision absent the protected speech. Leslie v. Hancock Cty. Bd. of Educ., 720 F.3d 1338, 1346 (11th Cir. 2013). "The first two steps are questions of law; the final two steps are 'questions of fact designed to determine whether the alleged adverse employment action was in retaliation for the protected speech.'" Cook, 414 F.3d at 1318 (quoting Anderson v. Burke Cty., 239 F.3d 1216, 1219–20 (11th Cir. 2001)).

The City does not oppose Plaintiff's contention that he spoke on a matter of public concern. See LR 7.1B, NDGa. Thus, the Court will only address the remaining, relevant Pickering factors.

### i. *Pickering* Balancing

Because it is admitted that Plaintiff's book addressed a matter of public concern, Pickering requires the Court to balance Plaintiff's First Amendment interests against the City's interest "in promoting the efficiency of the public services it performs through its employees." Pickering, 391 U.S. at 568; see also Garcetti v. Ceballos, 547 U.S. 410, 418 (2006) ("A government entity has broader discretion to restrict speech when it acts in its role as employer, but the

restrictions it imposes must be directed at speech that has some potential to affect the entity's operations."). The Supreme Court instructs that this is a decision to be made by the Court rather than a jury. <u>Cook</u>, 414 F.3d at 1318.

The district court's "pertinent considerations [include] whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." <u>Rankin v. McPherson</u>, 483 U.S. 378, 388 (1987) (citing <u>Pickering</u>, 391 U.S. at 570-73). "The government's legitimate interest in avoiding disruption does not require proof of actual disruption. Reasonable possibility of adverse harm is all that is required." <u>Moss v. City of Pembroke Pines</u>, 782 F.3d 613, 622 (11th Cir. 2015) (citing <u>Anderson</u>, 239 F.3d at 1220-21). And "the statement will not be considered in a vacuum; the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose." <u>Rankin</u>, 483 U.S. at 388.

Taking the facts most favorable to Plaintiff, the Court finds that the <u>Pickering</u> balance weighs in favor of the City. Although Plaintiff contends that the book was addressed to Christian men, the book was disseminated by a supervisor at the workplace—as opposed to completely off-campus—and was even distributed unsolicited to at least three individuals. At least one such employee felt the subject matter of the book was sufficiently concerning such that he gave

the book to the union President, and the union President then disseminated it more broadly to City officials.

The potential Title VII implications that Plaintiff's speech caused are also strong factors in the City's favor. The City was concerned that Plaintiff's book had exposed the City to hostile work environment liability if Plaintiff had treated subordinates differently based upon the views he had expressed in the book. Yancy Dep., Dkt. No. [129] at 68:2-20. In conducting a Title VII investigation, while the report revealed no actual evidence of discrimination, it was reported to Mayor Reed that firefighters throughout the organization were "appalled" by the book's sentiments and that the book "eroded trust" among the AFRD. Report, Dkt. No. [107-11] at 4-5. It is also reasonably possible that an employee would have used the book as purported evidence of discriminatory animus going forward, even if that employee did not suffer actual discrimination.

The Court also finds that Plaintiff's status as the Fire Chief—and thus the head of a safety agency—also favors the City. Because Plaintiff expressed his opinion that the death of all individuals who engage in homosexual and extramarital sex would be celebrated,[7] it was not unreasonable for the City to fear

---

[7] Plaintiff argues that because he also contends that "all have sinned" and all "need a Savior," Plaintiff's specific assertion was not a condemnation of homosexuals. See Dkt. No. [143] at 14 n.4. But the Court finds that even taking the facts most favorable to Plaintiff, it is uncontroverted that Plaintiff states those who engage in homosexual and extramarital sex—like those who engage in pederasty and bestiality, among others—are unclean and their deaths will be celebrated, regardless of whether others may also need a Savior for redemption. See Dkt. No. [106-3] at 20, 22-23.

public erosion of trust in the Fire Department. See Grutzmacher v. Howard Cty., 851 F.3d 332, 346 (4th Cir. 2017) ("[T]he expressive activities of a highly placed supervisory . . . employee will be more disruptive to the operation of the workplace than similar activity by a low level employee with little authority or discretion."). The Court could foresee individuals who might contend their fire department response time was not sufficient because of their sexual orientation or otherwise, regardless of the veracity of that claim. See Lumpkin v. Brown, 109 F.3d 1498, 1500 (9th Cir. 1997) (holding a minister's termination from his role as a San Francisco Human Rights Commission member did not violate the First Amendment as by condemning homosexuality as a sin, his statements were "at war" with his mission to eliminate prejudice against the LGBT community, among others).

Nor was it unreasonable to fear that Plaintiff's employees—who are required to risk their lives daily—would be unwilling or unable to rely on Plaintiff's leadership given his views about them. As the Eleventh Circuit has acknowledged, there is "a heightened need for order, loyalty, and harmony in a quasi-military organization such as a police or fire department." Moss, 782 F.3d at 621 (citing Anderson, 239 F.3d at 1222); see also Grutzmacher, 851 F.3d at 345 ("'[F]ire companies have a strong interest in the promotion of camaraderie and efficiency' as well as 'internal harmony [and] trust,' and therefore we accord 'substantial weight' to a fire department's interest in limiting dissension and discord." (quoting Goldstein v. Chestnut Ridge Volunteer Fire Co., 218 F.3d 337,

355 (4th Cir. 2000))). As the City's Law Department reported to Mayor Reed, there was "general agreement the contents of [Cochran's] book ha[d] eroded trust and ha[d] compromised [his] ability . . . to provide leadership in the future." Report, Dkt. No. [107-11] at 5.[8] And it is not unreasonable to think that it would have been difficult to recruit LGBT individuals going forward, contrary to the City's inclusive mission. See Garcetti, 547 U.S. at 419 ("Public employees, moreover, often occupy trusted positions in society. When they speak out, they can express views that contravene governmental policies or impair the proper performance of governmental functions."); Snipes v. Volusia Cty., ____ F. App'x ____, 2017 WL 3588273, at *4 (11th Cir. Aug. 21, 2017) (per curiam) (affirming the County's firing of a law enforcement officer who had made several racially insensitive comments on his Facebook page and in group text messages because "if the County had not terminated Snipes it was reasonably possible that there would have been substantial protests and rallies in the community, that the Beach Patrol's ability to recruit new members from the African-American community would have been hindered, and that the public's confidence in the

---

[8] Plaintiff summarily argues that this statement is inadmissible hearsay, which the Court cannot consider on summary judgment. See Pl. Opp. Br., Dkt. No. [143] at 12-13 n.2. However, the Court finds that the City is not using this statement for the truth of the matter, but rather to show what Mayor Reed was told about the level of disruption at the time he made his firing decision. See Fed. R. Evid. 801(c)(2). Because the Court finds the statement is not being offered for the truth of the matter, and Pickering balancing would support the City even in the absence of such evidence, the Court declines to decide at this time whether the report is non-hearsay under another exception, such as Federal Rule of Evidence 803(8).

Beach Patrol—and perhaps all County law enforcement—would have been adversely affected.").

The Court also finds that the actual disruption in this matter, and the context in which it arose, support the City's firing decision. Plaintiff's book was brought to the City's attention in late 2014 when LGBT rights, and specifically gay marriage, were hotly debated in anticipation of the Supreme Court's consideration of Obergefell v. Hodges, 576 U.S. ____, 135 S. Ct. 2584 (2015).[9] It is undisputed that Plaintiff "accepted support" of a social media campaign aimed at reversing his suspension which led to Mayor Reed receiving thousands of emails, both for and against Plaintiff's suspension. Pl.'s Resp. to Defs.' Stm't of Facts, Dkt. No. [144] ¶ 68. Mayor Reed also received phone calls to his home in which he was called a racial slur, the Anti-Christ, and a terrorist. Some calls even included death threats. Id. ¶ 70.

In balancing all of the Pickering factors, Plaintiff's speech caused such an actual and possible disruption that it does not warrant First Amendment protection in the workplace, based upon Supreme Court and Eleventh Circuit

---

[9] Plaintiff argued at the hearing that because the book existed in the workplace for 10-11 months without incident, the City cannot claim the book caused a disruption. However, because Plaintiff's speech was within a book whose content must be read and disseminated—as opposed to a widely publicized medium, such as a press conference, in which thousands of people would hear the speech at publication time—the Court cannot find as a matter of law the subject matter of the book was non-disruptive merely because there was a time period in which no reaction occurred. It is uncontroverted that once the book was publicized, it produced a disruption. The Court does not find that divisive speech is non-disruptive merely because it was not initially widely distributed.

precedent. See Moss, 782 F.3d at 618 (stating that if a plaintiff cannot survive the first two Pickering factors, the speech does not warrant First Amendment protection). "As a private citizen, [Plaintiff] is perfectly free to preach vigorously and robustly that homosexuality is a sin. But he did not enjoy that same unrestrained freedom while he occupied the important and prestigious office of a [Fire Chief]." Lumpkin, 109 F.3d at 1501. Plaintiff was also not entitled to exercise his free speech rights in the workplace when there is a "[r]easonable possibility of adverse harm." Moss, 782 F.3d at 622. The City's Motion for Summary Judgment is **GRANTED** and Plaintiff's Motion for Summary Judgment is **DENIED** as to Plaintiff's First Amendment Free Speech Retaliation claim.

### b. Freedom of Association Retaliation

The City next moves for summary judgment on Plaintiff's freedom of association claim. Plaintiff contends that the City retaliated against him for associating with his church when it fired him. "As with [his] free speech claim, the law is clearly established that public employees have a First Amendment right to engage in associative activity without retaliation." Cook, 414 F.3d at 1320. "In analyzing free association claims in this context, we do not apply the public concern portion of the Pickering analysis. We do, however, apply the Pickering balancing test." Id. (internal citation omitted).

For the reasons stated above with respect to Plaintiff's free speech retaliation claim, Plaintiff's interest in associating with his church through this

publication was outweighed by the City's countervailing interests. See Pickering, 391 U.S. at 568. The City's Motion for Summary Judgment is **GRANTED** and Plaintiff's Motion for Summary Judgment is **DENIED** as to Plaintiff's First Amendment Freedom of Association Retaliation claim.

### c. Viewpoint Discrimination

Plaintiff and the City move for summary judgment on Plaintiff's viewpoint discrimination claim. Plaintiff argues that he was terminated because the City disagreed with his book's contents, and that the City must satisfy strict scrutiny for its conduct in firing and suspending him due to his book's content. Pl.'s MSJ, Dkt. No. [139] at 32 ("In this case, Defendant consistently repudiated the beliefs expressed in Chief Cochran's book and predicated his suspension and termination upon its substantive disagreement with the book's contents."). In support of this argument, Plaintiff has cited cases which involve *private speech on public land* (where courts conduct a forum analysis) or *generally applicable laws that discriminate based on content.* See Reed v. Town of Gilbert, Ariz., 576 U.S. ____, 135 S. Ct. 2218, 2226 (2015) ("Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."); Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 829 (1995) ("These principles provide the framework forbidding the State to exercise viewpoint discrimination, even when the *limited public forum* is one of its own creation." (emphasis added)); Lamb's Chapel v.

<u>Ctr. Moriches Union Free Sch. Dist.</u>, 508 U.S. 384, 391 (1993) (conducting a forum analysis to find that the school district could not prevent a religious film from being played on its property because the property had "repeatedly been used by a wide variety of private organizations," among others).

In advance of the hearing, the Court asked the parties to address whether Plaintiff can mount a separate viewpoint discrimination claim apart from his First Amendment retaliation claim.[10] The Court noted that Plaintiff's approach appeared to be problematic in that the Eleventh Circuit has made clear that if Plaintiff cannot prove the first two <u>Pickering</u> factors, then the speech is *not protected by the First Amendment* and any firing based on that speech would accordingly be constitutional. <u>Moss</u>, 782 F.3d at 618 ("The court's resolution [of the first two prongs of the <u>Pickering</u> analysis] determines whether Plaintiff's speech is protected by the First Amendment." (citing <u>Battle</u>, 468 F.3d at 760)). Therefore, the Court had the parties address whether it would be incongruent for a city to be allowed to fire an employee because of his unprotected speech, but yet be subject to a viewpoint discrimination claim for that same firing.

---

[10] The City had contended in its briefing that: (1) Cochran was not fired for his beliefs but his non-compliance with City policies, among others; and (2) the City is entitled to express its own social views under the government speech framework of <u>Walker v. Texas Division, Sons of Confederate Veterans, Inc.</u>, 576 U.S. ____, 135 S. Ct. 2239 (2015). <u>Id.</u> at 2245 ("When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says."). But <u>Walker</u> and its progeny do not appear to apply here as this case does not involve literal government speech (for example, license plates and park monuments) but rather employee firings, which are governed by <u>Pickering</u>.

At the hearing, Plaintiff again contended that a viewpoint discrimination claim would be viable separate and apart from his First Amendment retaliation claim. But again, Plaintiff cited forum cases—that is, cases in which a private person seeks to speak on government property—as opposed to cases in which a former governmental employee was able to mount a separate viewpoint discrimination claim based upon his or her speech-based firing, as Plaintiff contends here. See Cook, 414 F.3d at 1321 (conducting a forum analysis to determine if the school district's refusal to distribute the plaintiff's union food drive flyer in employee paycheck envelopes and its internal mail system (i.e., a non-public forum) constituted viewpoint discrimination under the equal protection clause); Tucker v. State of Cal. Dep't of Educ., 97 F.3d 1204, 1213 (9th Cir. 1996) ("The interior walls of the offices of the Child Nutrition and Food Distribution Division are neither a public forum, nor a limited purpose public forum.").

In response, the City argued that a viewpoint discrimination claim could not be mounted separately in the government firing context. In support, the City cited Berry v. Department of Social Services, 447 F.3d 642 (9th Cir. 2006), and Knight v. Connecticut Department of Public Health, 275 F.3d 156 (2d Cir. 2001), arguing that when faced with similar circumstances, the Ninth and Second Circuits applied Pickering in lieu of strict scrutiny because of the government's interest as an employer in such situations. See Berry, 447 F.3d at 651-52 (holding that plaintiff's viewpoint discrimination claim, which was based on defendant's

26

refusal to allow him to display his Bible or a "Happy Birthday Jesus" sign in his office, was subject to <u>Pickering</u> balancing and that "[d]isplaying the Bible implicitly endorses a religious message and it is precisely that message which the Department reasonably seeks to avoid."); <u>Knight</u>, 275 F.3d at 166-67 (holding that for the plaintiffs' hybrid claims—or claims in which the plaintiffs contended more than one of their constitutional rights was violated—<u>Pickering</u> balancing would still apply instead of strict scrutiny "due to the state's significant interest in regulating the expressive conduct of its employees while they are acting on behalf of the state").

The Court finds that <u>Pickering</u> is the appropriate test to assess Plaintiff's viewpoint discrimination claim. This balancing appropriately acknowledges the City's unique position as an employer in its firing decision, and it appropriately balances the employee's interest with that of the employer. See <u>Waters v. Churchill</u>, 511 U.S. 661, 674 (1994) ("[C]onstitutional review of government employment decisions must rest on different principles than review of speech restraints imposed by the government as sovereign."). A contrary finding would defy not only the Supreme Court's precedent but also common sense. For example, if a public employer could constitutionally fire an employee for using racial slurs in the workplace under <u>Pickering</u>, under Plaintiff's reasoning, that employee could later prevail in a viewpoint discrimination claim by showing that the public employer did not fire employees who promoted racial equality. In other words, the Supreme Court has established the test to evaluate a city's firing

*of an employee* based on speech—<u>Pickering</u>—and that test is the most appropriate for any of Plaintiff's claims based upon his alleged speech-based firing.

Thus, because the Court finds that <u>Pickering</u> applies, the City's Motion for Summary Judgment is **GRANTED** and Plaintiff's Motion for Summary Judgment is **DENIED** as to Plaintiff's First Amendment Viewpoint Discrimination claim, for the reasons stated above.

### d. Challenges to the City's Pre-Clearance Policies

The City also moves for summary judgment on all of Plaintiff's challenges to its Pre-Clearance Rules,[11] and Plaintiff has moved for summary judgment on all of his challenges to the Pre-Clearance Rules except those grounded in the freedom of association and free exercise of religion clauses.

In relevant part, Section 2-820(d) states:

> [D]epartment heads . . . shall not engage in any private employment or render any services for private interests for remuneration, regardless of whether such employment or service is compatible with or adverse to the proper discharge of the official duties of such employee. However, the employees named in this paragraph may engage in private employment or render services for private interests only upon obtaining prior written approval from the board of ethics in accordance with this paragraph. The board of ethics shall review

---

[11] Plaintiff argues that there is an "unwritten rule" that he was required to obtain Mayor Reed's permission before publishing the book, but it appears this requirement is codified at Section 114-437(a). <u>Id.</u> ("No employee shall perform outside employment without having first filed a written request with such employee's department head for permission to engage in outside employment. Such request shall state the type and duration of employment, the hours of work, the name and business address of the prospective employer and the location of the place at which such employee shall be engaged in outside employment.").

28

each request individually and provide written approval or disapproval of the notification within 30 days. All requests for approval of outside employment shall state the type and place of employment, the hours of work, and the employer's name and address. City employment shall remain the first priority of the employee, and if at any time the outside employment interferes with city job requirements or performance, the official or employee shall be required to modify the conditions of the outside employment or terminate either the outside employment or the city employment. *This paragraph shall not apply to single speaking engagements or to participation in conferences or on professional panels; provided, however, that any expense reimbursements received for such engagements must be reported in accordance with section 2-815.*

Dkt. No. [106-1] at 152 (emphasis added). Further, Section 114-436 states:

Outside employment shall constitute any paid employment of an employee which is in addition to such employee's employment with the city. As related to one's employment with the city, outside employment shall only be allowed under the following conditions:

(1) Such employment shall not interfere with or affect the performance of the employee's duties.

(2) Such employment shall not involve a conflict of interest or a conflict with the employee's duties.

(3) Such employment shall not involve the performance of duties which the employee should perform as part of such employee's employment with the city.

(4) Such employment shall not occur during the employee's regular or assigned working hours, unless the employee is on either annual leave, compensatory leave or leave without pay.

(5) No employee engaging in outside employment shall work at such outside employment for a longer period of time than that stated in the employee's request for permission to engage in such employment.

(6) Such employment shall be conditioned upon the employee's being relieved immediately for the return to and performance of the

29

duties of such employee's employment with the city, if such employee should be called for emergency service.

(7) Such employment shall not involve the use of records or equipment of the city. Police uniforms shall not be considered equipment in the meaning of this subsection.

And Section 114-437 further sets out the Outside Employment procedure:

(a) No employee shall perform outside employment without having first filed a written request with such employee's department head for permission to engage in outside employment. Such request shall state the type and duration of employment, the hours of work, the name and business address of the prospective employer and the location of the place at which such employee shall be engaged in outside employment.

(b) The department head shall have the right to deny the request or approve the request, provided that such employment is in compliance with section 114-436.

(c) The finance/executive committee of the city council shall be notified when outside employment has been approved for employees whose appointments are subject to city council confirmation. Such notification shall be accompanied by a copy of the written request required by subsection (a) above.

The Court will address Plaintiff's challenges to the Pre-Clearance Rules in the following order: (1) prior restraint; (2) unbridled discretion; and (3) free exercise and no religious test claims.

i. <u>Prior Restraint</u>

The parties first move for summary judgment on Plaintiff's contention that the Pre-Clearance Rules constitute an unconstitutional prior restraint on speech. The parties disagree, however, on the standard the Court should use in evaluating this claim. The parties do agree that "Congress may impose restraints on the job-

related speech of public employees that would be plainly unconstitutional if applied to the public at large." United States v. Nat'l Treasury Emps. Union, 513 U.S. 454, 465 (1995) [hereinafter NTEU]. Because the Court finds NTEU squarely applies to this case and should be used as the standard for evaluating the constitutionality of the Pre-Clearance Rules, a brief discussion of that case is necessary.

In NTEU, the Supreme Court was required to determine the constitutionality of an honoraria ban that Congress had implemented to prevent any federal employee from receiving compensation for "an appearance, speech or article (including a series of appearances, speeches, or articles if the subject matter is directly related to the individual's official duties or the payment is made because of the individual's status with the Government)." Id. at 459-60. Two unions and several career civil servants sued, contending the ban violated the First Amendment as an unconstitutional prior restraint. Id. at 461.

The Supreme Court first set out the test it would use in evaluating such claims: "[w]hen a court is required to determine the validity of such a restraint, it must 'arrive at a balance between the interests of the [employee], of a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" Id. at 466 (quoting Pickering, 391 U.S. at 568). The Supreme Court further clarified that when courts review a ban that "chills potential speech before it happens," as opposed to a post-hoc review of an "adverse action taken in

response to actual speech," "[t]he **Government** must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government." NTEU, 513 U.S. at 468 (emphasis added) (quoting Pickering, 391 U.S. at 571); see also City of San Diego v. Roe, 543 U.S. 77, 80 (2004) ("[T]he Court has held that when government employees speak or write on their own time on topics unrelated to their employment, the speech can have First Amendment protection, absent some governmental justification 'far stronger than mere speculation' in regulating it." (quoting NTEU, 513 U.S. at 465, 475)).[12]

Applying that test, the Supreme Court held the honoraria ban unconstitutional. The Supreme Court first held that because the ban was an outright ban on all outside compensation, it was neither viewpoint- nor content-based. But by denying compensation to all outside publications, the honoraria ban induced the employees to curtail their speech if they wished to maintain their employment. NTEU, 513 U.S. at 468-69. The Supreme Court noted that the actual ban as implemented imposed a "far more significant burden" than

---

[12] It appears the only time the Eleventh Circuit has considered what test to use in this context, it affirmed—in an unpublished opinion—the district court's use of the NTEU test. Davis v. Phenix City, 296 F. App'x 759, 761 (11th Cir. 2008) (per curiam) ("We find no error in the district court's application of the principles announced in [NTEU], in concluding that the regulations did not constitute a prior restraint based on the jury's determination that a firefighter who had noticed the chain of command could address elected officials directly without obtaining permission.").

necessary when the ban was motivated to curtail a "small group of lawmakers whose past receipt of honoraria motivated its enactment." Id. at 469. There, the Government did not cite any evidence of misconduct related to the rank-and-file employees, but rather relied on "limited evidence of actual or apparent impropriety by legislators and high-level executives, together with the purported administrative costs of avoiding or detecting lower level employees' violations of established policies." Id. at 472.

> Congress reasonably could assume that payments of honoraria to judges or high-ranking officials in the Executive Branch might generate a similar appearance of improper influence. Congress could not, however, reasonably extend that assumption to all federal employees below grade GS–16, an immense class of workers with negligible power to confer favors on those who might pay to hear them speak or to read their articles. A federal employee, such as a supervisor of mechanics at the Mint, might impair efficiency and morale by using political criteria to judge the performance of his or her staff. But one can envision scant harm, or appearance of harm, resulting from the same employee's accepting pay to lecture on the Quaker religion or to write dance reviews.

Id. at 473.

The Supreme Court also noted that the regulations excluded a variety of performances and writings which would not appear to have a nexus to federal employment, such as "sermons, fictional writings, and athletic competitions." Id. at 476. The Court found that these exclusions actually diminished the credibility of the Government's rationale that "paying lower level employees for speech entirely unrelated to their work jeopardizes the efficiency of the entire federal service." Id.

At the hearing in this case, the City contended that <u>NTEU</u> is not the appropriate test because while <u>NTEU</u> involved honoraria for speeches—and thus burdened speech—the City's Pre-Clearance Rules deal with outside employment—which does not directly burden speech. This is a bit confusing, because in its briefing, the City stated it was applying the "*Pickering/NTEU* test," and thus it appears this contention was accordingly waived. Defs.' MSJ, Dkt. No. [105-1] at 23. But even turning to the substance of that argument, the Court finds that the Pre-Clearance Rules are appropriately analyzed under <u>NTEU</u> as, like <u>NTEU</u>, the Pre-Clearance Rules prevent Plaintiff from speaking or writing for money. <u>See</u> <u>NTEU</u>, 513 U.S. at 459-60 (assessing the constitutionality of an honoraria ban, which was defined to include the "payment of money or any thing of value for an appearance, speech or article," and thus by its terms involved outside employment).[13] In other words, that the City uses the term outside

---

[13] The City also argued at the hearing that the Pre-Clearance Rules are not a prior restraint (as opposed arguing that they are not an *unconstitutional* prior restraint), and frankly the Court does not understand that argument. It appears the City contends that the Pre-Clearance Rules are merely advisory—meaning, they just require that the employee give notice to the employer that the outside employment is occurring. But even taking the facts most favorable to the City, that argument is implausible. The Pre-Clearance Rules themselves state that the supervisor will "approve" or "deny" the outside employment, which by its very nature means that the speech can be limited by the supervisor's decision. <u>See</u> Atlanta, Ga. Code of Ordinances §§ 114-436, 114--437; <u>see also</u> <u>id.</u> § 2-820(d) ("City employment shall remain the first priority of the employee, and if at any time the outside employment interferes with city job requirements or performance, the official or employee *shall be required to modify the conditions of the outside employment or terminate either the outside employment or the city employment.*" (emphasis added)). By their very terms, the Pre-Clearance Rules require pre-clearance, and the City contends it fired Plaintiff because it did

employment in lieu of honoraria is mere semantics—both include speech outside the workplace for money.[14] And Section 2-280, by excluding individual speeches from its provisions, implicitly applies to multiple *speaking* engagements. The Pre-Clearance Rules clearly affect speech.

Applying NTEU, the Court will now balance the interests of prospective speakers and their audiences in commenting on public matters against the City's interests in promoting efficiency. NTEU, 513 U.S. at 466 ("When a court is required to determine the validity of such a restraint, it must 'arrive at a balance between the interests of the [employee], of a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'"(quoting Pickering, 391 U.S. at 568)).

---

not seek this pre-clearance. See Neb. Press Ass'n v. Stuart, 427 U.S. 539, 588 (1976) (defining a prior restraint as rules which place "previous restraints upon publication"). The City has also not submitted any evidence that the Rules have been enforced in an advisory fashion. Thus, the Pre-Clearance Rules are a prior restraint.

[14] The Court also finds that, whether the challenge is as applied or facial, the NTEU test applies equally, and the Court is required to balance the interest of all potential speakers in his position generally against that of the government. See Sanjour v. E.P.A., 56 F.3d 85, 93 (D.C. Cir. 1995) (holding that in the NTEU context, the facial and as applied distinction is blurred by the very nature of the test which requires the court "look beyond the particular facts" of the plaintiff's case but not "so far as to include every possible application of the challenged scheme," as in NTEU, the Supreme Court declined to consider the interests relevant to senior executive officials as they were not similarly situated to the low-level employees who filed that case).

### 1. *Prospective Speaker and Audience's Interests*

The interest of Plaintiff and all other prospective speakers under this policy is the ability to engage in any private employment—including speaking or writing on any subject—without prior approval by the City. The City diminishes this interest by contending that the Pre-Clearance Rules do not "specifically target[] expressive activities, let alone protected public speech." Dkt. No. [105-1] at 26. It contends that "[e]mployees remain free to speak, write, or otherwise express whatever they choose without seeking approval pursuant to these provisions so long as they do not receive compensation for doing so." Id. But the Supreme Court has already rejected this argument. In NTEU, the Supreme Court stated that the ability to work for free did not somehow limit the plaintiffs' interest because it still curtailed their incentive for expression. 513 U.S. at 469 ("By denying respondents that incentive, the honoraria ban induces them to curtail their expression if they wish to continue working for the Government.").

Under NTEU, the Court must also weigh not only interests of "present and future employees in a broad range of present and future expression" but also the interests of "potential audiences." Id. at 468. "This interest is manifestly great; as numerous courts and commentators have observed, government employees are in a position to offer the public unique insights into the workings of government generally and their areas of specialization in particular." Sanjour, 56 F.3d at 94. Thus, the Court finds this interest weighs heavily.

## 2. *Government's Interest*

In applying the NTEU balancing test, the Court must also identify the government's efficiency interest in its Pre-Clearance Rules. The City contends its Pre-Clearance Rules "allow the City to ensure that its employees do not have conflicts of interest or otherwise engage in outside activities that could improperly influence or interfere with their official City duties (or even appear to)." Dkt. No. [105-1] at 24. Other than this conclusory statement, the City provides no support for its Pre-Clearance Rules. The City thus fails with respect to its burden because it has not even attempted to produce any evidence for the Court to weigh in evaluating its side of the equation outside of the policy's stated purpose (which does not include any specific factual findings).[15] See NTEU, 513 U.S. at 475 ("[W]hen the Government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply posit the existence of the disease sought to be cured. It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way."). Unlike in NTEU, where the government relied on various studies and legislative findings to support its ban and it was still held unconstitutional, the City here has provided absolutely no

---

[15] The City was specifically asked to support its burden at the hearing. In response, the City contended the policy did not burden speech because it applied broadly to outside employment. That position is squarely foreclosed by NTEU. See supra.

evidence to support the necessity of this ban, and this Court cannot speculate on what evidence the City could have brought forward.

In lieu of presenting evidence which supports its contention that the Rules are necessary to prevent outside employment conflicts of interest, the City points the Court to other courts that have upheld similar bans. See Gibson v. Office of the Att'y Gen., 561 F.3d 920, 927 (9th Cir. 2009) (upholding the California Office of Attorney General's policy that employees obtain permission prior to engaging in the private practice of law); Wolfe v. Barnhart, 446 F.3d 1096, 1106 (10th Cir. 2006) ("The importance of the government's interest in avoiding impropriety or the appearance thereof among its employees is well established."); Williams v. IRS, 919 F.2d 745, 745-47 (D.C. Cir. 1990) (upholding the IRS's private employment approval bar which prevented an IRS attorney from acting a class-counsel in a private class action lawsuit pre-NTEU).

But those cases cannot save the City. In Wolfe, the Tenth Circuit noted that while the Supreme Court had struck down the honoraria ban in NTEU because the government had not substantiated an actual risk of harm caused by the receipt of honoraria, that concern was not present in Wolfe because the provision was tailored to preventing only compensation for expressive activity which "relates to the employee's official duties." 446 F. 3d at 1106. Like NTEU, the City's ban bars all outside employment without regard to its relation to the employee's official employment. See Atlanta, Ga. Code of Ordinances § 2-280(d).

And in <u>Gibson</u>, the outside employment ban was limited to the private practice of law—plainly necessary to rule out conflicts of interest with its client—and was limited to law practice; all other outside employment was permissible. 561 F.3d at 927-28. <u>Williams</u> is similarly distinguishable because, beyond the fact it arose pre-<u>NTEU</u>, D.C. Circuit held that the plaintiff did not have a First Amendment right to act as counsel for others while working for the government, while it is plain that this bar would prevent speech. Essentially, then, the Court is left with mere assertions by the City that there is a wrong to be cured. But the Supreme Court has said that is not enough. The City's interest as presented is thus relatively weak.

### 3. Balancing

The Court finds that the balance weighs in the potential speaker and audience's favor. In conducting <u>NTEU</u> balancing, "courts must consider whether the challenged statute or regulation is tailored to address the harm that the government allegedly aims to protect." <u>Sanjour</u>, 56 F.3d at 97; <u>see</u> <u>id.</u> ("[T]his [tailoring] requirement appears close to the heart of the Supreme Court's decision in <u>NTEU</u>."). The Court finds that these Pre-Clearance Rules are not properly tailored in light of Defendants' stated rationale that the policy's aim is to prevent conflicts of interest.

First, the Pre-Clearance Rules are underinclusive. Pursuant to Section 2-820(d), high-level employees are not required to obtain permission to engage in single speaking engagements or to participate in conferences or professional

panels. This exception renders the policy underinclusive, because it is entirely plausible that a one-time speaking engagement could create more of a conflict for the City than full-time employment. For instance, under the plain text of Section 2-820(d), it would be permissible for a high-level employee to speak in return for compensation at a different potential governmental contractor without Board of Ethics approval every week, so long as the income was later reported.

And the Rules are also overinclusive. Section 2-280(d) applies to all outside employment even if it is plainly untethered from the employee's job. This policy would prevent an employee from writing and selling a book on golf or badminton on his own time and, without prior approval, would subject him to firing. It is unclear to the Court how such an outside employment would ever affect the City's ability to function, and the City provides no evidence to justify it.

When comparing the potential speaker and audience's interests against the City's failure to proffer any evidence to support its poorly tailored Pre-Clearance Rules, the Court finds that the <u>NTEU</u> balancing weighs in Plaintiff's favor. The potential for stifled speech far outweighs an unsupported assertion of harm. The Court thus **GRANTS** Plaintiff's Motion for Summary Judgment on its Prior Restraint challenge to the City's Pre-Clearance Rules, and **DENIES** Defendants' Motion on the same ground.

## ii. <u>Unbridled Discretion</u>

Plaintiff additionally claims that the Pre-Clearance Policies are unconstitutional as content-based restrictions in that they grant unbridled

discretion to the City to approve or deny outside employment requests. "The infirmity flowing from 'unbridled discretion' is that it allows the government official to reject or limit [] application[s] based on improper content based considerations." Bloedorn v. Grube, 631 F.3d 1218, 1236 (11th Cir. 2011) (citing Thomas v. Chicago Park Dist., 534 U.S. 316, 323 (2002)).

To determine unbridled discretion, the Eleventh Circuit first instructs courts to look to the "purpose behind the regulation." Id. at 1236 (quoting Cooper v. Dillon, 403 F.3d 1208, 1215 (11th Cir. 2005)). "And, '[a]s a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based.'" Id., 631 F.3d at 1236 (quoting Cooper, 403 F.3d at 1215). "To avoid unbridled discretion, the permit requirements should contain narrowly drawn, reasonable, and definite standards to guide the official's decision." Id. at 1236 (citing Burk v. Augusta–Richmond Cty., 365 F.3d 1247, 1256 (11th Cir. 2004)). The Eleventh Circuit also considers the actual manner in which the policy is employed by the city, not just the text. Id. at 1237 (citing Forsyth Cty. v. Nationalist Movement, 505 U.S. 123, 131 (1992) for the proposition that "in evaluating a claim of 'unbridled discretion,' [ ] 'we must consider the [government's] authoritative constructions of the ordinance, including its own implementation and interpretation of it'").

Here, the City has set out its Pre-Clearance Rules in Sections 2-820(d) and 114-436 to 114-437. As set out in Section 2-802, the City's purpose in enacting those rules is as follows:

41

It is the purpose of this division to promote the objective of protecting the integrity of the government of the city by prohibiting any official or employee from engaging in any business, employment or transactions, from rendering services or from having contractual, financial, or personal interests, direct or indirect, which are in conflict with or which would create the justifiable impression in the public of conflict with the proper discharge of the official or employee's official duties or the best interest of the city or which would tend to impair independence or objectivity of judgment or action in the performance of official duties. It is also the purpose of this division to require disclosure of the assets and income of elected officials and certain employees so that the public may review actual and potential conflicts of interest. Finally, it is the purpose of this division to provide for an orderly and fair process for raising and addressing ethical questions and for disciplining those officials and employees and other persons who violate these standards of conduct.

Atlanta, Ga. Code of Ordinances § 2-802. In other words, its stated purpose is to eliminate any actual or appearance of impropriety. See id.

As an initial matter, Section 2-820(d)—the provision that requires Plaintiff to seek pre-approval from the Board of Ethics—does not define any standards for the Board to apply. The above purpose is not specifically referenced as the guidepost that the Board should use in making its decision. This ultimately could result in inconsistent results and does not provide the Board any standards to use in defining what a "conflict" would be, assuming the purpose is the relevant standard.

But even if the Court were to import the standards from Sections 114-436 and 114-437, many of these provisions do not set out objective standards for the supervisor to employ. For instance, the provisions state that the employment "shall not interfere with or affect the performance of the employee's duties," and

"shall not involve a conflict of interest or a conflict with the employee's duties," but it does not set out what constitutes such an interference or conflict. This does not pass constitutional muster.

Taking the facts most favorable to Defendant, the Court finds that the City's Pre-Clearance Rules invite unbridled discretion. Thus, the Court **GRANTS** Plaintiff's Motion for Summary Judgment on its Unbridled Discretion challenge to the City's Pre-Clearance Rules, and **DENIES** the City's Motion on the same ground.

iii.  Free Exercise

Plaintiff contends that by disciplining Plaintiff pursuant to the Pre-Clearance Rules, Defendants violated his right to freely exercise his religion because the City targeted his expression of sincerely held religious beliefs regarding marriage and sexuality. Defendants move for summary judgment on this claim, arguing that the Pre-Clearance Rules in question are neutral and generally applicable and thus do not impermissibly burden his beliefs.[16]

---

[16] At the hearing, Plaintiff contended for the first time that his Free Exercise of Religion claim was a contention that Mayor Reed and his staff established an unwritten religious test for the Fire Chief position, as distinct from their decision under Pre-Clearance Rules. This contention is not fairly raised in Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment—where Plaintiff argued that the *Pre-Clearance Rules* were neither neutral nor generally applicable. See Dkt. No. [143] at 38-42. Thus, to the extent Plaintiff intends to make such a claim, the Court finds it was waived as Defendants did not have fair notice that Plaintiff intended to raise such a claim. See Compl., Dkt. No. [1] at 35-38 (couching Plaintiff's free exercise claim as a challenge to Defendant's pre-clearance rules and that such rules constituted an impermissible religious test).

The free exercise clause of the First Amendment provides that "Congress shall make no law respecting an establishment of religion, or *prohibiting the free exercise thereof.*" U.S. Const. amend I (emphasis added). "In addressing the constitutional protection for free exercise of religion, our cases establish the general proposition that a law that is *neutral* and of *general applicability* need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 531 (1993) [hereinafter Lukumi] (emphasis added).

"To determine the object of a law, we must begin with its text, for the minimum requirement of neutrality is that a law not discriminate on its face. A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernable from the language or context." Id. at 533. But facial neutrality does not end the inquiry; equally barred by the Free Exercise Clause is masked governmental hostility. Id. at 534. To that end, "[t]he Court must survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders." Id. (quoting Walz v. Tax Comm'n of N.Y. City, 397 U.S. 664, 696 (1970) (Harlan, J., concurring)).

The Supreme Court has also stated that in determining the provision's object, courts may draw on an equal protection analysis to determine discriminatory intent. Lukumi, 508 U.S. at 540. Direct and circumstantial evidence can inform the City's object in creating the Pre-Clearance Rules. Id.

"Relevant evidence includes, among other things, the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." Id. at 540 (citing Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 266 (1977)).

The court must also determine if the law is of general applicability. "[A] law is generally applicable if it does not 'in a selective manner impose burdens only on conduct motivated by religious belief.'" Eternal Word TV Network, Inc. v. Sec'y of U.S. Dep't of Health & Human Servs., 818 F.3d 1122, 1164 (11th Cir. 2016) (quoting Lukumi, 508 U.S. at 543).

If a law is neutral and generally applicable, it must satisfy only rational basis scrutiny—that is, the plaintiff must show "that there is not a legitimate government interest or that the law is not rationally related to protect that interest." Eternal Word TV Network, Inc, 818 F.3d at 1164 (quoting GeorgiaCarry.Org, Inc. v. Georgia, 687 F.3d 1244, 1255 n.21 (11th Cir.2012)). But if not, the law must satisfy strict scrutiny in that it must be "justified by a compelling governmental interest and must be narrowly tailored to advance that interest." Eternal Word TV Network, Inc., 818 F.3d at 1164 (quoting Lukumi, 508 U.S. at 531-32).

The Court finds that the Pre-Clearance Rules are neutral and generally applicable. They apply to all employees and all outside employment. The Rules do

not address religion and were not passed because of religious motivations. Rather, the Rules' purpose is to prevent conflicts of interest and the appearance of impropriety, which is a legitimate government interest the Rules are designed to prevent.

Plaintiff additionally argues that the Pre-Clearance Rules set out a "religious test" in violation of the Constitution. See Torcaso v. Watkins, 367 U.S. 488, 494 (1961) (stating that "limiting public offices to persons who have . . . a belief in some particular kind of religious concept" is a "historically and constitutionally discredited policy"); see also U.S. Const. art. VI, cl. 3 ("[N]o religious Test shall ever be required as a Qualification to any Office or public Trust under the United States."). But this argument misses the mark. As stated above, the Pre-Clearance Rules are generally applicable. Plaintiff is not required to maintain a specific religion in order to receive permission for outside employment. The City's Motion for Summary Judgment is **GRANTED** and Plaintiff's Motion for Summary Judgment is **DENIED** as to Plaintiff's First Amendment free exercise claim.

### e. Procedural Due Process

The parties additionally move for summary judgment on Plaintiff's procedural due process claim. Plaintiff claims the City and Mayor Reed in his individual capacity violated his right to procedural due process by suspending and terminating him without providing him advance notice of an adverse employment action or giving him a meaningful opportunity to respond, as

required by City Ordinances. See Atlanta, Ga. Code of Ordinances §§ 114-528; id. § 2-820. Defendants in return argue that Plaintiff was not entitled to any procedure because under the City's Charter—regardless of what the City Code states—he was an at-will public employee with no property interest protected by the due process clause.

The Fourteenth Amendment protects against the government's deprivation of liberty or property without procedural due process. Bd. of Regents v. Roth, 408 U.S. 564, 569 (1972). "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire . . . [or] unilateral expectation of it." Id. at 577. Rather, property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Id.

Under Georgia law, "a public employee has a property interest in employment when that employee can be fired only for cause." Wilson v. City of Sardis, 590 S.E.2d 383, 385 (Ga. Ct. App. 2003); see also Warren v. Crawford, 927 F.2d 559, 562 (11th Cir. 1991) (applying Georgia law). However, absent "a contractual or statutory 'for cause' requirement," the employee may be terminated at any time, for any reason. Wilson, 590 S.E.2d at 385.

47

Plaintiff contends that he has a property interest in his employment because City Ordinance Section 114-528[17] provides that no employee may be terminated or otherwise adversely affected except for cause. Notably, the definition of "employee" in Section 114-76, which applies to Section 114-528, is broadly defined and includes "any person holding a position or employment with the city."

Defendants argue that notwithstanding those provisions, the City Charter provides that Plaintiff's position is at will. City of Atlanta Charter, §§ 3-305(a), -301(c) (stating the Fire Chief, as the department head, "may be removed at the pleasure of the Mayor"). And given a conflict between the Charter and the Code, the Charter controls under Georgia law. See O.C.G.A. § 36-35-3(a) (stating that cities "shall have legislative power to adopt clearly reasonable ordinances, resolutions, or regulations relating to its property, affairs, and local government for which no provision has been made by general law and which are not inconsistent with the Constitution or any charter provision applicable thereto.");

---

[17] Section 114-528 states in relevant part,

> No employee shall be dismissed from employment or otherwise adversely affected as to compensation or employment status except for cause. However, this shall not apply to employees dismissed or otherwise adversely affected due to curtailment of funds or reduction in staff or reorganization or demoted during a probationary period such that the employee is returned to the position held immediately prior to promotion when such action is in accordance with article IV of this chapter.

Atlanta, Ga. Code of Ordinances § 114-528.

48

City of Buchanan v. Pope, 476 S.E.2d 53, 56 (Ga. Ct. App. 1996) ("Pope's contention that the police department manual creates permanent tenure in a position upon good behavior is in direct conflict with the term of office provided by the City's charter, and the charter must prevail."); see also Waters v. Buckner, 699 F. Supp. 900, 903 (N.D. Ga. 1988), aff'd, 889 F.2d 274 (11th Cir. 1989) ("City ordinances which are inconsistent with a city charter are void.").

Defendant is correct under Georgia law. Because the Charter plainly states that a department head may be removed with or without cause, Plaintiff does not have a property interest in his employment. Plaintiff therefore cannot mount a procedural due process claim. Defendants' Motion is **GRANTED** and Plaintiff's Motion is **DENIED** on Plaintiff's procedural due process claim.

### 4. Conclusion

Defendants City of Atlanta, Georgia and Mayor Kasim Reed's Motion for Summary Judgment [105] is **GRANTED** as to Plaintiff's claims of First Amendment free speech retaliation; First Amendment freedom of association retaliation; viewpoint discrimination; violation of the First Amendment right to the free exercise of religion and the no religious tests clause of article VI, cl. 3 of the Constitution; and, violation of Fourteenth Amendment procedural due process but **DENIED** as to Plaintiff's First Amendment prior restraint and unbridled discretion claims.

Plaintiff's Motion for Partial Summary Judgment [107] is **DENIED** as to Plaintiff's claims of First Amendment free speech retaliation; First Amendment

freedom of association retaliation; viewpoint discrimination; violation of the First Amendment right to the free exercise of religion and the No Religious Tests clause of Article VI, ¶ 3 of the Constitution; and, violation of Fourteenth Amendment procedural due process claims and **GRANTED** as to Plaintiff's First Amendment prior restraint and unbridled discretion claims.

The parties are **DIRECTED** to file a Pre-Trial Order within 30 days of this Order. This Pre-Trial Order should clearly present the issues the parties contend remain given this Order.

**IT IS SO ORDERED** this 20th day of December, 2017.

_____
**Leigh Martin May**
**United States District Judge**